# EXHIBIT 1



faegredrinker.com

**Michael R. MacPhail**
**Partner**
michael.macphail@faegredrinker.com
+1 303 607 3692 direct

**Faegre Drinker Biddle & Reath LLP**
1144 15th Street, Suite 3400
Denver, Colorado 80202
+1 303 607 3500 main
+1 303 607 3600 fax

June 20, 2024

**VIA E-MAIL**

Richards, Layton & Finger, P.A.
Attn: Matthew D. Perri, Esq.
920 North King Street
Wilmington, DE 19801

   *Re: TMTG Securities Transfer Issues and Related Interpleader Lawsuit*

Dear Mr. Perri:

  This firm represents Odyssey Transfer and Trust Co. ("Odyssey"), the transfer and escrow agent for Trump Media & Technology Group Corp. ("TMTG"). We are writing to inform you of our client's position regarding certain TMTG securities as to which your client, ARC Global Investments II, LLC ("ARC"), is the owner of record. ██████████████████████ ██████████

  We have learned that there is an ownership dispute concerning a total of 716,140 Class A TMTG shares and 25,000 TMTG warrants ("Disputed Securities") as to which Michael Melkerson, an apparent ARC member/shareholder, has asserted a claim to current ownership. Mr. Melkerson has represented that he intends to file, or has filed, a related lawsuit against Odyssey and ARC in Florida state court (Miami, Dade County). ████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ *See* Attachment A. Accordingly, Odyssey is faced with competing claims to the Disputed Securities and is unable to determine their lawful owner and/or who may be entitled and authorized to give instructions regarding the disposition or transfer of same.

  To protect our client's interests, we have filed a lawsuit on its behalf in the U.S. District Court for the District of Delaware naming ARC and Mr. Melkerson as interpleader defendants and TMTG as a nominal defendant. In that lawsuit, Odyssey will ask the Court to resolve the ownership dispute and, among other things, discharge Odyssey and award it attorney's fees, stay the Florida lawsuit, and authorize Odyssey to continue to hold, and refrain from transferring, the Disputed Securities, pending further proceedings.

Matthew D. Perri, Esq.                    - 2 -                    June 20, 2024
.


     Please be advised that Odyssey stands willing and able to honor ARC's requests for specified transfers of the Undisputed Securities that comply with the conditions set forth in § 8-401 of the Uniform Commercial Code and other state and federal laws (including securities laws), and that otherwise are in "good order," in compliance with Odyssey's internal processes and any applicable court orders, including without limitation any "status quo" orders, seller's representation letters, opinions of counsel, medallion guarantees, lockup agreements, etc. However, pending further proceedings, Odyssey is unwilling to honor requests for transfer of any of the Disputed Securities.

     We note that we are aware of the potential for other competing claims that may require interpleading additional parties.  Odyssey reserves all of its rights and remedies.


Sincerely,

Michael R. MacPhail


MRM/jmt
Attachment

DMS_US.364645337.1

ATTACHMENT A



# EXHIBIT 2

## IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. _____

MICHAEL J. MELKERSEN, an individual

      Plaintiff,

v.

ARC GLOBAL INVESTMENTS II, LLC,
a Delaware Corporation,

-and-

PATRICK ORLANDO, an individual,

-and-

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,
f/k/a DIGITAL WORLD ACQUISITION CORP.,
A Delaware Corporation,

-and-

ODYSSEY TRANSFER AND TRUST COMPANY,
A Minnesota Corporation,

      Defendants.

_____/

## **VERIFIED COMPLAINT**

Plaintiff Michael J. Melkersen ("Plaintiff" or "Melkersen"), *pro se*, sues Defendants ARC Global Investments II, LLC ("ARC"), Patrick Orlando ("Orlando"), Trump Media & Technology Group Corp., f/k/a Digital World Acquisition Corp. ("TMTG") and Odyssey Transfer and Trust Company ("Odyssey") (collectively referred to as "Defendants"), and alleges the following:

## **INTRODUCTION**

1.    Digital World Acquisition Corp. ("DWAC") is a special purpose acquisition company ("SPAC") that merged with Trump Media & Technology Group Corp. ("TMTG") on March 25, 2024.[1] TMTG is the surviving entity post-merger with DWAC. The term TMTG as used herein shall be used inclusively to include the surviving post-merger entity Trump Media & Technology Group Corp. as well as DWAC. TMTG is responsible for all DWAC liabilities that existed prior to March 25, 2024, or that are based on DWAC acts or omissions that occurred prior to March 25, 2024. The term DWAC when used herein shall mean Digital World Acquisition Corp. prior to the closing of its business combination with TMTG on March 25, 2024.

2.    ARC served as DWAC's sponsor, and Orlando, in turn, served as ARC's manager.

3.    Odyssey Transfer and Trust Company ("Odyssey") serves as the share-transfer and escrow agent for certain shares of TMTG common stock.

4.    In 2023, Plaintiff purchased LLC membership interests in ARC from ARC and Orlando, which granted Plaintiff an agreed-upon number of DWAC shares to be delivered to Plaintiff after consummation of the merger in the form of TMTG shares.

5.    Separately, between July 2022 and March 2023—at a time when ARC and DWAC were having liquidity issues—Plaintiff injected much needed capital into ARC by providing it with three significantly sized loans. In consideration for those loans, ARC executed three convertible promissory notes, which, among other things: (1) granted Plaintiff a security interest in a specified number of DWAC securities, and (2) provided Plaintiff with the option of converting any unpaid

---

[1] The merger occurred by and through DWAC's subsidiary with TMTG, and upon consummation of the closing of the business combination, DWAC amended its charger and changed its name to TMTG as the surviving entity post-merger.

principal on his loans to additional DWAC securities after consummation of DWAC's merger with TMTG.

6.      After the merger, Plaintiff exercised his option and converted all unpaid principal due under those promissory notes to additional DWAC securities.

7.      Plaintiff has made demand upon Defendants that they register the shares belonging to him in his name (or for ARC/Orlando to direct DWAC/TMTG to do so as ARC is entitled to do under the DWAC/TMTG Merger Agreement and Registration Rights Agreement to which ARC is a party), notify the transfer agent Odyssey Transfer and Trust Company ("Odyssey") of Plaintiff's ownership interests to cause Odyssey to properly create the needed account and ledger on its books and records to facilitate the issuance and transfer process, and otherwise cause the transfer all of Plaintiff's shares to him. Notwithstanding Defendants' contractual obligations to do so, Defendants have failed to abide by the terms of their prior agreements, have failed or otherwise refused to register the shares belonging to Plaintiff into Plaintiff's name (or otherwise failing to direct TMTG/DWAC to do so), failed to notify Odyssey of Plaintiff's share ownership or to request that Odyssey create the necessary account and ledger recognizing Plaintiff's shares, and otherwise failed to deliver the at-issue securities to Plaintiff, which necessitated the filing of this lawsuit.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff Michael Melkersen is an individual domiciled and residing in Puerto Rico.

9.      Defendant ARC Global Investments LLC is a Delaware limited liability company with its principal place of business at 78 SW 7th Street, Miami, Florida.

10.     Defendant Patrick Orlando is an individual domiciled and residing in Miami-Dade County, Florida.

11.     Defendant Digital World Acquisition Corp. is a Delaware corporation with its principal place of business in Florida.

12.     Defendant Trump Media and Technology Group is a Delaware corporation with its principal place of business in Florida.

13.     Venue is proper in Miami-Dade County, Florida because the MIPA (as herein defined) contains a forum selection clause, which states that "[t]he jurisdiction for any legal action with respect to this Agreement shall be exclusively vested in, and the Parties hereby submit to the jurisdiction of, the state and federal courts located in Miami-Dade County, Florida." Venue is also appropriate with this Court because the Defendants regularly conduct and solicit business in Miami-Dade County and some of the wrongful acts at issue were committed in Miami-Dade County.

14.     All conditions precedent for filing and maintaining this action have been performed, waived, or excused.

## BACKGROUND

A.      **DWAC's Formation and Merger with Trump Media & Technology Group**

15.     DWAC was formed on December 11, 2020, for the purpose of effecting a merger or similar business combination following its initial public offering ("IPO").

4

16.      SPACs are publicly traded companies created for the sole purpose of acquiring an existing target company.

17.      After a SPAC completes its IPO, the SPAC uses the initial capital it raised to acquire a target company.

18.      Absent receiving an extension, SPACs are typically required to complete a business combination with a target company within a specified timeframe, usually 18 to 24 months.  If a business combination fails to occur by that time, the SPAC is forced to liquidate and return unused funds to its shareholders.

19.      SPACs are formed by "sponsors," who provide capital to cover the SPAC's initial expenses.  In exchange for this capital, sponsors receive an approximate 20% interest in the SPAC via Class B shares—which are typically referred to as "founder shares"—with the remaining 80% interest in the SPAC being held by the public in the form Class A shares.

20.      ARC was DWAC's sponsor.  As its sponsor, ARC received approximately 19% of the interest in DWAC, primarily in the form of Class B shares.

21.      At the time that DWAC made its initial public filings with the SEC in May 2021, ARC was listed as DWAC's sponsor and Orlando was listed as ARC's managing member.  From at least May 2021 through the present, Orlando served as ARC's managing member.

22.      On October 20, 2021, DWAC entered into a merger agreement with DWAC Merger Sub Inc., and TMTG. ARC executed that merger agreement as representative of the stockholders of DWAC and was defined as a "Party" to that agreement. Shareholders of DWAC securities (automatically converting to TMTG securities at the closing of the business combination), or persons entitled to such securities, including Melkersen, were and are intended third-party beneficiaries of the merger agreement, or should otherwise be entitled to rely upon the recognition

5

by ARC, DWAC and TMTG, as set out in the merger agreement, that failure to transfer securities as required by the merger agreement would result in irreparable harm.

23.     Specifically, the merger agreement contains the following clause, "Each Party acknowledges that the rights of each Party to consummate the transactions contemplated hereby are unique, recognizes and affirms that in the event of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Parties may have not adequate remedy at law, and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by an applicable Party in accordance with their specific terms or were otherwise breached. Accordingly, each Party shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement and to seek to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such Party may be entitled under this Agreement, at law or in equity."

**B.      Melkersen's Investment in DWAC Through ARC**

24.     Melkersen made several investments with ARC, entitling him to DWAC shares.

25.     First, on August 2, 2021, Melkersen signed a subscription agreement (the "Subscription Agreement") with ARC in which he purchased $100,000.00 of ARC's limited liability company interests (the "LLC Interests"). *See* Subscription Agreement dated August 2, 2021, attached hereto as **Exhibit 1.**

26.     As specified in the Subscription Agreement, Melkersen's purchase of LLC Interests entitled him to 25,000 shares of Class B common stock (or "Founder Shares") of DWAC. *See* Ex. 1 at 1.

27.     Under the terms of the Subscription Agreement, although the DWAC shares were allocated to Melkersen, ARC retained possession of the shares, as well as voting rights of those shares "until the consummation of the Business Combination, following which time the Company [ARC] will distribute such securities to [Melkersen] . . . ." *Id.*

28.     In 2022, DWAC's planned merger with TMTG hit numerous roadblocks, including delays causes by separate investigations by the Securities and Exchange Commission ("SEC") and United States Department of Justice ("DOJ").

29.     As a result of those delays, DWAC needed additional liquidity to fund ongoing operations.

30.     During this time, Orlando contacted Melkersen to solicit additional funds. Specifically, Orlando asked Melkersen to loan funds to ARC, which ARC would, in turn, utilize to pay for DWAC's ongoing expenses.

31.     On July 14, 2022, Melkersen agreed to loan ARC $250,000.00.  In exchange, ARC issued a convertible promissory note to Melkersen in which ARC promised to repay Melkersen the amount loaned (the "First Convertible Promissory Note").  *See* Convertible Promissory Note dated July 14, 2022, attached hereto as **Exhibit 2.**

32.     The First Convertible Promissory Note granted Melkersen a security interest in and to 50,000 shares of DWAC, consisting of 25,000 Class A shares and 25,000 Class B shares, which shares ARC represented and warranted were "unencumbered" other than being subject to "applicable lock-up periods." Ex. 2, § 1.

33.     The First Convertible Promissory Note also provided that "[w]ithin five (5) days after the business combination closing, [Melkersen] may elect to convert the full principal amount

into a package of securities of Digital World Acquisition Corp. ('SPAC') held by [ARC]." *Id.*, §
3.

34.     On July 18, 2022, Melkersen agreed to loan ARC an additional $50,000.00.  In
exchange, ARC issued a second convertible promissory note to Melkersen in which ARC promised
to repay Melkersen the amount loaned (the "Second Convertible Promissory Note").  *See*
Convertible Promissory Note dated July 18, 2022, attached hereto as **Exhibit 3.**

35.     The Second Convertible Promissory Note granted Melkersen a security interest in
and to 10,000 shares of DWAC, consisting of 5,000 Class A shares and 5,000 Class B shares,
which ARC again represented and warranted it owned "unencumbered" other than being subject
to "applicable lock-up periods."  Ex. 3, § 1.

36.     Like the First Convertible Promissory Note, the Second Convertible Promissory
Note also granted Melkersen the option to convert any unpaid principal into DWAC securities
within five days after the business combination between DWAC and TMTG.  *Id.*, § 3.

37.     In 2023, with the merger still delayed, DWAC required access to additional capital.

38.     Once again, Orlando solicited funds from Melkersen, and once again, Melkersen
obliged.

39.     On March 16, 2023, Melkersen entered into a Membership Interest Purchase
Agreement between him, as the "Buyer," and ARC and Orlando, as the "Seller" (the "MIPA").
*See* Membership Interest Purchase Agreement, dated March 16, 2023, attached hereto as **Exhibit
4.**

40.     The MIPA provides, in pertinent part, that Melkersen would purchase $350,000.00
of additional LLC Interests from ARC and Orlando.  Those LLC Interests equated to 500,000

DWAC shares, consisting of 250,000 Class A shares and 250,000 Class B shares, which were defined in the Agreement as the "Offered Units." Ex. 4, Recitals; *id.* at § 1.1.

41.    ARC and Orlando represented and warranted that they had the "complete legal right, power, and authority to transfer and deliver all the Offered Units free of any liens or encumbrances whatsoever." *Id.* § 2.1(b).

42.    The MIPA further provided that Melkersen had the "right to require the transfer agent [Odyssey] post-closing of the DWAC business combination to transfer to Buyer the DWAC shares as more particularly described herein [the Offered Units,]" which rights "survive[d] the consummation of the transactions contemplated hereby on the date hereof." *Id.* § 4.1.

43.    Similarly, the MIPA provided that, upon its execution, "Seller and Buyer shall execute and deliver such other documents and take such other action as shall be reasonably requested by any other party hereto to carry out the transactions contemplated by this Agreement." *Id.* § 6.1.

44.    The MIPA contained further assurances from the Seller [ARC and Orlando] that they would "not seek to amend or modify the ARCII Operating Agreements, or take any action under such Operating Agreements, that would materially and adversely impact [Melkersen's] rights under this Agreement." *Id.* § 6.1.

45.    As additional consideration for entry of the MIPA, Melkersen agreed to loan DWAC an additional $250,000.00. *Id.* § 1.2.

46.    In exchange for the additional $250,000.00 loan, on March 21, 2023, ARC issued a third convertible promissory note to Melkersen in which ARC promised to repay Melkersen the

amount loaned (the "Third Convertible Promissory Note"). *See* Convertible Promissory Note dated March 21, 2023, attached hereto as **Exhibit 5.**[2]

47.     The Third Convertible Promissory Note granted Melkersen a security interest in and to 25,000 Class A shares of DWAC and 25,000 warrants.. Ex. 5, § 1. ARC represented and warranted it owned the rights to the shares and warrants unencumbered. *Id.*

48.     The Third Convertible Promissory Note, like the prior two notes, granted Melkersen the option to convert the full principal amount of the loan into DWAC shares and/or warrants "[w]ithin five (5) days after the business combination closing [as between DWAC and TMTG] . . . ." *Id.*, § 3.

49.     On March 13, 2024, Melkersen recorded his security interest in the shares identified in the Promissory Notes, as well as the 500,000 DWAC shares purchased by way of the MIPA, with the Delaware Department of State. *See* UCC Financing Statements, dated March 13, 2024, attached hereto as Composite **Exhibit 6.**

**C.     DWAC Merges With TMTG and Melkersen Exercises His Conversion Rights**

50.     On March 22, 2024, DWAC shareholders voted to complete its merger with TMTG.

51.     On March 25, 2024, DWAC's merger with TMTG closed.

52.     As a result of the merger, DWAC Merger Sub Inc., a wholly owned subsidiary of DWAC, was merged into and became part of TMTG, with TMTG being the surviving company post-merger.

53.     ARC has not repaid any portion of the loans, and the Promissory Notes remain unpaid.

---

[2] The First Convertible Promissory Note, the Second Convertible Promissory Note, and Third Convertible Promissory Note shall be collectively referred to as the "Promissory Notes."

54.     On March 22, 2024, after DWAC voted to approve the TMTG merger but before the merger closed, Melkersen wrote to Orlando and ARC advising that he would be exercising his option under the Promissory Notes to convert the unpaid principal to DWAC securities in the manner specified in the Promissory Notes.

55.     On March 27, 2024, having not heard from ARC or Orlando, Melkersen provided formal notice that he was exercising his right to convert the unpaid principal due under the Promissory Notes into DWAC securities.  *See* Correspondence from Melkersen to Orlando and ARC, dated March 27, 2024, attached hereto as **Exhibit 7.**

56.     In that correspondence, Melkersen also advised ARC and Orlando that the terms of the MIPA required ARC and Orlando to convey the 500,000 shares of DWAC—consisting of 250,000 Class A shares and 250,000 Class B shares—to Melkersen.  *Id.*  In doing so, Melkersen complied with the notice requirements of the MIPA and sent copies of the correspondence to both ARC and its designated legal counsel by certified mail, return receipt requested.

57.     As Melkersen advised ARC and Orlando, between Melkersen's initial 2021 investment in LLC Interests, Melkersen's conversion of the sums owed under the Promissory Notes to DWAC shares, and the shares conveyed by way of the MIPA, Melkersen was entitled to a total of 610,000 shares of DWAC stock, namely, 305,000 Class A shares, 305,000 Class B shares, and 25,000 warrants.  *Id.* (These figures exclude additional shares Melkersen is entitled to as to all Class B shares in which Melkersen maintains an interests by an increase in those shares by a factor of 1.348 and such additional amount as determined in the True-Up Litigation discussed hereinafter).

58.     Per DWAC's Amended and Restated Certificate of Incorporation (the "DWAC Charter"), upon the consummation of the merger with TMTG, all Class B shares automatically

convert to Class A shares, but Class B shares are not converted to Class A shares on a one-to-one ratio. Rather, Class B shares are converted in accordance with a formula set forth in DWAC's Charter.

59.    At present, DWAC/TMTG and ARC are involved in pending litigation (the "True-Up Litigation") regarding the correct conversion ratio at which Class B shares will convert to Class A shares. DWAC has calculated the conversion ratio as 1.348:1, while ARC has calculated a higher conversion ratio. On information and belief, ARC calculates the ratio as 1.81:1.

60.    DWAC/TMTG has paid over these additional shares to ARC at the 1.348:1 ratio, which are held by Odyssey, and has escrowed with Odyssey additional shares calculated as the difference between the 1.348:1 ratio and a 2.0:1 ratio, all pending the outcome of the litigation between ARC and DWAC/TMTG in Delaware. Upon information and belief, two escrow accounts exist – one for those whose rights to B-shares derive from ARC membership interests, and one for others whose rights to B-shares derive from sources other than ARC membership interests. Given that Melkersen holds an ARC membership interest as well as converted promissory notes, Melkersen maintains rights in and two the escrowed shares in both escrow accounts held by Odyssey.

61.    Accordingly, pursuant to the agreements described above, Melkersen is entitled to, at a minimum, the 305,000 TMTG Class A shares derived from DWAC Class B shares owed to him under the MIPA and the Promissory Notes increased to 411,140 TMTG shares (305,000 x 1.348), along with the 305,000 TMTG Class A shares derived from DWAC Class A shares owed to Melkersen under the terms of the MIPA and the Promissory Notes, for a combined total of 716,140 shares owed to Melkersen by ARC and/or Orlando (Orlando is personally on the hook for the obligations under the MIPA). Melkersen is also owed by ARC the additional 25,000 warrants

under the terms of Promissory Note#3. Additionally, Melkersen will be owed such additional amount of TMTG Class A shares derived from DWAC Class B shares beyond 1.348:1 ratio, as determined by the outcome of the True-Up Litigation.

62.    Upon closing of the business combination which occurred March 25, 2024, all DWAC shares, including A Shares and B Shares, automatically converted into A Shares of TMTG on a 1:1 basis, except that the DWAC B Shares that automatically converted to TMTG A Shares remain subject to certain lockup provisions that restrict resale that follow those shares.

63.    The DWAC warrants automatically converted to TMTG warrants on a 1:1 basis at the closing of the business combination on March 25, 2024.  Beginning March 26, 2024, TMTG A shares that have been registered and are sellable on the public markets are traded under the ticker symbol DJT on the Nasdaq Stock Exchange ("Nasdaq"), and the TMTG warrants that have been registered and are sellable on the public markets are traded under the ticker symbol DJTWW on the Nasdaq.

64.    A single warrant entitles the holder of the warrant to exercise the option to purchase a single TMTG A share at $11.50 per share, but such warrants also maintain their own stand-alone value and, therefore, are regularly traded on the Nasdaq without the need to exercise the underlying option to purchase TMTG A shares at the $11.50 strike price.

65.    Melkersen demanded that ARC and Orlando provide instructions to DWAC's transfer agent responsible for registering shares, Odyssey Transfer and Trust Company ("Odyssey"), to register Melkersen's allotted shares in his name, and transfer those shares to Melkersen's personal brokerage account.  *See* Ex. 7.

66.    Melkersen also made demand on DWAC and TMTG that they honor Melkersen's agreements with ARC, given that DWAC benefitted from the money provided by Melkersen

pursuant to those agreements (the money Melkersen provided was either passed along to DWAC by ARC or provided directly by Melkersen to DWAC with ARC's consent) and given that TMTG benefitted by merging with DWAC that would not have occurred, but for Melkersen providing desperately needed funds at a time it was questionable whether DWAC could survive. Specifically, Melkersen requested that DWAC and TMTG: (a) direct Odyssey that Melkersen was the beneficial owner of the shares and warrants described herein; and (b) list Melkersen in the S1 registration statement to be filed with the SEC to recognize Melkersen, rather than ARC or Orlando, as the rightful owner of the shares described herein.

67.    DWAC and TMTG failed to direct Odyssey to recognize on its books and records that Melkersen was the rightful owner of the shares described herein despite the fact that there is no dispute that Melkersen is the rightful owner of those securities and despite the fact that both DWAC and TMTG had notice of Melkersen's correct ownership interest, as described herein, before providing the official written list to Odyssey identifying the owners of the unregistered securities.

68.    DWAC and TMTG also failed to list Melkersen as the rightful owner and registrant of the shares described herein, in either the S1 filed on April 15, 2024, or the amended S1 filed on June 10, 2024.   Instead, DWAC and TMTG included a footnote (footnote#18 in the most-recent amended S1 filed on June 10, 2024), indicating, "Mr. Melkersen claims beneficial ownership to 411,140 Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants through separate contractual agreements with ARC, which are not reflected in his beneficial ownership information for the reasons stated above."

69.    On April 14, 2024, TMTG provided a copy of its draft S1 for comment from those claiming ownership of the shares to be registered (to the extent that the party claiming ownership

14

responded to agree to confidentiality until the S1 was filed/made public, after which time the draft was provided). Melkersen requested and received the draft S1 and promptly and in writing advised TMTG that the draft registration statement was incorrect because it failed to list Melkersen as the true owner of the at-issue 411,140 Founder Shares, 305,000 shares of Common Stock and 25,000 Warrants, and instead, relegated Melkersen to a footnote indicating that Melkersen "claimed" such ownership. TMTG made this decision despite benefitting from the money paid by Melkersen for such shares and despite knowing such ownership claims by Melkersen were true, given that Melkersen had previously provided DWAC/TMTG copies of his agreements with ARC and Orlando entitling Melkersen to the at-issue shares, which occurred well prior to the filing by DWAC/TMTG of the S1 registration statements on April 15, 2024.

70.    For unknown reasons, DWAC/TMTG repeated this same mistake, by failing once again to identify Melkersen as the true owner/registration of the at-issue 411,140 Founder Shares, 305,000 shares of Common Stock and 25,000 Warrants, when DWAC/TMTG filed its amended S1 on June 10, 2024.

71.    In preparing to file its S1 on April 15, 2024, DWAC/TMTG distributed a form to each of known owner of the DWAC/TMTG unregistered securities and requested that each person or entity to complete the form to identify their specific ownership interests to facilitate the inclusion of that information in the S1. Melkersen timely completed that form as requested and returned it to DWAC/TMTG as instructed. In that completed form, Melkersen identified, *inter alia*, the 411,140 Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants described in foothote#18 of the S1 that he was supposed to have received from ARC and/or Orlando and requested that DWAC/TMTG recognize Melkersen as the true owner of those

15

securities and list Melkersen as the sole and proper owner of those securities in the S1 to ensure that such securities were registered Melkersen's name as the rightful owner of those shares.

72.    On information and belief, ARC and/or Orlando similarly completed the requested DWAC/TMTG form and returned it to DWAC/TMTG prior to the April 15, 2024, S1 filing, but ARC and/or Orlando failed to identify Melkersen as the proper owner and registrant of the 411,140 Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants referenced above. Instead, on information and belief, ARC and/or Orlando falsely claimed that ARC was the owner of such securities and that ARC was entitled to registration of those securities.

73.    Melkersen maintains other DWAC securities (which automatically converted to TMTG securities at the closing of the business combination), which are not issue in this lawsuit, that were purchased or otherwise acquired from DWAC or one of its affiliates, which include TMTG A shares derived from DWAC A shares issued directly by DWAC and convertible notes exercisable on similar conversion terms to the Promissory Notes at-issue in this case, as well as TMTG warrants derived from DWAC warrants.  Unlike ARC, DWAC/TMTG properly and promptly identified Melkersen as the owner of such DWAC securities (now automatically converted into TMTG securities) in communications and directives sent to Odyssey on or about March 25, 2024, the date of the closing of the business combination, which is the expected and reasonable time for such actions to occur.  This has caused Odyssey to open accounts in Melkersen's name and to identify these securities not at-issue in the current lawsuit as being owned by Mekersen in the official Odyssey share list/register.

74.    To their further credit, DWAC/TMTG timely took steps to include these shares in its S1 registration statement that was filed with the SEC to register the Melkersen's shares that are not at-issue in this lawsuit, to enable those shares to be sellable on the open market.  ARC has

16

failed to take either of these steps, or to otherwise request Odyssey or DWAC/TMTG do so, with respect to the securities Melkersen is entitled to that are at-issue in the current lawsuit (411,140 Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants referenced in footnote#18 of the S1 filed by DWAC/TMTG on June 10, 2024).

75.     On information and belief, ARC has not paid and has otherwise been unable to pay its debts as they become due, including, on information and belief, at least 46 other noteholders (not counting the Melkersen Promissory Notes), which lenders, on information and belief, have collectively loaned ARC over $3 million dollars.

76.     On information and belief, ARC has minimal cash-on-hand or other liquidity to enable it to pay any money judgment that might be entered in Melkersen's favor if money damages were being sought in this action (they are not at this time other than payment of reasonable attorneys' fees and costs – Melkersen is an attorney), rather than the remedy of legal title, registration and transfer of the securities to which Melkersen is entitled and is seeking in this lawsuit.

77.     The stock price of DJT and DJTWW has been volatile since the closing of the business combination, making time of the essence to get the securities to which Melkersen is entitled from ARC registered and transferred to Melkersen to allow such securities to be traded on the public market and to permit Melkersen to attempt to mitigate any further harm that the actions and inactions of ARC/Orlando have caused and will continue to cause. DJT shares last closed at a price of $31.31 per share on June 18, 2024, and DJTWW last closed at a price of $20.64 per warrant on June 18, 2024. Given as much, the securities to which Melkersen is entitled from ARC/Orlando that are at-issue in this lawsuit (not counting the additional shares Melkersen is entitled to above 1.1348:1 in the True-Up Litigation), which have been wrongfully withheld from Melkersen, if

tradeable on the public market and registered in his name and transferred to Melkersen as required by his agreements, have a value of $22,938,343 ((305,000 TMTG A-Shares derived from DWAC A-Shares + 411,140 TMTG A-Shares derived from DWAC B-Shares) * $31.31/share) + 25,000 Warrants * 20.64), based on the June 18, 2024, closing prices.

78.    Because Melkersen is entitled to the specific securities described herein, the acts and inactions by ARC/Orlando in depriving Melkersen of his property has caused, is causing and will continue to cause Melkersen irreparable harm.  Irreparable harm further exists, and a money judgment would be an inadequate remedy (except with respect to Melkersen's attorneys' fees and costs sought herein), because of the nature of the at-issue shares, the peculiarity of the rights accompanying such shares (i.e. rights to additional shares in the True-Up Litigation), the difficulty of measuring damage given the volatility of the price, and because, on information and belief, it is doubtful that ARC/Orlando have the liquidity or resources to satisfy any money judgment if one were sought in lieu of recovery of the securities to which Melkersen is contractually entitled and in which he maintains a perfected security interest.   Moreover, the merger agreement, to which Melkersen is a third-party beneficiary, specifically envisions that the harms arising from the type of dispute at-issue in this lawsuit are irreparable and, for that independent reason, Melkersen is entitled to the relief sought herein, rather than a judgment at law, which would be inadequate.

79.    To date, neither ARC nor Orlando have made good on their prior contractual commitments to Melkersen, and Melkersen has not received any of his allotted shares detailed herein, despite repeated demands for delivery.

80.    On April 1, 2024, after Melkersen had already converted his Promissory Notes into the securities described herein, and after all other prerequisites to conversion had been satisfied, Orlando sent Melkersen, along with other noteholders, a mass email claiming: that ARC was

prepared to repay the Promissory Notes; that ARC was allegedly waiting to receive wiring instructions to make payment; that ARC purportedly had made repeated prior requests for payment instructions at the time of maturity of the Promissory Notes to allow repayment to be made; and that, if payment instructions were not promptly forthcoming, ARC would repay the loans represented by the Promissory Notes by depositing funds into escrow. ARC further advised that such funds, if not claimed within a reasonable time, are customarily delivered to the state's office of unclaimed property.

81.     In sending this bulk April 1, 2024, email, Orlando included a prior email purportedly sent to other noteholders who loaned money to ARC, in an apparent attempt to substantiate the false claim that Orlando/ARC had made prior requests for wiring instructions to Melkersen to facilitate repayment of the Promissory Notes. In fact, prior to the April 1, 2024, email, neither ARC nor Orlando made any request of Melkersen for payment instructions to repay the Promissory Notes, nor did they ever suggest to Melkersen that ARC intended to repay the Promissory Notes or otherwise make any attempt to repay the Promissory Notes.

82.     In any event, each of the Promissory Notes contain specific protections, not contained in ARC's notes with other lenders, that grant Melkersen the right to unilaterally extend the maturity dates on the Promissory Notes, and to unilaterally reject any attempted payment of the sums due under the Promissory Notes to preserve all rights under the Promissory Notes to convert them into the securities as more particularly described herein.

83.     In addition to ARC's wrongful repudiation of ARC's obligations to deliver the at-issue shares under the terms of the Promissory Notes (as well as its repeated failure to do so despite Melkersen's demands), on March 4, 2024, ARC/Orlando materially breached the MIPA by soliciting the members of ARC, including Melkersen, to agree to an Amended Operating

Agreement dated February 29, 2024 that, *inter alia*, sought to bar Orlando's removal as manager of ARC by requiring the vote of 100% of disinterested ARC members.  ARC/Orlando sought such approval deceptively by including the approval language as part of that certain "Know Your Customer" form that Orlando stated was required to be completed to facilitate the transfer of DWAC/TMTG securities to ARC's members including Melkersen.  In an action pending in the Delaware Chancery Court, Leon et als v. ARC & Orlando, the Defendants have affirmatively represented to that Court that the February 29, 2024, operating agreement has been adopted by ARC and now governs its affairs.

84.     Melkersen never agreed to the Amended Operating Agreement (or any prior Operating Agreement for that matter), and instead, returned the KYC form with the required customer information, but not before removing the language approving the Amended Operating Agreement. Orlando/ARC never acknowledged the return of the KYC information by Melkersen, but instead, emailed Melkersen again on March 27, 2024, with a second attached "KYI" form that, yet again, deceptively sought approval of yet another version of an Amended Operating Agreement under the guise of attempting to obtain information to facilitate the distribution to Melkersen of the securities to which he is entitled.

85.     Orlando has created at least one offshore trust located in Belize and managed by a Peruvian trustee.  Melkersen believes that Orlando and ARC may attempt to transfer Melkersen's shares beyond the jurisdictional reach of this Court.

86.     On information and belief, Orlando has transferred large sums of money out of ARC and into other SPACS in which Orlando holds an interest, which further calls into question the financial viability of ARC as a going concern.

87.    On information and belief, absent the requested injunctive relief, there is a risk that some of the at-issue shares belonging to Melkersen could be subject to potential forfeiture to the government because of the illegal or otherwise improper actions of ARC and/or Orlando, and the ongoing investigations and anticipated legal actions that will likely be filed, and because ARC and Orlando have wrongfully kept Melkersen's shares held in the name of ARC and/or Orlando, even though Melkersen is the beneficial owner of those shares, thereby potentially subjecting Melkersen to this additional risk of irreparable harm.

88.    On information and belief, post-business combination, TMTG controlled the actions of DWAC or otherwise had the power or authority to control DWAC or otherwise is a successor-in-interest to DWAC, by virtue of the business combination described herein, or has otherwise now become the same entity by virtue the name change of DWAC to TMTG as described in footnote 1 herein, and therefore, TMTG is responsible for the DWAC failures described herein, or is otherwise responsible.

<u>**COUNT I – BREACH OF CONTRACT**</u>
<u>**(Against Orlando and ARC)**</u>

89.    Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

90.    Melkersen, Orlando, and ARC entered into the MIPA whereby Melkersen agreed to purchase, and Orlando and ARC agreed to sell, LLC Interests in ARC equal to 250,000 Class A shares and 250,000 Class B shares of DWAC.

91.    By virtue of the true-up approved by DWAC/TMTG, the 250,000 Class B shares referred to in this Count that Melkersen is entitled to have increased, at a minimum, to a ratio of 1.348:1, to wit: 337,000 B Shares (250,000 x 1.348).  Melkersen is further entitled to additional

shares, above the 1.348:1 ratio, pending the outcome of the True-Up Litigation, which shares are currently sitting in escrow accounts maintained by Odyssey.

92.     The MIPA required ARC and Orlando to represent and warrant that they would transfer the specified number of shares to Melkersen upon completion of the merger.  Ex. 4, § 4.1.

93.     The MIPA further provided that "Seller and Buyer shall execute and deliver such other documents and take such other action as shall be reasonably requested by any other party hereto to carry out the transactions contemplated by this Agreement."  Ex. 4, § 6.1.

94.     Melkersen placed his confidence in ARC and Orlando to hold his shares in trust until such time that DWAC and TMTG merged, at which point ARC and Orlando were required to cause Melkersen's shares to be registered in his name and delivered to him.

95.     Orlando, as ARC's managing member, additionally owed fiduciary duties of loyalty and care to ARC's members, including Melkersen, who is a member of ARC by virtue of his purchase of LLC Interests in ARC.

96.     In reliance on ARC's and Orlando's representations, warranties, and assurances, Melkersen purchased LLC Interests in accordance with the terms of the MIPA.

97.     Despite ARC's and Orlando's representations, warranties, and assurances, ARC and Orlando breached the MIPA by refusing to appropriately register and deliver the securities to which Melkersen is entitled under the MIPA.

98.     Orlando and ARC further breached the MIPA by adopting or attempting to adopt the February 29, 2024, operating agreement which substantially increased the required vote necessary to remove Orlando as manager, which directly violates MIPA Section 6.1 which prohibits such operating agreement amendments.

99.    As a result of the foregoing breaches, Melkersen has been damaged in that he has been deprived of the DWAC/TMTG shares and warrants to which he is entitled.

100.    ARC and Orlando have been unjustly enriched in that they still hold legal title to Melkersen's shares, and to date, have refused to tender those shares to Melkersen.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendants Patrick Orlando and ARC Global Investments II, LLC for breach of the MIPA, and prays for additional relief as follows: (1) order Orlando and ARC to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to register Melkersen's shares in his name and deliver those shares to Melkersen in the amounts more particularly set forth herein and/or to otherwise identify Melkersen as the owner of such shares in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto or, alternatively, order Odyssey directly to do so, (2) order Orlando and ARC to irrevocably direct TMTG in a signed writing to identify Melkersen as the owner of the shares in the amounts more particularly set forth herein in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement entered into by DWAC/TMTG/ARC), or, alternatively, order TMTG directly to do so, (3) issue an immediate injunction prohibiting ARC or Orlando or Odyssey from transferring, liquidating, dissipating, hypothecating or otherwise encumbering the shares to which Melkersen is entitled pursuant to the terms of the MIPA, (4) impose a constructive trust upon the shares ARC and Orlando have wrongfully detained, (5) award Melkersen his reasonable attorneys' fees and costs under Section 6.4 of the MIPA, and (6) award all other relief this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT
### (Against ARC)

101.    Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

102.    Melkersen issued three loans to ARC totaling $550,000.00 in exchange for ARC executing the Promissory Notes.

103.    In accordance with the terms of the Promissory Notes, Melkersen exercised his option of converting the principal amount of the Promissory Notes to a total of 55,000 Class A shares, 30,000 Class B shares, and 25,000 warrants.

104.    By virtue of a true-up approved by DWAC/TMTG, the 30,000 Class B shares referred to in this Count that Melkersen is entitled to have increased, at a minimum, to a ratio of 1.348:1, to wit: 40,440 B Shares (30,000 x 1.348).

105.    All conditions precedent giving rise to the right of conversion of the Promissory Notes were satisfied to permit Melkersen to exercise his conversion rights, which Melkersen exercised in the manner and within the time required by the Promissory Notes.

106.    Since ARC was entitled to maintain legal title in the shares until the closing of the merger, the Promissory Notes required ARC to represent and warrant that it would not encumber those shares.  Ex. 2, § 1; Ex. 3, § 1; Ex. 5 § 1.

107.    Melkersen placed his confidence in ARC to hold his shares in trust until such time that DWAC and TMTG merged, at which point Melkersen's shares were required to be registered and delivered to him.

108.    In reliance on ARC's representations, warranties, and assurances set forth in the Promissory Notes, Melkersen loaned ARC sums, which Melkersen later converted to DWAC/TMTG shares.

24

109.    Despite ARC's representations, warranties, and assurances that ARC would deliver DWAC shares to Melkersen, ARC breached the terms of the Promissory Notes by failing and otherwise refusing to appropriately register and deliver Melkersen's shares to him.

110.    ARC further materially breached the terms of the Promissory Notes by disregarding Melkersen's conversion of the Promissory Notes into the at-issue securities, and thereafter, by claiming that ARC would be repaying the principal amounts of the Promissory Notes as set forth in the Orlando/ARC email to Melkersen on April 1, 2024.

111.    Melkersen is also entitled to further true-up, above the 1.348:1 ratio already paid over to ARC, in an amount to be determined by the Court in the True-Up Litigation, including the right to shares in that certain escrow account held by Odyssey. Melkersen made demand for those shares on ARC, by and through counsel, and was unequivocally informed that Melkersen, in his capacity as a noteholder, would be provided no additional TMTG shares derived from B-Shares to which Melkersen is entitled under the Promissory Notes, which constitutes breach by anticipatory repudiation of Melkersen's rights to such shares.

112.    As a result of the foregoing breaches, Melkersen has been damaged because he has been deprived of the TMTG securities to which he is entitled.

113.    ARC has been unjustly enriched because it still holds legal title Melkersen's securities to which Melkersen entitled.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, for breach of the Promissory Notes, and prays for additional relief as follows: (1) order Orlando and ARC to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to register Melkersen's securities in his name and deliver those securities to Melkersen in the amounts more particularly set forth herein and/or to otherwise

identify Melkersen as the owner of such securities in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto or, alternatively, order Odyssey directly to do so, (2) order Orlando and ARC to irrevocably direct TMTG in a signed writing to identify Melkersen as the owner of the securities in the amounts more particularly set forth herein in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement to which DWAC, TMTG and ARC are signatories), or, alternatively, order TMTG directly to do so, (3) issue an immediate injunction prohibiting ARC or Orlando or Odyssey from transferring, liquidating, hypothecating or otherwise encumbering the securities to which Melkersen is entitled, (4) impose a constructive trust upon the securities ARC has wrongfully detained, (5) award Melkersen his reasonable attorneys' fees and costs under Section 12 of the First and Second Convertible Promissory Notes, Section 13 of the Third Convertible Promissory Note, and (6) award all other relief this Court deems just and proper.

### COUNT III – BREACH OF CONTRACT
### (Against ARC and TMTG)

114.    Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

115.    ARC entered into the Subscription Agreement with Melkersen on August 2, 2021, whereby ARC agreed to provide Melkersen with an interest equal to 25,000 Founders Shares in DWAC in exchange for a $100,000 investment.

116.    Melkersen, ARC and DWAC (now TMTG) were all signatories to the Subscription Agreement.

117.    The Subscription Agreement contemplated that ARC and Melkersen would work cooperatively to agree upon and enter into a registration rights agreement to facilitate registration of the shares to which Melkersen was entitled, as well as an operating agreement. The contemplated registration rights agreement and the operating agreement were required to be "typical for transactions of this nature" but also that are "reasonably acceptable to the undersigned" (Melkersen, ARC and DWAC).

118.    The only operating agreement validly adopted by ARC occurred with its formation in December 2020.  No other operating agreement for ARC exists that is signed or otherwise expressly agreed to by Melkersen as required by the Subscription Agreement.  Yet, ARC has taken the position that Melkersen is subject to an operating agreement that ARC unilaterally adopted, without the consent of Melkersen, on August 4, 2021, <u>after</u> the execution of Melkersen's Subscription Agreement and the payment by Melkersen of his $100,000 for membership interests in ARC equal to 25,000 Founders Shares of DWAC, or alternatively, an operating agreement unilaterally adopted by Orlando on behalf of ARC on February 29, 2024.  Neither the August 4, 2021, operating agreement, nor the February 29, 2024, operating agreement were ever agreed to by Melkersen, and contains provisions, including those relating to dilution of Founders Shares, that are not "typical for transactions of this nature."   Moreover, even if the August 4, 2021, operating agreement were binding, Orlando's and ARC's attempts to replace it with the February 24, 2024, operating agreement (which increased the disinterested member voting requirement to remove Orlando as manager from 80% of the membership interest to 100% of the membership interest), constitutes a material breach of the MIPA as previously alleged herein.

119.    ARC's attempt to force Melkersen to be bound by an operating agreement he never agreed to and that is atypical for transactions of this nature constitutes a material breach of the Subscription Agreement.

120.    ARC and DWAC (now TMTG) failed to propose or otherwise execute any registration rights agreement in favor of Melkersen as required by the Subscription Agreement to facilitate the registration of Founders Shares that Melkersen is entitled to under the Subscription Agreement.  The failure by ARC or DWAC (now TMTG) to provide Melkersen with a registration rights agreement is a material breach of the Subscription Agreement.

121.    Because of the agreed upon true-up between DWAC/TMTG and ARC, Melkersen is entitled to, at a minimum, 33,700 Founders Shares (25,000 x 1.348) (now TMTG shares) under his Subscription Agreement.

122.    The failure to pay over the 33,700 shares that Melkersen is entitled to under his Subscription Agreement is a material breach of the Subscription Agreement by ARC and DWAC.

123.    The failure by ARC or DWAC to cause registration of the 33,700 shares that Melkersen is entitled to under his Subscription Agreement is a material breach of the Subscription Agreement by ARC and DWAC.

124.    Upon the conclusion of the business combination between DWAC and TMTG, neither ARC nor DWAC (now TMTG) took any action, despite Melkersen's repeated requests, to ensure that the shares to which Melkersen is entitled under the Subscription Agreement were transferred or otherwise conveyed to Melkersen, or otherwise registered in Melkersen's name. These failures by ARC and DWAC constitute material breaches of the Subscription Agreement.

125.    Melkersen is also entitled to further true-up, above the 1.348:1 ratio already paid over to ARC, in an amount to be determined by the Court in the True-Up Litigation, including the right to shares in that certain escrow account held by Odyssey.

126.    WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, Digital World Acquisition Corp. and Trump Media and Technology Group for breach of the of Subscription Agreement, and prays for additional relief as follows: (1) order ARC and/or TMTG to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to register Melkersen's securities in his name and deliver those securities to Melkersen in the amounts more particularly set forth herein and/or to otherwise identify Melkersen as the owner of such securities in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto or, alternatively, order Odyssey directly to do so, (2) order Orlando and ARC to irrevocably direct TMTG in a signed writing to identify Melkersen as the owner of the securities in the amounts more particularly set forth herein in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement to which DWAC, TMTG and ARC are signatories), or, alternatively, order TMTG directly to do so, (3) issue an immediate injunction prohibiting ARC or Orlando or Odyssey from transferring, liquidating, hypothecating or otherwise encumbering the securities to which Melkersen is entitled, (4) impose a constructive trust upon the securities ARC has wrongfully detained, and (6) award all other relief this Court deems just and proper.

## COUNT IV – REPLEVIN
### (Against Orlando, ARC, TMTG and Odyssey)

127.    Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

128.    This is an action to recover possession of personal property in Miami-Dade County, Florida.

129.    The property, as more fully described above, consists of: (1) 337,000 Class B shares of DWAC stock (now TMTG A-shares subject to lockup) and 250,0000 Class A shares of DWAC stock (now TMTG A-shares) to which Melkersen is entitled pursuant to the MIPA, (2) 40,440 Class B shares of DWAC stock (now TMTG A-shares subject to lockup), 55,000 Class A shares of DWAC stock (now TMTG A-shares), and 25,000 DWAC warrants (now TMTG warrants) to which Melkersen is entitled pursuant to the terms of the Promissory Notes, and (3) 33,700 Class B Shares of DWAC stock (now TMTG A-shares subject to lockup) pursuant to Melkersen's Subscription Agreement.  Melkersen is further entitled to his proportional share, based on the B shares of DWAC stock to which Melkersen is entitled under the agreements set forth herein, in an amount over the 1:348:1 ratio already paid over by DWAC/TMTG to ARC, depending on the outcome of the True-Up Litigation.

130.    Upon information and belief, the foregoing 716,140 shares are in Orlando's and/or ARC's custody or control in Miami-Dade County Florida.  Upon information and belief, the additional shares to which Melkersen will become entitled to upon conclusion of the True-Up Litigation, although held in trust by Odyssey, are in Orlando's and/or ARC's custody or control in Miami-Dade County Florida.

131.    Alternatively, Melkersen alleges that his 716,140 shares (and the additional true up shares to which Melkersen will become entitled referred to above) are in TMTG's control or

30

control of Odyssey, which control may be or has been exercised over such shares in Miami-Dade County Florida.

132.     Melkersen is entitled to possession of the aforementioned 716,140 shares pursuant to the terms of the MIPA, Promissory Notes and the Subscription Agreement (along with the additional shares referred to herein pending the result of the True-Up Litigation), but ARC and/or Orlando has wrongfully detained the shares in its own name, and on information and belief, while TMTG and/or Odyssey have the power to pay over the shares to which Melkersen is entitled as described herein, they have all failed to do so despite Melkersen's repeated demands for such shares.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, Orlando, Trump Media and Technology Group Corp. and/or Odyssey Transfer and Trust Company for immediate return of his property, including an order setting forth those shares Melkersen is entitled to that are currently held in trust by Odyssey pending the result of the True-Up Litigation, and such other relief the Court deems just and proper.

**COUNT V – UNJUST ENRICHMENT**
**(Against ARC/ORLANDO /DWAC/TMTG)**
**(Pleaded in the Alternative to Breach of Contract Counts)**

133.     Melkersen repeats and realleges all the allegations in paragraphs 1 through 88 as if fully set forth herein.

134.     In the alternative, at all times material, Melkersen conferred a direct benefit upon ARC/Orlando/DWAC (and ultimately also to TMTG by virtue of the merger) by providing funds to DWAC, by and through ARC at the request of Orlando, pursuant to the terms of the MIPA. DWAC was also directly involved in facilitating this funding and in approving it.

135.    Melkersen also conferred a direct benefit upon ARC/Orlando/DWAC (and ultimately also to TMTG by virtue of the merger) by providing loans to ARC, which were to be repaid in shares of DWAC stock.  On information and belief, the vast majority of the money Melkersen loaned to ARC as memorialized in the Promissory Notes, and paid by Melkersen in connection with the MIPA, information and belief, was paid over to DWAC by ARC or was otherwise used for DWAC's direct benefit. TMTG also benefited from the use of Melkersen's funds by virtue of the merger.

136.    DWAC (now TMTG) voluntarily accepted and retained the benefit of Melkersen's funds, which were loaned with the purpose of obtaining a specified number of DWAC shares as heretofore described and which benefitted DWAC (now TMTG).  These funds also benefitted ARC/Orlando who are now, on information and belief, entitled to a substantial number of shares that would have been otherwise lost had DWAC been forced to de-SPAC, which was likely to have occurred in the absence of Melkersen's infusion of cash into ARC, which then flowed through to DWAC.

137.    To be sure, the cash infusion made by Melkersen at the time of the MIPA was a last-ditch effort by DWAC/ARC to save DWAC from being delisted from the NASDAQ and being forced to de-SPAC, or otherwise dissolve, for insufficient liquidity needed to pay its obligations as they were becoming due.

138.    Under the circumstances, it would be inequitable for ARC and Orlando to accept and retain Melkersen's shares without delivering those shares to Melkersen, or for DWAC/TMTG not to make Melkersen whole by paying Melkersen the shares to which he would have been entitled to under the at-issue agreements, which is, at minimum, the fair value of the benefit that Melkersen conveyed upon ARC, DWAC and TMTG in light of the timing of Melkersen providing those

resources and the enormous benefit, as a financial lifeline, that these Defendants have enjoyed as a result of Melkersen's efforts and money.

139.      Accordingly, Orlando/ARC/DWAC/TMTG have been unjustly enriched by failing to deliver Melkersen's shares to him.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, Orlando, and Trump Media and Technology Group and prays for additional relief as follows: (1) order Orlando and ARC to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to transfer Melkersen's securities into his name and deliver those securities to Melkersen in the amounts more particularly set forth herein and/or to otherwise identify Melkersen as the owner of such securities in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto, or alternatively, directly order Odyssey to do so, (2) order Orlando and ARC to irrevocably direct TMTG, in a signed writing to identify Melkersen as the owner of the securities in the amounts more particularly set forth herein on its books and records and in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement to which DWAC, TMTG and ARC are signatories), or otherwise direct TMTG to directly do so, (3) issue an immediate injunction prohibiting Orlando or ARC or Odyssey from transferring, liquidating, hypothecating or otherwise encumbering the securities to which Melkersen is entitled, (4) impose a constructive trust upon the securities that Orlando and ARC have wrongfully detained, and (5) award such other relief this Court deems just and proper.

## COUNT V – DECLARATORY JUDGMENT
### (Against Orlando and ARC)

140.     Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

141.     The Court may "declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed."  Fla. Stat. § 86.011.

142.     A plaintiff "claiming to be interested or who may be in doubt about his . . . rights under a . . . contract . . . may have determined any question of construction or validity arising under such . . . contract . . . ."  Fla. Stat. § 86.021.

143.     Given ARC's and Orlando's refusal to register Melkersen's securities as described herein, and failure to deliver those shares to him pursuant to the terms of the MIPA and the Promissory Notes and the Subscription Agreement and the failure by TMTG and Odyssey to transfer such shares to Melkersen or otherwise cause such shares to register in Melkersen's name despite timely and repeated demands by Melkersen that they do so, Melkersen has a bona fide, actual, present, and practical need for a declaration from this Court that those contracts afford Melkersen the right to delivery and registration of those shares.

144.     Based on the foregoing allegations, real and substantial justiciable controversies exist between ARC and Orlando on the one hand, and Melkersen on the other hand.

145.     These are actual, definite, concrete, and substantial controversies that require an immediate determination of Melkersen's rights under the MIPA and Promissory Notes and the Subscription Agreement.

146.     Declaratory relief is appropriate here because such judgment will serve a useful purpose in clarifying Melkersen's rights under the MIPA and Promissory Notes and the Subscription Agreement.

147.     There is a bona fide, actual, present practical need for a declaration.  Declaratory relief will terminate and afford relief from uncertainty, insecurity, and controversy concerning the Melkersen's rights under the subject contracts.

148.     All antagonistic and adverse interests relating to the declaration sought herein are parties to this action.

149.     The relief sought is not merely to seek legal advice of the Court nor does Melkersen seek answers to questions propounded from mere curiosity.

150.     Melkersen is consequently entitled to a declaration of his rights pursuant to Fla. Stat. § 86.021.

151.     WHEREFORE, Plaintiff Michael Melkersen respectfully requests that this Court issue a judicial declaration that Melkersen is entitled to: (1) receive 250,000 Class A shares and 337,000 Class B shares (250,000 x 1.348) of DWAC stock (now TMTG stock) from ARC and Orlando pursuant to the terms of the MIPA, (2) 25,000 Class A shares and 33,700 Class B shares (25,000 x 1.348) of DWAC stock (now TMTG stock) from ARC pursuant to the terms of the First Convertible Promissory Note, (3) 5,000 Class A shares and 6,740 Class B shares of DWAC stock (now TMTG stock) pursuant to the terms of the Second Convertible Promissory Note, (4) 25,000 Class A shares of DWAC stock (now TMTG stock) and 25,000 warrants (now TMTG warrants) pursuant to the terms of the Third Convertible Promissory Note, (5) an additional proportional number of shares, above the 1.348:1 ratio, pending the outcome of the True-Up Litigation; (6) an injunction freezing the at-issue shares to require that they not be moved, transferred or otherwise

encumbered by any Defendant hereto until the resolution of this action, except for otherwise transferring and conveying such shares to Melkersen in the amounts requested herein, and (7) any and all further relief as the Court deems just and proper.

152.     As to all counts herein, except quantum meruit, Melkersen requests that the jury or the court, as applicable, award him his reasonable attorneys' fees and costs against ARC and Orlando.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all claims so triable.

Dated:  June 20, 2024.


Respectfully submitted,


By:     _/s/ Michael Melkersen_____
        **MICHAEL MELKERSEN,** *pro se*
        Cedro Street #6, Palmas del Mar
        Humacao, Puerto Rico 00791
        540-435-2375 (Telephone)
        540-242-3200 (Facsimile)
        mike@mlawpc.com (Email)

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that I have read the allegations set forth in this Complaint, and with the exception of those allegations expressly based upon information and belief, the facts alleged herein are true and correct to the best of my knowledge.

Dated: June 20, 2024 */s/ Michael Melkersen*_____
Michael J. Melkersen

# EXHIBIT 3
UNDER SEAL

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

**THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT** (the **"Agreement") is made effective and entered into as of this 16th day of March 2023 (the** "**Effective Date**"), by and between Patrick Orlando ("**Orlando**") and ARC Global Investments II LLC ("**ARCII**") (ARCII and Orlando are collectively referred to herein as "**Seller**") and Michael Melkersen (hereinafter "**Buyer**" or "**Melkersen**"). Hereinafter, Seller and Buyer may be referred to collectively as the "**Parties**," or individually as a "**Party**."

### RECITALS

**WHEREAS,** Seller desires to sell membership interests in ARCII equivalent to 250,000 B Shares (the "**B Shares**") of Digital World Acquisition Corporation ("**DWAC**") to be distributed to the membership interest holders by the transfer agent post-closing of the DWAC business combination, and Seller further desires to sell membership interests in ARCII equivalent 250,000 Private Placement A Shares (the "**PP A Shares**") of DWAC, which PP A Shares were acquired by ARCII pursuant to that certain Unit Subscription Agreement (the "**Subscription Agreement**") dated September 2, 2021, and referred to therein as Placement Shares, all in accordance with the terms and conditions set forth herein (collectively the Membership Interests entitling Buyer to receive PP A Shares and B Shares are referred to herein as the "**Offered Units**"); and

**WHEREAS,** Buyer desires to purchase from the Seller all the Offered Units in accordance with the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### SALE AND PURCHASE OF MEMBERSHIP INTEREST

**Section 1.1 <u>Sale and Purchase</u>.** Upon the terms and subject to the conditions set forth in this Agreement, Seller hereby agrees to sell and transfer to Buyer, and Buyer hereby agrees to purchase and accept, all the Offered Units, that is, a membership interest in ARCII equivalent to 250,000 PP A Shares of DWAC and a membership interest in ARCII equivalent to 250,000 B Shares of DWAC.  The foregoing Offered Units are in addition to any other shares of DWAC or membership interests in ARCII previously purchased by Melkersen prior to the execution of this Agreement.

**Section 1.2 <u>Payment</u>.** As payment in full for the Offered Units, Buyer shall pay Seller the total sum of ███████████████████████ split into initial payment of ██████ and subsequent payment of ████████ (the "**Purchase Price**")**,** which Buyer and Seller acknowledge and agree constitutes a fair sum based on all conditions whether known or unknown and with a current stock price of DWAC publicly trading shares of circa $13. Payment shall be made by Buyer to Seller of the aforesaid ██████████████████████████████ on or before March 17, 2023 (the "**Payment Date**"), by wire transfer to the bank account indicated by the Seller and the balance of ████████ to be sent to DWAC by the Buyer on behalf of the Seller on or before

Initials: _PO_ (PO) _MM_ (MM)                                    Page 1 of 14

DocuSign Envelope ID: 6DCB8AFB-5129-4A2B-A096-8A7934B1A739

March 21, 2023. As further consideration for this Agreement, Buyer shall loan DWAC ████████ ███████████ by wire transfer from Buyer to DWAC's working capital account on or before March 21, 2023 (the "**Loan Date**").  ARCII shall execute a convertible note for the ████████ lent by Buyer to ARCII to fund DWAC working capital requirements substantially in the form Exhibit A hereto, with the execution of this Agreement.

Section 1.3 <u>Transfer of Offered Units.</u> Seller shall retain all rights and interests in the Offered Units until full payment of the Purchase Price, as described in Section 1.2, has been made. Seller shall execute such reasonable documents as may be requested by Buyer to affirm Buyer's ownership interest in the Offered Units.

Section 1.4 <u>Due Diligence.</u> Buyer acknowledges that it has had a full and fair opportunity to conduct any and all due diligence that it wishes to conduct and that no further due diligence is required and that there is a risk of total loss of investment with respect to investment in the Offered Units, especially if the Company does not complete a business combination for any reason.

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 2.1 <u>Representations and Warranties of Seller.</u> Seller represents and warrants to, and agrees with Buyer as follows:

(a)   Organization. Seller has full power and authority to enter into and complete the transactions herein contained. All required corporate action has been taken by Seller to make and carry out this Agreement. The execution and delivery of this Agreement and the completion of the transactions hereunder will not result in the violation of any law, rule or regulation, license, permit, judgment or decree to which Seller is subject, or the breach or termination of, or a default under, any contract, agreement or other commitment to which Seller is a party or by which it is bound. All consents of any kind required for Seller to make or carry out the terms of this Agreement have been obtained or shall be obtained at or prior to Closing Date.

(b)   Offered Membership Interest. Seller has complete legal right, power, and authority to transfer and deliver all the Offered Units free of any liens or encumbrances whatsoever. The Offered Units have been duly authorized and validly issued and are fully paid and non-assessable.

(c)   Binding Obligation. Seller has all requisite power and authority to enter into and perform its obligations under this Agreement, and to carry out the transactions contemplated hereby. The person(s) executing this Agreement is/are fully authorized to execute and deliver this Agreement and to execute those deliveries contemplated hereby, and no other proceedings on the part of Seller are necessary to authorize this Agreement and the transactions contemplated hereby. This Agreement has been duly executed and delivered by Seller and constitutes the valid and binding obligation of the Seller, enforceable against Seller in accordance with its terms. The execution, delivery, and performance by Seller of this Agreement, and the other documents being executed and delivered by Seller in connection herewith, do not and will not conflict with, or result



Initials: _____ (PO) _____ (MM).

in any violation of, or default under, any provision of any rule, regulation, judgment, order, decree, other agreement, instrument or license applicable to Seller or to any of Seller's properties or assets.

(d)    The 250,000 private placement A Shares being conveyed by Seller to Buyer under this Agreement are separate and distinct from the Working Capital Units as described in DWAC's S4 (see, e.g., page#254) filed with the Securities and Exchange Commission on May 16, 2022, and the conveyance of such 250,000 private placement A Shares will not impact, reduce or otherwise diminish such Working Capital Units.

**Section 2.2 Representations. Warranties and Covenants of Buyer.** Buyer represents and warrants to Seller as follows:

(a)    Organization. Power of Authority. Buyer has full power and authority to enter into this Agreement and all other agreements contemplated hereby and to perform its obligations hereunder and thereunder.

(b)    Binding Obligation. Buyer has all requisite power and authority to enter into and perform their obligations under this Agreement and to carry out the transactions contemplated hereby. The person(s) executing this Agreement is/are fully authorized to execute and deliver this Agreement and to execute those deliveries contemplated hereby, and no other proceedings on the part of Buyer is necessary to authorize this Agreement and the transactions contemplated hereby. This Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. The execution, delivery, and performance by Buyer of this Agreement, and the other documents being executed and delivered by the Buyer in connection herewith, do not and will not conflict with, or result in any violation of, or default under, any organizational document, operating agreement, provision of any rule, regulation, judgment, order, decree, other agreement, instrument or license applicable to the Buyer.

(c)    No Other Representation. In purchasing the Offered Units, Buyer is not relying on any other representations, warranties, statements, or information provided by the Seller or any of its officers or agents except for the representations and warranties expressly set forth in this Agreement or otherwise referred to in this Agreement. Buyer acknowledges that the only representations it may rely on in entering into the Agreement are the ones set forth in this Agreement or in the documents expressly referred to herein.

(d)    No Broker's or Finder's Fees. No agent, broker, person or firm acting or purporting to act on behalf of Buyer is or will be entitled to any commission or broker's or finder's fees from ARCII.

**ARTICLE III**
**CLOSING**

**Section 3.1 <u>Closing</u>.** Except as otherwise set forth herein, the closing of the transactions hereunder shall take place on March 16, 2023 (the "**Closing Date**")**,** at a location mutually agreed



Initials: _____ (PO); _____(MM).

DocuSign Envelope ID: 6DCB8AFB-5129-4A2B-A096-8A7934B1A739

upon by the Parties.

**Section 3.2 Deliveries by Buyer.** At the Closing Date, Buyer agrees to deliver to Seller the following:

      (a)  The Purchase Price as described in Section 1.2 hereof;

      (b)  Such other documents and instruments as may be required to consummate the transactions contemplated herein or as may be required by this Agreement.

**Section 3.2 Deliveries by Seller.** At the Closing Date, Seller agrees to deliver to Buyer the following:

      (a)  Fully executed Note in the form attached hereto;

      (b)  Such other documents and instruments as may be required to consummate the transactions contemplated herein or as may be required by this Agreement.

## ARTICLE IV
## SURVIVAL OF REPRESENTATIONS,
## WARRANTIES AND COVENANTS; INDEMNIFICATION

**Section 4.1 Survival of Representations, Warranties and Covenants.** The rights of the Parties to enforce the representations, warranties, and covenants contained in this Agreement shall survive the consummation of the transactions contemplated hereby on the date hereof.  Buyer's right to require the transfer agent post-closing of the DWAC business combination to transfer to Buyer the DWAC shares as more particularly described herein shall also survive the consummation of the transactions contemplated hereby on the date hereof.  The Seller's obligations under the Note attached hereto that the Seller shall execute and deliver to Buyer at Closing shall also survive the consummation of the transactions contemplated hereby on the date hereof.  The personal guarantees executed in connection with this Agreement shall also survive the consummation of the transactions contemplated hereby on the date hereof.  The terms and conditions of any other prior written agreement executed between Seller and Buyer shall also survive the consummation of the transactions contemplated hereby on the date hereof.

**Section 4.2 Releases.** Except for the covenants and obligations provided in this Agreement, or in any other Agreement executed between Seller and Buyer, or between ARCII and Buyer, upon execution and delivery of this Agreement, each party (herein referred to as the "**Releasing Party**")**,** on behalf of itself, its heirs, grantees, assigns, personal representatives, executors, guardians, successors, or agents, and/or its respective owners, managers, officers, directors, members, shareholders, employees, and affiliates hereby releases, acquits, satisfies and forever discharges the other party and the other party's heirs, grantees, assigns, personal representatives, executors, guardians, successors, and agents and/or its respective owners, managers, officers, directors, members, shareholders, employees, and affiliates (such other Parties and persons and entities collectively, the "**Released Parties**"), of and from all, and all manner of, action and actions, causes and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills,



specialties, variances, trespasses, liabilities, obligations, promises, agreements, controversies, damages, judgments, executions, claims and demands whatsoever, whether known or unknown, in law and in equity, which the Releasing Party ever had individually or jointly, now has individually or jointly, or which the Releasing Party or any of its owners, managers, officers, directors, members, shareholders, employees, legal representatives, affiliates, personal representatives, executors, guardians, successors, agents, legal representatives, heirs or assigns hereafter may have or assert against the Released Parties, for, upon, or by reason of any matter, cause, event, act or omission whatsoever from the beginning of time to and including the date of execution of this Agreement (all of the foregoing, collectively, the "**Released Claims**"). Buyer further agrees that he shall not represent or advise any other parties in any litigation, demand, or other action against Seller or any related parties (including but not limited to ARCII, ARC Global Investments LLC ("ARCI"), Benessere Captial Acquisition Corp ("BENE"), and Orlando). Nothing in the foregoing sentence, however, shall prohibit Buyer from representing or advising DWAC.  This Agreement finally and forever resolves any claim for relief which could have been alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, conversion, breach of fiduciary duty (to the maximum extent permitted under applicable law), bad faith damages, reliance damages, liquidated damages, damages for humiliation and embarrassment, punitive damages, costs and attorneys' fees, arising from, attributable to, or related to the matters described or included in the Released Claims.

Section 4.3 <u>Indemnification</u>. It is the intention of the Parties that Seller be fully released from any and all obligations of ARCII, ARCI, BENE, DWAC and/or obligations which Seller undertook in its respective roles with the aforementioned entities, unless expressly provided otherwise in this Agreement. As such, and to the extent that such release is not possible, the Buyer agrees to indemnify, hold harmless, and defend Seller from any claim(s) which Buyer (or someone claiming by and through Buyer) may assert against Seller. The indemnification set forth herein shall include, but not be limited to, indemnification of the costs of attorneys' fees, judgments, interest, and costs of defense. All agreements and covenants of the Parties shall survive the execution and delivery of this Agreement without limitation as to time or amount.

## ARTICLE V
## CONFIDENTIALITY

Section 5.1 <u>Confidentiality</u>. The Parties expressly understand and agree that the specific amounts to be paid under this Agreement shall remain CONFIDENTIAL and shall not be disclosed to any third party whatsoever, except as required by law or order of court, or as may be required to facilitate the transactions contemplated by this Agreement. Any person identified in the preceding sentence to whom information concerning this Agreement is disclosed is bound by this confidentiality provision and the disclosing party shall be liable for any breaches of confidentiality by persons to whom he has disclosed information about this Agreement in accordance with this paragraph. If any subpoena, order, or discovery request (the "**Document Request**") is received by any of the Parties hereto calling for production of the Agreement, such Party shall promptly notify the other Party hereto prior to any disclosure of same. In such case, the subpoenaed Party shall: (a) make available as soon as practicable (and in any event prior to disclosure), for inspection and copying, a copy of the Agreement it intends to produce pursuant to the Document Request unless such disclosure is otherwise prohibited by law; and (b) to the extent possible, not produce anything in response to the



Initials: _____ (PO). _____ (MM).

Document Request for at least ten (10) business days following such notice. If necessary, the subpoenaed Party shall take appropriate actions to resist production, as permitted by law, so as to allow the Parties to try to reach agreement on what shall be produced. This paragraph is a material part of this Agreement.

## ARTICLE VI
## GENERAL PROVISIONS

**Section 6.1 <u>Further Assurances</u>.** Upon execution of this Agreement, Seller and Buyer shall execute and deliver such other documents and take such other action as shall be reasonably requested by any other party hereto to carry out the transactions contemplated by this Agreement. The Seller and Buyer acknowledge and agree that the execution of this Agreement does not constitute and may not be construed as an amendment or modification of the ARCII Operating Agreements or the waiver or surrender of any rights thereunder, but Seller also represents and warrants it will not seek to amend or modify the ARCII Operating Agreements, or take any action under such Operating Agreements, that would materially and adversely impact Buyer's rights under this Agreement.

**Section 6.2 <u>Entire Agreement; Amendments and Waivers</u>.** This Agreement constitutes the entire agreement between and among the Parties hereto pertaining to the subject matter hereof, and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties with regards to the subject matter hereof, except the following, which shall all remain in full force and effect: (i) that certain prior written agreement between ARCII and Melkersen concerning Buyer's initial subscription for that certain membership interest in ARCII equivalent to 25,000 B-shares in DWAC; (ii) convertible promissory note dated July 14, 2022, between ARCII and Melkersen; (iii) convertible promissory note dated July 18, 2022, between ARCII and Melkersen.

There are no warranties, representations, or other agreements between the Parties in connection with the subject matter hereof, except as set forth specifically herein or contemplated hereby or as otherwise set forth in the above-referenced subscription agreement and convertible promissory notes. No supplement, modification, or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver, unless otherwise expressly provided.

**Section 6.3 <u>Counterparts</u>.** This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other party, it being understood that all Parties need not sign the same counterpart.

**Section 6.4 <u>Governing Law; Jurisdiction; Prevailing Party</u>.** This Agreement shall be governed by and construed (both as to validity and performance) and enforced in accordance with the laws of the State of Florida applicable to agreements made and to be performed wholly therein, and without giving effect to the conflict of law rules thereof. The jurisdiction for any legal action with respect to this Agreement shall be exclusively vested in, and the Parties hereby submit to the

Initials:  (PO), _____ (MM).                     Page 6 of 14

jurisdiction of, the state and federal courts located in Miami-Dade County, Florida; and the Parties hereby waive any claims or defense that said courts constitute an inconvenient forum. If either party should bring legal action against the other under this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all its costs and expenses relating to the action (including, without limitation, reasonable attorney's fees, court costs, and enforcement of judgment costs), at all trial and appellate levels and collection of judgment proceedings.

Section 6.5 **Expenses.** The Parties hereto shall pay all of their own expenses relating to the transactions contemplated in this Agreement.

Section 6.6 **Captions; Agreement.** The Article and Section captions used herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement. The term "Agreement" as used herein means this document and all Exhibits annexed hereto, if any. References herein to a Section hereof include all numerical or alphabetical subsections thereof.

Section 6.7 **Facsimile.** A signed copy of this Agreement transmitted via facsimile shall have the same validity for all purposes as one bearing an original signature.

Section 6.8 **Notices.** Any notice which may or must be given hereunder shall be in writing and shall be sent via certified mail (return receipt requested) and email to the intended party at the following addresses:

Michael Melkersen
E-Mail: mike@mlawpc.com
9633 S. Congress Street
New Market, VA 22844

Patrick Orlando
E-Mail: porlando@benesserecapital.com

       With a copy to:       EPGD BUSINESS LAW
                                    Attn: Eric P. Gros-Dubois, Esq.
                                    777 SW 37th Avenue, Suite 510
                                    Miami, FL 33134 Fax: (305) 718-0687 E-Mail:
                                    eric@EPGDLaw.com

Such notices are deemed sent when placed in the mail as evidenced by the date stamp on the U.S. Postal Service Certified Mail Receipt.

Section 6.9 **Electronic Signatures.** The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic



Initials: _____ (PO), _____(MM).

Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**THE PARTIES HAVE READ EVERYTHING IN THIS AGREEMENT AND UNDERSTAND EVERYTHING THAT IS IN THIS AGREEMENT. THE PARTIES UNDERSTAND THAT THIS AGREEMENT IS A LEGAL DOCUMENT. THE PARTIES HAVE BEEN GIVEN A REASONABLE PERIOD OF TIME, WHETHER OR NOT THE PARTIES ELECTED TO USE ALL THAT TIME, IN WHICH TO CONSULT WITH THE PARTIES' ATTORNEY AND TO CONSIDER WHETHER OR NOT THE PARTIES WANT TO SETTLE THE PARTIES' CLAIMS ON THE TERMS SET FORTH IN THIS AGREEMENT. THE PARTIES HAVE BEEN INSTRUCTED TO CONSULT WITH THE PARTIES' LAWYER BEFORE SIGNING THIS AGREEMENT AND GIVEN ALL OF THE TIME THE PARTIES WANT AND NEED TO TALK TO THE PARTIES' LAWYER ABOUT THIS AGREEMENT BEFORE SIGNING IT. NO ONE HAS MADE ANY PROMISES TO GET THE PARTIES TO SIGN THIS AGREEMENT, EXCEPT FOR THE PROMISES THAT ARE WRITTEN IN THIS AGREEMENT ITSELF.**

**IN WITNESS WHEREOF,** the Parties hereto have each executed and delivered this Membership Interest Purchase Agreement as of the Effective Date first above written.

**FOR THE SELLER:**                    **FOR THE BUYER:**

*Patrick Orlando*                    *Michael Melkersen*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯            ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
6F514D5DB46D470...                   D381F9BE714C484...

Patrick Orlando                      Michael Melkersen

-and-

ARC Global Investments II LLC

*Patrick Orlando*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
6F514D5DB46D470

By: Patrick Orlando
Its: Managing Member

APPENDIX A:

# CONVERTIBLE PROMISSORY NOTE

**No. CN-3**                                                                          **Date of Issuance**

**USD$250,000**                                                                          **March 21, 2023**

In consideration for borrowing the principal sum of USD$250,000, ARC Global Investments II LLC (the "**Company**" or "**DWAC SPONSOR**"), hereby promises to pay to the order of Michael Melkersen (the "**Holder**" or "**Lender**"), the principal sum of USD$250,000 (the "**Principal**"), and any accrued interest (the "Interest"). Interest will accrue at a simple rate of 8% per annum. Unless earlier converted into the securities detailed in section 2 herein, the principal and accrued interest of this Note will be due and payable by the Company on March 21, 2024 ("**Maturity Date**"). At the written election of the Holder, the Holder shall maintain the right, but not the obligation, to extend the Maturity Date.

1.    Payment. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal.  Holder shall have the absolute right to reject payment of any Principal or Interest prior to the Maturity Date. The Company grants Holder a security interest (the "Security Interest") in and to its rights to 25,000 shares of Class A common stock in Digital World Acquisition Corporation ("DWAC") and in and to 25,000 warrants ("**Warrants**"), each of which is exercisable to purchase one-half share share of Class A stock in DWAC at $11.50 per share in accordance with that certain Unit Subscription Agreement (the "**Subscription Agreement**") dated September 2, 2021 (collectively, these 25,000 Class A shares of DWAC common stock and 25,000 Warrants are referred to herein as the "Equity Securities").  The Company represents and warrants that it currently owns the rights to the Equity Securities and that the Equity Securities are unencumbered other than being subject to closing of the business combination.

2.    Conversion of the Notes. Within five (5) days after the business combination closing, Holder may elect to convert the full principal amount into a package of securities of DWAC. For each $10 converted, Holder will receive: (i) one Class A share of DWAC, and (ii) one Warrant entitling Holder to purchase one-half Class A share of DWAC at $11.50 in accordance with the Unit Subscription Agreement. The business-combination closing and the issuance of Class A shares are contingent upon shareholder approval. Company will use all reasonable efforts to cause the DWAC to obtain shareholder approval. Company anticipates that after the business combination closing Class A and B Shares of the DWAC are entitled to registration rights and will be immediately sellable in the marketplace after registration with the SEC and, with respect to Class B Shares only, lockup

Initials:  ___(PO)___  ___(MM)___.

expiration. Class A shares of DWAC will be immediately sellable in the marketplace without restriction after registration with the SEC.

3. <u>Material Non-Public Information</u>. Nothing in this Note constitutes material non-public information ("MNPI") with respect to DWAC. Each of the Parties hereby acknowledges that any oral or written information exchanged between the Parties in connection with the preparation and performance this Note (except for the Note itself) are regarded as Confidential Information, as that term is defined in the Non-Disclosure Agreement and shall be subject to the terms and conditions set forth therein. If previously agreed to by Holder, the Company may share with Holder information that constitutes, or the Company reasonably believes constitutes, MNPI of the Company with Holder, which information shall be subject to terms of the Non-Disclosure Agreement, and the receipt of which Holder shall acknowledge in writing.

4. <u>Sophisticated Holder</u>. The risk factors delineated in Digital World Acquisition Corp.'s public filings, including in its Form S-4, filed on May 16, 2022, are incorporated herein as if fully restated. The Holder has sophistication and experience in financial and business matters and has the capacity to bear the economic risk of such investment for an indefinite period of time. There is a risk of total loss of investment with respect to this term sheet, specifically including if the Company does not complete a business combination for any reason. There is no guarantee that the current proposed business combination involving the Company will be approved by the SEC as there is an ongoing SEC investigation that may result in detrimental delays or the issuance of a stop order, potential for litigation, and other factors that may cause there to be insufficient capital to close the transaction.

5. <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto.

6. <u>Officers and Directors not Liable</u>. In no event will any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

7. <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holders as a payment of principal. The right to covert this Note into DWAC stock as described in paragraph 4 of this Note shall not, for any reason, be deemed to be interest of whatsoever nature.

8. <u>Transfer of Notes.</u> Should Holder transfer ownership of this Note or the rights set forth herein, in whole or in part, Holder shall notify the Company in writing of the identity of any new Holder and the right or interest conveyed to any new Holder. Interest and principal shall be paid solely to the registered holder of this Note. Subject to the Holder's right of rejection set forth in paragraph 1 of this Note, such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

9. <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to the conflict of laws provisions thereof to the

extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

10.    <u>Approval</u>. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it will use the principal of this Note solely to fund working capital for DWAC, and not for any personal, family or household purpose.

11.    <u>Representations and Warranties</u>. The Company represents and warrants to Lender, acknowledging and confirming that the Lender is relying on such representations and warranties without independent inquiry in entering into this Agreement and providing the Loan that:

a)    Incorporation and Qualification.  The Company is corporation duly continued, organized and validly existing under the laws of Delaware. The Company is qualified, licensed or registered to carry on business under the laws applicable to it in all jurisdictions in which such qualification, licensing or registration is necessary or where failure to be so qualified would have a Material Adverse Effect;

b)    Corporate Power.  The Company has all requisite corporate power and authority to (i) own, lease and operate its properties and assets and to carry on its business as now being conducted by it, and (ii) enter into and perform its obligations under the Loan to which it is a party;

c)    Conflict With Other Instruments.  Except as would not be expected to have a Material Adverse Effect, the execution and delivery by the Company the performance of its obligations under, and compliance with the terms, conditions and provisions of, the Loan to which it is a party will not (i) conflict with or result in a breach of any of the terms or conditions of (A) its constating documents or by-laws, (B) any applicable law, rule or regulation, (C) any contractual restriction binding on or affecting it or its assets, or (D) any judgment, injunction, determination or award which is binding on it, or (ii) result in, require or permit the imposition of any encumbrance in, on or with respect to any of its assets or property;

d)    Corporate Action, Governmental Approvals, etc.    The execution and delivery by the Company of each of the Loans to which it is a party and the performance by the Company it of its obligations under such Loan have been duly authorized by all necessary corporate action.  No authorization, consent, approval, registration, qualification, designation, declaration or filing with any governmental entity or other person, is or was necessary in connection with the execution, delivery and performance of obligations by the Company and under the Loan, except as have been previously disclosed to the Lender herein, including but not limited to DWAC

shareholder approval of the Business Combination and the issuance of the Class A Shares, or as would not be expected to have a Material Adverse Effect.

e)      Execution and Binding Obligation.  This Agreement and the Loan to which the Company is a party have been duly executed and delivered by the Company and constitute legal, valid and binding obligations of the Company enforceable against the Company_in accordance with their respective terms, subject only to any limitation under applicable laws relating to (i) bankruptcy, insolvency, arrangement or creditors' rights generally, and (ii) the discretion that a court may exercise in the granting of equitable remedies;

f)      No Default.  The Company_is not in material violation of its constating documents, its by-laws or any shareholders' agreement applicable to it;

g)      Compliance with Laws.  The Company is in material compliance with all applicable laws, judgments and orders and rulings, guidelines and decisions having force of law;

h)      No Material Adverse Agreements.  The Company is not a party to any agreement or instrument or subject to any restriction (including any restriction set forth in its constating documents, by-laws or any shareholders' agreement applicable to it) which has or could reasonably be expected to have a Material Adverse Effect;

i)      Material Agreements, etc.  The Company is in material compliance with all material agreements to which it is a party and has not defaulted.  No event has occurred which, with the giving of notice, lapse of time or both, would constitute a default under, or in respect of, any material agreement.  There is no dispute regarding any material agreement which could reasonably be expected to have a Material Adverse Effect;

("Material Adverse Effect") means, a material adverse effect on the business, operations, assets or financial condition of the Company, taken as a whole.

12.   Events of Default.   If any of the following events (each an "Event of Default") occurs and is continuing:

a)      The Company fails to pay any amount of the Loan or any accrued interest thereon or any fees, expenses or costs due under any Loan when such amount becomes due and payable and such failure remains unremedied for a period of ten (10) Business Days after written notice thereof from the Lender to the Company.

b) Any representation or warranty or certification made or deemed to be made by the Company, or any of their respective directors or officers in any Loan or other document delivered to the Lender thereunder shall prove to have been incorrect in any material respect when made or deemed to be made; and, if the circumstances giving rise to the incorrect representation or warranty are capable of modification or rectification (such that, thereafter the representation or warranty would be correct), the representation or warranty remains uncorrected for a period of ten (10) Business Days.

c) The Company fails to perform, observe or comply, in any material respect, with any other term, covenant or agreement contained in the Loan and such failure remains unremedied for 20 Business Days following notice of such failure from the Lender to the Company.

d) Any judgment or order for the payment of money in excess of US$2,000,000 (or the equivalent amount in any other currency) is rendered against the Company and either (i) enforcement proceedings have been commenced by a creditor upon such judgment or order, or (ii) there is any period of 30 consecutive days during which a stay of enforcement of the judgment or order, by reason of a pending appeal or otherwise, is not in effect.

e) DWAC's common stock have been permanently delisted from the NASDAQ Stock Market or another stock exchange acceptable to the Lender.

f) DWAC is no longer a reporting issuer or the equivalent under the applicable securities laws of the United States, a US reporting issuer or is included on a list of defaulting reporting issuers maintained by the securities regulators for more than 90 consecutive days.

g) A securities commission or any similar regulatory authority in any jurisdiction issues any order permanently preventing or suspending trading in any securities of DWAC.

h) The Company (i) becomes insolvent or generally not able to pay its debts as they become due, (ii) admits in writing its inability to pay its debts generally or makes a general assignment for the benefit of creditors, (iii) institutes or has instituted against it any proceeding seeking (x) to adjudicate it a bankrupt or insolvent, (y) liquidation, winding-up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors including any plan of compromise or arrangement or other corporate proceeding involving or affecting its creditors, or (z) the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or

for any substantial part of its properties and assets, or (iv) takes any corporate action to authorize any of the above actions.

then the Lender may declare the Loan, all accrued interest and all other amounts payable under this Agreement to be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Company.

13.    <u>Attorneys' Fees</u>. In the event of any material breach of the terms of this Note, the non-breaching party shall be entitled to reasonable attorneys' fees and litigation expenses resulting from any such material breach.

14.    <u>Electronic Signatures</u>. The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Witness the following signatures evidencing agreement to the aforesaid Convertible Promissory Note effective as of the date first above written:

**FOR THE COMPANY:**                    **FOR THE HOLDER:**

ARC Global Investments II, LLC

*Patrick Orlando*                          *Michael Melkersen*
_____                    _____
By: Patrick Orlando                        Michael Melkersen
Its: Managing Member

Initials:   PO  (PO)   MM  (MM).                        Page 14 of 14

# EXHIBIT 4

THIS INSTRUMENT AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT OR AS MAY OTHERWISE BE ALLOWABLE UNDER APPLICABLE LAW.

**CONVERTIBLE PROMISSORY NOTE**

**No. CN-1**                              **Date of Issuance**

**USD$250,000**                           **July 14, 2022**

In consideration for borrowing the principal sum of USD$250,000, ARC Global Investments II LLC a Florida limited liability company (the **"Company"**), hereby promises to pay to the order of Michael Melkersen (the **"Holder"**), the principal sum of USD$250,000 (the "Principal"), and any accrued interest (the "Interest"). Interest will accrue at a simple rate of 5% per annum. Unless earlier converted into the securities detailed in section 4 herein, the principal and accrued interest of this Note will be due and payable by the Company on July 14, 2023 ("**Maturity Date**").At the written election of the Holder, the Holder shall maintain the right, but not the obligation, to extend the Maturity Date.

1.   Payment. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal.  Holder shall have the absolute right to reject payment of any Principal or Interest prior to the Maturity Date. The Company grants Holder a security interest (the "Security Interest") in and to 25,000 shares of Class A stock in Digital World Acquisition Corp. ("**SPAC**") and in and to 25,000 shares of Class B stock, also referred to as founders' shares, in the SPAC (collectively these 50,000 shares are referred to herein as the "Equity Securities").  The Company represents and warrants that it currently owns the Equity Securities and that the Equity Securities, other than the applicable lock-up periods[1], are unencumbered.

---

[1] the earlier to occur of: (A) six months after the completion of the SPAC's initial business combination and (B) subsequent to the SPAC's initial business combination,  (x) if the reported last sale price of the SPAC's Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination , or (y) the date on which the SPAC completes a liquidation, merger, capital stock exchange or other similar transaction that results in all of the SPAC's stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described in the section of the SPAC's prospectus entitled "Principal Stockholders ━ Restrictions on Transfers of Founder Shares and Placement Units").

DocuSign Envelope ID: 25629F4F-8C97-407B-8EEC-61455554CB9A

2.    <u>Priority</u>. Except for the Security Interest granted in the Equity Securities referenced above and the right to convert this Note into Equity Securities as hereinafter described, this Note is subordinated in right of payment to all current and future indebtedness of the Company for borrowed money (whether or not such indebtedness is secured) to banks, commercial finance Holders or other institutions regularly engaged in the business of lending money (the "**Senior Debt**"). Nothing in this paragraph will preclude or prohibit the Holder from converting this Note or any amounts due hereunder into Equity Securities.

3.    <u>Conversion of the Notes</u>. Within five (5) days after the business combination closing, Holder may elect to convert the full principal amount into a package of securities of Digital World Acquisition Corp. ("**SPAC**") held by Company. For each $10 converted, Holder will receive: (i) one Class A share of SPAC, and (ii) one Class B share of SPAC. The business combination closing and the issuance of the Class A shares are contingent upon shareholder approval. The Company anticipates that after the business combination closing, Class A shares of the SPAC will be immediately sellable in the marketplace without restriction, while Class B shares of the SPAC will be subject to the lock-up[1], after which the Company anticipates the Class B shares to be sellable in the marketplace without restriction.

4.    <u>Material Non-Public Information</u>. Nothing in this Note constitutes material non-public information ("MNPI") with respect to SPAC. Each of the Parties hereby acknowledges that any oral or written information exchanged between the Parties in connection with the preparation and performance this Note (except for the Note itself) are regarded as Confidential Information, as that term is defined in the Non-Disclosure Agreement and shall be subject to the terms and conditions set forth therein. If previously agreed to by Holder, the Company may share with Holder information that constitutes, or the Company reasonably believes constitutes, MNPI of the Company with Holder, which information shall be subject to terms of the Non-Disclosure Agreement, and the receipt of which Holder shall acknowledge in writing.

5.    <u>Sophisticated Holder</u>. The risk factors delineated in Digital World Acquisition Corp.'s public filings, including in its Form S-4, filed on May 16, 2022, are incorporated herein as if fully restated. The Holder has sophistication and experience in financial and business matters and has the capacity to bear the economic risk of such investment for an indefinite period of time. There is a risk of total loss of investment with respect to this term sheet, specifically including if the Company does not complete a business combination for any reason. There is no guarantee that the current proposed business combination involving the Company will be approved by the SEC as there is an ongoing SEC investigation that may result in detrimental delays or the issuance of a stop order, potential for litigation, and other factors that may cause there to be insufficient capital to close the transaction.

6.    <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto.

7.    <u>Officers and Directors not Liable</u>. In no event will any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

8.    <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment

made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holders as a payment of principal. The right to covert this Note into SPAC stock as described in paragraph 4 of this Note shall not, for any reason, be deemed to be interest of whatsoever nature.

9.    <u>Transfer of Notes.</u> Should Holder transfer ownership of this Note or the rights set forth herein, in whole or in part, Holder shall notify the Company in writing of the identity of any new Holder and the right or interest conveyed to any new Holder. Interest and principal shall be paid solely to the registered holder of this Note. Subject to the Holder's right of rejection set forth in paragraph 1 of this Note, such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

10.    <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

11.    <u>Approval</u>. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note primarily for the operations of its business, and not for any personal, family or household purpose.

12.    <u>Attorneys' Fees</u>. In the event of any material breach of the terms of this Note, the non-breaching party shall be entitled to reasonable attorneys' fees and litigation expenses resulting from any such material breach.

**ARC GLOBAL INVESTMENTS II LLC**            **MICHAEL MELKERSEN**

By_____*Patrick Orlando*_____            By_____*Michael Melkersen*_____

Name: Patrick Orlando

Title:   Manager

# EXHIBIT 5

THIS INSTRUMENT AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT OR AS MAY OTHERWISE BE ALLOWABLE UNDER APPLICABLE LAW.

## CONVERTIBLE PROMISSORY NOTE

**No. CN-2**                                                   **Date of Issuance**

**USD$50,000**                                                   **July 18, 2022**

In consideration for borrowing the principal sum of USD$50,000, ARC Global Investments II LLC a Florida limited liability company (the **"Company"**), hereby promises to pay to the order of Michael Melkersen (the **"Holder"**), the principal sum of USD$50,000 (the "Principal"), and any accrued interest (the "Interest"). Interest will accrue at a simple rate of 5% per annum. Unless earlier converted into the securities detailed in section 4 herein, the principal and accrued interest of this Note will be due and payable by the Company on July 18, 2023 ("**Maturity Date**"). At the written election of the Holder, the Holder shall maintain the right, but not the obligation, to extend the Maturity Date.

1.  <u>Payment</u>. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. Holder shall have the absolute right to reject payment of any Principal or Interest prior to the Maturity Date. The Company grants Holder a security interest (the "Security Interest") in and to 5,000 shares of Class A stock in Digital World Acquisition Corp. ("**SPAC**") and in and to 5,000 shares of Class B stock, also referred to as founders' shares, in the SPAC (collectively these 10,000 shares are referred to herein as the "Equity Securities"). The Company represents and warrants that it currently owns the Equity Securities and that the Equity Securities, other than the applicable lock-up periods[1], are unencumbered.

---

[1] the earlier to occur of: (A) six months after the completion of the SPAC's initial business combination and (B) subsequent to the SPAC's initial business combination, (x) if the reported last sale price of the SPAC's Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination , or (y) the date on which the SPAC completes a liquidation, merger, capital stock exchange or other similar transaction that results in all of the SPAC's stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described in the section of the SPAC's prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units").

2. <u>Priority</u>. Except for the Security Interest granted in the Equity Securities referenced above and the right to convert this Note into Equity Securities as hereinafter described, this Note is subordinated in right of payment to all current and future indebtedness of the Company for borrowed money (whether or not such indebtedness is secured) to banks, commercial finance Holders or other institutions regularly engaged in the business of lending money (the "**Senior Debt**"). Nothing in this paragraph will preclude or prohibit the Holder from converting this Note or any amounts due hereunder into Equity Securities.

3. <u>Conversion of the Notes</u>. Within five (5) days after the business combination closing, Holder may elect to convert the full principal amount into a package of securities of Digital World Acquisition Corp. ("SPAC") held by Company. For each $10 converted, Holder will receive: (i) one Class A share of SPAC, and (ii) one Class B share of SPAC. The business combination closing and the issuance of the Class A shares are contingent upon shareholder approval. The Company anticipates that after the business combination closing, Class A shares of the SPAC will be immediately sellable in the marketplace without restriction, while Class B shares of the SPAC will be subject to the lock-up[1], after which the Company anticipates the Class B shares to be sellable in the marketplace without restriction.

4. <u>Material Non-Public Information</u>. Nothing in this Note constitutes material non-public information ("MNPI") with respect to SPAC. Each of the Parties hereby acknowledges that any oral or written information exchanged between the Parties in connection with the preparation and performance this Note (except for the Note itself) are regarded as Confidential Information, as that term is defined in the Non-Disclosure Agreement and shall be subject to the terms and conditions set forth therein. If previously agreed to by Holder, the Company may share with Holder information that constitutes, or the Company reasonably believes constitutes, MNPI of the Company with Holder, which information shall be subject to terms of the Non-Disclosure Agreement, and the receipt of which Holder shall acknowledge in writing.

5. <u>Sophisticated Holder</u>. The risk factors delineated in Digital World Acquisition Corp.'s public filings, including in its Form S-4, filed on May 16, 2022, are incorporated herein as if fully restated. The Holder has sophistication and experience in financial and business matters and has the capacity to bear the economic risk of such investment for an indefinite period of time. There is a risk of total loss of investment with respect to this term sheet, specifically including if the Company does not complete a business combination for any reason. There is no guarantee that the current proposed business combination involving the Company will be approved by the SEC as there is an ongoing SEC investigation that may result in detrimental delays or the issuance of a stop order, potential for litigation, and other factors that may cause there to be insufficient capital to close the transaction.

6. <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto.

7. <u>Officers and Directors not Liable</u>. In no event will any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

8. <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment

made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holders as a payment of principal. The right to covert this Note into SPAC stock as described in paragraph 4 of this Note shall not, for any reason, be deemed to be interest of whatsoever nature.

9.    <u>Transfer of Notes.</u> Should Holder transfer ownership of this Note or the rights set forth herein, in whole or in part, Holder shall notify the Company in writing of the identity of any new Holder and the right or interest conveyed to any new Holder. Interest and principal shall be paid solely to the registered holder of this Note. Subject to the Holder's right of rejection set forth in paragraph 1 of this Note, such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

10.    <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

11.    <u>Approval</u>. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note primarily for the operations of its business, and not for any personal, family or household purpose.

12.    <u>Attorneys' Fees</u>. In the event of any material breach of the terms of this Note, the non-breaching party shall be entitled to reasonable attorneys' fees and litigation expenses resulting from any such material breach.

**ARC GLOBAL INVESTMENTS II LLC**          **MICHAEL MELKERSEN**

By_____ *Patrick Orlando* _____          By_____ *Michael Melkersen* _____

Name: Patrick Orlando

Title:   Manager

# EXHIBIT 6

APPENDIX A:

# CONVERTIBLE PROMISSORY NOTE

**No. CN-3**                                                                      **Date of Issuance**

**USD$250,000**                                                                  **March 21, 2023**

In consideration for borrowing the principal sum of USD$250,000, ARC Global Investments II LLC (the **"Company"** or **"DWAC SPONSOR"**), hereby promises to pay to the order of Michael Melkersen (the **"Holder"** or **"Lender"**), the principal sum of USD$250,000 (the **"Principal"**), and any accrued interest (the "Interest"). Interest will accrue at a simple rate of 8% per annum. Unless earlier converted into the securities detailed in section 2 herein, the principal and accrued interest of this Note will be due and payable by the Company on March 21, 2024 ("**Maturity Date**"). At the written election of the Holder, the Holder shall maintain the right, but not the obligation, to extend the Maturity Date.

1.    <u>Payment</u>. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal.  Holder shall have the absolute right to reject payment of any Principal or Interest prior to the Maturity Date. The Company grants Holder a security interest (the "Security Interest") in and to its rights to 25,000 shares of Class A common stock in Digital World Acquisition Corporation ("DWAC") and in and to 25,000 warrants ("**Warrants**"), each of which is exercisable to purchase one-half share share of Class A stock in DWAC at $11.50 per share in accordance with that certain Unit Subscription Agreement (the "**Subscription Agreement**") dated September 2, 2021 (collectively, these 25,000 Class A shares of DWAC common stock and 25,000 Warrants are referred to herein as the "Equity Securities").  The Company represents and warrants that it currently owns the rights to the Equity Securities and that the Equity Securities are unencumbered other than being subject to closing of the business combination.

2.    <u>Conversion of the Notes</u>. Within five (5) days after the business combination closing, Holder may elect to convert the full principal amount into a package of securities of DWAC. For each $10 converted, Holder will receive: (i) one Class A share of DWAC, and (ii) one Warrant entitling Holder to purchase one-half Class A share of DWAC at $11.50 in accordance with the Unit Subscription Agreement. The business-combination closing and the issuance of Class A shares are contingent upon shareholder approval. Company will use all reasonable efforts to cause the DWAC to obtain shareholder approval. Company anticipates that after the business combination closing Class A and B Shares of the DWAC are entitled to registration rights and will be immediately sellable in the marketplace after registration with the SEC and, with respect to Class B Shares only, lockup

Initials: _____ (PO) _____ (MM).                                                   Page 9 of 14

expiration. Class A shares of DWAC will be immediately sellable in the marketplace without restriction after registration with the SEC.

3.   <u>Material Non-Public Information</u>. Nothing in this Note constitutes material non-public information ("MNPI") with respect to DWAC. Each of the Parties hereby acknowledges that any oral or written information exchanged between the Parties in connection with the preparation and performance this Note (except for the Note itself) are regarded as Confidential Information, as that term is defined in the Non-Disclosure Agreement and shall be subject to the terms and conditions set forth therein. If previously agreed to by Holder, the Company may share with Holder information that constitutes, or the Company reasonably believes constitutes, MNPI of the Company with Holder, which information shall be subject to terms of the Non-Disclosure Agreement, and the receipt of which Holder shall acknowledge in writing.

4.   <u>Sophisticated Holder</u>. The risk factors delineated in Digital World Acquisition Corp.'s public filings, including in its Form S-4, filed on May 16, 2022, are incorporated herein as if fully restated. The Holder has sophistication and experience in financial and business matters and has the capacity to bear the economic risk of such investment for an indefinite period of time. There is a risk of total loss of investment with respect to this term sheet, specifically including if the Company does not complete a business combination for any reason. There is no guarantee that the current proposed business combination involving the Company will be approved by the SEC as there is an ongoing SEC investigation that may result in detrimental delays or the issuance of a stop order, potential for litigation, and other factors that may cause there to be insufficient capital to close the transaction.

5.   <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto.

6.   <u>Officers and Directors not Liable</u>. In no event will any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

7.   <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holders as a payment of principal. The right to covert this Note into DWAC stock as described in paragraph 4 of this Note shall not, for any reason, be deemed to be interest of whatsoever nature.

8.   <u>Transfer of Notes.</u> Should Holder transfer ownership of this Note or the rights set forth herein, in whole or in part, Holder shall notify the Company in writing of the identity of any new Holder and the right or interest conveyed to any new Holder. Interest and principal shall be paid solely to the registered holder of this Note. Subject to the Holder's right of rejection set forth in paragraph 1 of this Note, such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

9.   <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to the conflict of laws provisions thereof to the

Initials: ____ (PO) ____(MM).                                           Page 10 of 14

extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

10.    <u>Approval</u>. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it will use the principal of this Note solely to fund working capital for DWAC, and not for any personal, family or household purpose.

11.    <u>Representations and Warranties</u>. The Company represents and warrants to Lender, acknowledging and confirming that the Lender is relying on such representations and warranties without independent inquiry in entering into this Agreement and providing the Loan that:

a)    Incorporation and Qualification.  The Company is corporation duly continued, organized and validly existing under the laws of Delaware. The Company is qualified, licensed or registered to carry on business under the laws applicable to it in all jurisdictions in which such qualification, licensing or registration is necessary or where failure to be so qualified would have a Material Adverse Effect;

b)    Corporate Power.  The Company has all requisite corporate power and authority to (i) own, lease and operate its properties and assets and to carry on its business as now being conducted by it, and (ii) enter into and perform its obligations under the Loan to which it is a party;

c)    Conflict With Other Instruments.  Except as would not be expected to have a Material Adverse Effect, the execution and delivery by the Company the performance of its obligations under, and compliance with the terms, conditions and provisions of, the Loan to which it is a party will not (i) conflict with or result in a breach of any of the terms or conditions of (A) its constating documents or by-laws, (B) any applicable law, rule or regulation, (C) any contractual restriction binding on or affecting it or its assets, or (D) any judgment, injunction, determination or award which is binding on it, or (ii) result in, require or permit the imposition of any encumbrance in, on or with respect to any of its assets or property;

d)    Corporate Action, Governmental Approvals, etc.   The execution and delivery by the Company of each of the Loans to which it is a party and the performance by the Company it of its obligations under such Loan have been duly authorized by all necessary corporate action.   No authorization, consent, approval, registration, qualification, designation, declaration or filing with any governmental entity or other person, is or was necessary in connection with the execution, delivery and performance of obligations by the Company and under the Loan, except as have been previously disclosed to the Lender herein, including but not limited to DWAC

DocuSign Envelope ID: 4DCB8AE0C372D94A2B3A096-8A7984B1A729

shareholder approval of the Business Combination and the issuance of the Class A Shares, or as would not be expected to have a Material Adverse Effect.

e) Execution and Binding Obligation. This Agreement and the Loan to which the Company is a party have been duly executed and delivered by the Company and constitute legal, valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, subject only to any limitation under applicable laws relating to (i) bankruptcy, insolvency, arrangement or creditors' rights generally, and (ii) the discretion that a court may exercise in the granting of equitable remedies;

f) No Default. The Company is not in material violation of its constating documents, its by-laws or any shareholders' agreement applicable to it;

g) Compliance with Laws. The Company is in material compliance with all applicable laws, judgments and orders and rulings, guidelines and decisions having force of law;

h) No Material Adverse Agreements. The Company is not a party to any agreement or instrument or subject to any restriction (including any restriction set forth in its constating documents, by-laws or any shareholders' agreement applicable to it) which has or could reasonably be expected to have a Material Adverse Effect;

i) Material Agreements, etc. The Company is in material compliance with all material agreements to which it is a party and has not defaulted. No event has occurred which, with the giving of notice, lapse of time or both, would constitute a default under, or in respect of, any material agreement. There is no dispute regarding any material agreement which could reasonably be expected to have a Material Adverse Effect;

("Material Adverse Effect") means, a material adverse effect on the business, operations, assets or financial condition of the Company, taken as a whole.

12. Events of Default. If any of the following events (each an "Event of Default") occurs and is continuing:

a) The Company fails to pay any amount of the Loan or any accrued interest thereon or any fees, expenses or costs due under any Loan when such amount becomes due and payable and such failure remains unremedied for a period of ten (10) Business Days after written notice thereof from the Lender to the Company.



Initials: _____ (PO), _____ (MM).

b)      Any representation or warranty or certification made or deemed to be made by the Company, or any of their respective directors or officers in any Loan or other document delivered to the Lender thereunder shall prove to have been incorrect in any material respect when made or deemed to be made; and, if the circumstances giving rise to the incorrect representation or warranty are capable of modification or rectification (such that, thereafter the representation or warranty would be correct), the representation or warranty remains uncorrected for a period of ten (10) Business Days.

c)      The Company fails to perform, observe or comply, in any material respect, with any other term, covenant or agreement contained in the Loan and such failure remains unremedied for 20 Business Days following notice of such failure from the Lender to the Company.

d)      Any judgment or order for the payment of money in excess of US$2,000,000 (or the equivalent amount in any other currency) is rendered against the Company and either (i) enforcement proceedings have been commenced by a creditor upon such judgment or order, or (ii) there is any period of 30 consecutive days during which a stay of enforcement of the judgment or order, by reason of a pending appeal or otherwise, is not in effect.

e)      DWAC's common stock have been permanently delisted from the NASDAQ Stock Market or another stock exchange acceptable to the Lender.

f)      DWAC is no longer a reporting issuer or the equivalent under the applicable securities laws of the United States, a US reporting issuer or is included on a list of defaulting reporting issuers maintained by the securities regulators for more than 90 consecutive days.

g)      A securities commission or any similar regulatory authority in any jurisdiction issues any order permanently preventing or suspending trading in any securities of DWAC.

h)      The Company (i) becomes insolvent or generally not able to pay its debts as they become due, (ii) admits in writing its inability to pay its debts generally or makes a general assignment for the benefit of creditors, (iii) institutes or has instituted against it any proceeding seeking (x) to adjudicate it a bankrupt or insolvent, (y) liquidation, winding-up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors including any plan of compromise or arrangement or other corporate proceeding involving or affecting its creditors, or (z) the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or

for any substantial part of its properties and assets, or (iv) takes any corporate action to authorize any of the above actions.

then the Lender may declare the Loan, all accrued interest and all other amounts payable under this Agreement to be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Company.

13.    <u>Attorneys' Fees</u>. In the event of any material breach of the terms of this Note, the non-breaching party shall be entitled to reasonable attorneys' fees and litigation expenses resulting from any such material breach.

14.    <u>Electronic Signatures</u>. The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Witness the following signatures evidencing agreement to the aforesaid Convertible Promissory Note effective as of the date first above written:

**FOR THE COMPANY:**                    **FOR THE HOLDER:**

ARC Global Investments II, LLC

*Patrick Orlando*

By: Patrick Orlando                    Michael Melkersen
Its: Managing Member

*Michael Melkersen*

Michael Melkersen

Initials: _PO_ (PO), _MM_ (MM).                    Page 14 of 14

# EXHIBIT 7

THE LAW OFFICES OF

# MICHAEL J. MELKERSEN, P.C.

9633 S. Congress Street
New Market, VA 22844
(540) 740-3937 • (540) 740-8851 (fax)
http://www.mlawpc.com

March 27, 2024

**VIA EMAIL**

ARC Global Investments II LLC
c/o Patrick Orlando (porlando@beneinvest.com)
c/o Greg Alper (gregg@arc2invest.com)
c/o Eric P. Gros-Dubois, Esq. (eric@EPGDLaw.com)

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

ARC Global Investments II LLC
78 SW 7th Street, Ste. 500
Miami, Florida 33130

ARC Global Investments II LLC
3109 Grand Ave, #450
Miami, Florida 33133

ARC Global Investments II LLC
c/o EPGD BUSINESS LAW
Attn: Eric P. Gros-Dubois, Esq.
777 SW 37th Avenue, Suite 510
Miami, Florida 33134

      Re:   Exercise of Conversion Rights Under Convertible Notes

Dear Mssrs. Orlando & Alper:

      As Mr. Orlando is aware, I lent money to ARC Global Investments II LLC ("ARC") pursuant to three separate convertible promissory notes (the "Notes"), to wit: (1) a convertible promissory note for $250,000 dated July 14, 2022, which is convertible into 25,000 A-shares and 25,000 B-shares of Digital World Acquisition Corp., which has now merged with Trump Media and Technology Group ("TMTG") (collectively "DJT"); (2) a convertible promissory note for $50,000 dated July 18, 2022, which is convertible into 5,000 A-shares and 5,000 B-shares of DJT; and (3) a convertible promissory note for $250,000 dated March 21, 2023, which is convertible into 25,000 A-Shares and 25,000 Warrants of DJT. Each of the Notes entitles me to the right to convert them into the above-specified securities by providing ARC with notice that I am exercising my rights of conversion. The Notes require this notice to be given within five days after the closing of the business combination closing, which closing occurred on March 25, 2024. Please be advised that I hereby irrevocably exercise my conversion rights under the at-issue Notes in full.

ARC Global Investments II LLC
Notice by Melkersen of Exercise of Conversion Rights
Page 2

In addition, as Mr. Orlando is aware, he and ARC executed a membership purchase agreement (the "MPA") dated March 16, 2023, by which ARC & Orlando conveyed to me rights in and to 250,000 A-Shares and 250,000 B-Shares of DJT. And as you both are aware, I executed a Subscription Agreement (the "Subscription Agreement") with ARC on August 2, 2021, entitling me to an additional 25,000 B-Shares of DJT. Therefore, to summarize, the total DJT securities to which I am entitled from ARC and/or Orlando, having exercised my conversion rights described herein, are as follows: 305,000 A-Shares of DJT, 305,000 B-Shares of DJT and 25,000 Warrants in DJT. As Mr. Orlando is aware, I maintain a perfected security interest in and to all the above-referenced securities, except for the 25,000 B-Shares in DJT I am entitled to receive under the Subscription Agreement with ARC.

I ask that you acknowledge ARC's receipt of this letter exercising my conversion rights under the Notes and that you provide instructions to Odyssey Transfer and Trust Company ("Odyssey"), copying me or affirming to me you have done so, directing Odyssey to register as may be required, and transfer over to my brokerage account, the DJT securities described herein. Please note that in the meantime, to ensure that my interests are properly protected, I have notified Odyssey and DJT of my perfected security interest in the at-issue securities and my rights to have such securities registered in my name and transferred to me.

Finally, as Mr. Orlando is aware, I have provided him with my personal information, proof of my identification, along with my brokerage account information to facilitate the transfer of the securities described herein. I am providing that same information again as an attachment to this letter for your ease of use, and, if needed, for the use of Odyssey and DJT. Please let me know if you need anything further from me to facilitate the registration and transfer to me of the securities described herein.

Sincerely,

Michael J. Melkersen

cc:    Odyssey, c/o Becky Paulson, President (bpaulson@odysseytrust.com)
       DJT, c/o Scott Glabe, Esq. (scott.glabe@tmediatech.com)
       DWAC, c/o Eric Swider (es@renatusadvisors.com & eric@dwacspac.com)
       Gil Savir, Esq. (gilsavir@paulhastings.com)
       Brad Bondi, Esq. (bradbondi@paulhastings.com)
       Ethan Rosenfeld, Esq. (ethan.rosenfeld@nelsonmullins.com)
       Mike Bryan, Esq. (mike.bryan@nelsonmullins.com)

# EXHIBIT 8

**CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT**
**SARASOTA COUNTY, FLORIDA**
**CIVIL DIVISION**

TRUMP MEDIA & TECHNOLOGY GROUP
CORP., a Delaware Corporation (f/k/a Digital
World Acquisition Corp.) and TMTG Sub Inc.,

     Plaintiffs,

v.                                                                    Case No. 2024-CA-001061-NC

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company, and
PATRICK ORLANDO,

     Defendants.

_____/

**PLAINTIFFS' MOTION FOR TEMPORARY**
**INJUNCTION WITH NOTICE AND HEARING**

To avoid irreparable harm and preserve the status quo pending a disposition on the merits,

Plaintiffs Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp.[1]

("TMTG" or "DWAC") and TMTG Sub Inc. ("Old TMTG")[2] (collectively, "Plaintiffs"), pursuant

to Florida Rule of Civil Procedure 1.610, request that the Court render an order temporarily

enjoining Defendants ARC Global Investments II, LLC ("ARC") and United Atlantic Ventures

LLC's ("UAV")[3] imminent sale of more than 18 million shares in TMTG to which they are not

---

[1] DWAC no longer exists as a separate entity and is now known as TMTG following a merger on March 25, 2024. For the purpose of clarity, Plaintiffs will generally refer to TMTG as "DWAC" or "DWAC n/k/a TMTG" when referring to events taking place prior to the merger.

[2] Old TMTG was formerly known as Trump Media & Technology Group Corp. On March 25, 2024, Old TMTG merged with DWAC. Through the merger, Old TMTG became a wholly owned subsidiary of DWAC and changed its name to TMTG Sub Inc. DWAC, in turn, changed its name to Trump Media & Technology Group. Corp.

[3] As a threshold matter, Plaintiffs recognize that UAV is not yet currently a party in this action and that Florida law generally disfavors enjoining non-parties. Given the magnitude of obvious misconduct by UAV, and its principals Andrew Litinsky and Wesley Moss, in connection with the matters raised herein, Plaintiffs seek a temporary injunction in connection with Plaintiffs' Motion for Leave to File Second Amended Complaint, dated July 31, 2024, which Plaintiffs anticipate the Court will grant. If the Court denies Plaintiffs Motion for Leave to File Second Amended Complaint, Plaintiffs will withdraw the present request to the extent that it seeks to enjoin proposed Defendants UAV,

entitled following the expiration of a lock-up restriction as soon as September 19, 2024 (the "Lock-Up Period"). If permitted to proceed, this fire sale will cause significant, irreparable harm to Plaintiffs.

## I.    INTRODUCTION

For the reasons set forth further below, ARC and UAV cannot be permitted to sell their more than 18 million locked-up shares of TMTG, a publicly-traded company with a multi-billion dollar enterprise value. Defendants are fraudsters who have directly and intentionally brought substantial harm to the Company. Permitting them to sell shares worth hundreds of millions of dollars (received in consideration for a collective investment of ~$25,000) will egregiously reward illegal conduct and irreparably harm TMTG where (a) ARC and UAV collectively own approximately 10% of TMTG's outstanding shares and one third of its float[4] and, therefore, such sales will have a substantial market impact; (b) TMTG will be left without the possibility of disgorging these shares, which both ARC and UAV obtained as a result of illegal conduct and consequently should forfeit; and (c) with respect to ARC, its misconduct has created share disputes amongst ARC and persons to whom ARC promised at least some of its TMTG shares and, according to ARC, these ARC-created share disputes now have led to exposure to TMTG that will be realized if ARC is permitted to sell or transfer its shares prior to such disputes being resolved. Accordingly, it is critical and in the public interest for this Court to preserve the status quo and prevent ARC and UAV from selling TMTG shares.

*******

---

Andrew Litinsky, and Wesley Moss. Plaintiffs therefore maintain that the present request for temporary injunction does not seek relief concerning a contingent irreparable harm; rather, Plaintiffs' request is predicated on a conditional procedural outcome and is therefore appropriate.

[4] As used herein, "float" refers to the number of shares available to the public for trading.

ARC purports to own millions of shares of TMTG stock, including at least 7,400,520 locked-up shares, that are worth hundreds of millions of dollars. In reality, ARC flagrantly violated the duties it owed and assumed in order to receive those shares. As a result, ARC is not entitled to their benefit, let alone their sale pending the adjudication of this case. It is undisputed that ARC was the sponsor of the DWAC special purpose acquisition company ("SPAC"). As a sponsor, ARC was charged with creating a SPAC (here, DWAC), and raising money for it to acquire and merge with a private operating company (here, Old TMTG) within a specified time period. As a sponsor, ARC provided DWAC with an initial $25,000 capital contribution in exchange for a portion of the shares presently at issue and with the underlying agreement that ARC, as sponsor, and Orlando, as ARC's controlling member, would guide DWAC towards a *legitimate* and *lawful* merger. ARC's significant shares presently at issue were conditioned on its strict adherence to the fiduciary duties ARC owed to DWAC as its sponsor and successful fulfilment of ARC's overarching obligation to effectuate a legally permissible merger. ARC and Orlando did not, however, steer DWAC towards an efficient and issue-free merger. Instead, their unlawful and tortious acts prompted a government investigation and cost TMTG millions of dollars in regulatory fines and legal fees.

ARC and Orlando, with the knowledge and support of UAV and its principals Litinsky and Moss, formulated and engaged in an unlawful pre-targeting scheme. Specifically, the parties conspired to merge Old TMTG and DWAC before DWAC had gone public through an initial public offering ("IPO"). To effectuate this scheme, Orlando and ARC—with UAV's knowledge— falsely represented in public filings that DWAC did not intend to merge, and had no substantive conversations with, any specific company. This was false because an Old TMTG/DWAC merger had been expressly communicated and planned over the course of several months and was

therefore at the time of the public filings all but certain to occur. SPACs such as DWAC are prohibited from such pre-IPO targeting, as well as from making false or misleading statements to investors and the public in connection with potential mergers. *See* 17 C.F.R. § 230.419; 17 C.F.R. § 240.10b-5; 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b). As a result of ARC, Orlando, and UAV's pre-targeting scheme, the U.S. Securities and Exchange Commission ("SEC") launched an investigation into the merger which led to an $18 million penalty against DWAC, more than $11 million in legal fees incurred by Plaintiffs, and two years of unnecessary delay that cost incalculable damage to TMTG in lost business opportunities and reputational harm. The SEC has now separately sued Orlando while simultaneously implicating UAV, Moss, and Litinsky, further illustrating and corroborating the litany of unlawful pre-targeting misconduct that has harmed and continues to harm Plaintiffs. A true and correct copy of the SEC's complaint against Orlando (the "SEC Complaint") is attached hereto as **Exhibit 1** to the Declaration of Scott L. Glabe dated August 14, 2024 ("Glabe Aff.") and incorporated herein by reference.

Similar to its co-conspirator ARC, UAV claims entitlement to 10,912,141 shares of Old TMTG (now TMTG) stock, also worth hundreds of millions of dollars, despite its unlawful pre-targeting conduct and without any real investment in the business. Indeed, in exchange for the shares at issue, UAV and its principals, Moss and Litinsky, put in little to no cash of their own and were principally responsible for faithfully shepherding Old TMTG through its early development and a merger transaction. They "failed on all fronts." (*See* Proposed Second Amended Complaint ("SAC") ¶ 47, **Exh. 3** to Glabe Aff.). UAV, Moss, and Litinsky failed to properly organize the company. They made wasteful and reckless decisions that threatened the launch of Old TMTG's social media network, Truth Social. Once new leadership was appointed, their failures and misconduct threatened the company and its business operations and future success to advantage

themselves. But perhaps even more damaging, UAV, Moss, and Litinsky partnered with ARC and Orlando in the above-mentioned unlawful pre-targeting scheme, which led to millions of dollars in fines, legal fees, and lost revenues and business.

Despite their unlawful conduct, UAV and ARC have made clear that they intend to sell or transfer all of their shares in TMTG upon expiration of the Lock-Up Period restricting that sale until at least September 19, 2024. Permitting the sale would unjustly enrich these bad actors and implicitly condone the wrongful dissipation of the stock TMTG seeks to recover—assets to which UAV was not entitled in the first place and which ARC obtained through unlawful means—before the Court can hold a trial, or even a substantive hearing, on the merits. Moreover, the intended sale of a significant percentage of TMTG's stock—representing many multiples of TMTG's recent average daily trading volume—would inflict further irreparable harm by depressing TMTG's stock price and its access to capital, negatively impacting TMTG's business reputation. To timely resolve this issue before the Defendants' threatened fire sale of TMTG stock, Plaintiffs seek a temporary injunction to preserve the status quo, with notice and a hearing in the near term—indeed, as soon as possible.[5]

## II.      BACKGROUND

### A.      Procedural History

1.      DWAC n/k/a TMTG initiated this action on February 27, 2024, seeking declaratory relief and alleging several causes of action against ARC and Orlando concerning their tortious conduct and purported shares in Old TMTG. DWAC n/k/a TMTG amended its complaint on March 17, 2024, adding additional fiduciary duty and statutory claims against ARC and Orlando.

---

[5] Plaintiffs do not presently seek *ex parte* relief.

The facts and claims alleged are stated more fully in the original and first amended Complaints and are incorporated herein by reference.

2.      On July 17, 2024, the SEC Complaint was filed, alleging in great detail that Orlando, ARC's controlling member, engaged in securities fraud in connection with the pre-targeting scheme to merge Old TMTG and DWAC. (*See generally* SEC Compl.). Although UAV, Moss, and Litinsky are not named as defendants or expressly identified in the SEC Complaint, they are clearly and prominently featured therein, and their involvement in the unlawful scheme is irrefutable.

3.      On July 31, 2024, in the wake of the SEC Complaint, TMTG and Old TMTG filed a Motion for Leave to File Second Amended Complaint against ARC, Orlando, UAV, Litinsky, and Moss. Among other things, TMTG and Old TMTG seek damages, including the disgorgement and/or return of any TMTG shares or other benefits ARC, Orlando, UAV, Litinsky, and Moss received, and other relief the Court deems appropriate. (*See* SAC, Counts I-XII).

4.      As alleged in the SAC—and as will be shown at a hearing—UAV agreed in February 2021 to establish Old TMTG's corporate governance, make all preparations to launch Truth Social, and identify a suitable merger partner to take Old TMTG public and provide it with capital to advance its business plan. (Glabe Aff. ¶ 8). In exchange for taking on these responsibilities, UAV received stock in Old TMTG rather than cash.

5.      UAV, Moss, and Litinsky, however, acted recklessly and in bad faith in managing Old TMTG. (*Id.* ¶¶ 8-9). When new management took over Old TMTG's operations, they discovered, among other things:

> a.      UAV, Moss, and Litinsky failed to establish Old TMTG's corporate governance. They failed to adopt incorporator resolutions or corporate

bylaws and failed to facilitate the adoption of a shareholders' agreement that would have established a corporate government structure. (Glabe Aff. ¶ 9, Exh. 4 at 2). Consequently, Old TMTG had no choice but to expend substantial effort and resources to remediate and reverse their failures and establish its authority to make and execute on important business decisions. (Glabe Aff. ¶ 10).

    b.    UAV, Moss, and Litinsky also selected an unqualified technical team and managed it abusively, recklessly hastening development, setting arbitrary and unattainable deadlines, and establishing a toxic corporate culture. These decisions impaired and impeded Truth Social's launch and undermined Old TMTG's business reputation. (Glabe Aff. ¶ 9, Exh. 4 at 3-4).

6.    ARC and Orlando acted as DWAC's sponsor, which is an entity that creates a SPAC (here, DWAC) and raises money to acquire and merge with a private operating company (here, Old TMTG) within a specified time period. (*See* SEC Compl. ¶¶ 19-20, 27). In exchange for its initial $25,000 capital contribution in the DWAC SPAC—and the representation that DWAC could rely on ARC and Orlando, as sponsor, to lawfully acquire a target company—ARC, controlled by Orlando, received 8,625,000 Class B shares of DWAC stock. (*Id.* ¶ 27).

7.    Regarding the merger transaction, and as laid out in further detail in the SEC Complaint, UAV, Moss, and Litinsky negotiated an illicit deal with ARC and Orlando whereby Old TMTG would merge with one of two Orlando-controlled SPACs: first, Benessere Capital Acquisition Corp., which Defendants referred to as "Plan A," and second, DWAC, which Defendants referred to as "Plan B." (*See* Glabe Aff. ¶¶ 12-14, 16-18; *see also* SEC Compl. ¶¶ 31-43). Importantly, Defendants' decision to merge Old TMTG with one of the Orlando-

controlled entities—and Orlando's subsequent publicly filed statements on behalf of DWAC which failed to disclose the parties' pre-targeting communications and efforts—not only violated securities regulations, but also flagrantly violated the fiduciary duties ARC and Orlando owed to DWAC and UAV, Moss, and Litinsky owed to Old TMTG.

8.    Indeed, Litinsky himself both acknowledged and then astonishingly disregarded the illegality and serious risk the pre-targeting scheme posed not only to a successful merger, but also to Old TMTG itself, asking in notes he drafted to himself "is [Orlando] wearing a wire?" (Glabe Aff. ¶ 16, Exh. 6 at 4).[6] Nonetheless, UAV, Moss, and Litinsky persisted in partnering with ARC and Orlando, which led to the SEC's investigation into the ultimate merger between Old TMTG and DWAC. (*See* Glabe Aff. ¶ 17).

9.    The SEC's investigation resulted in an $18 million penalty imposed against DWAC. (*See* Glabe Aff. ¶ 6, Exh. 2). It also delayed the SEC's approval of the merger—which was required for the deal to close—for two years. (*Id.* ¶¶ 6, 27-29). This, in turn, caused Plaintiffs to incur millions of dollars in legal fees and costs. (*Id.* ¶ 26).

10.    Moreover, the delay prevented Old TMTG from accessing the hundreds of millions of dollars in capital it would have received from a quick, efficient, and lawful SPAC merger. (Glabe Aff. ¶ 27). Without this capital—which was vital to this young startup company's success and future—Old TMTG was forced to operate on a limited budget, eliminate several positions, and abandon certain business opportunities it would have otherwise pursued absent the SEC investigation. (*See id.* ¶¶ 27-28). Old TMTG was also forced to seek capital contributions from other sources, including the issuance of promissory notes, which resulted in the issuance of

---

[6] Plaintiffs' allegations in this Motion and in the Proposed Second Amended Complaint are further supported by documents that are in the possession of both Defendants and the SEC. Plaintiffs have requested the production of these documents, but Defendants have refused.

additional Old TMTG and TMTG shares. (*Id.* ¶ 28). Ultimately, despite UAV agreeing to effectuate an expeditious SPAC merger, ARC and UAV's pre-targeting scheme and the resulting SEC investigation and delay forced Old TMTG to operate without SPAC capital for a much longer period of time than it had anticipated.

11.     On April 11, 2024, UAV filed a Second Amended Complaint in the Delaware Court of Chancery, Case No. 2024-0184-MTZ (the "Delaware Action") requesting, *inter alia*, declaratory relief to invalidate a provision contained in TMTG's corporate charter restricting Old TMTG stockholders from selling post-merger TMTG stock during the Lock-Up Period. (*See* Delaware Action, Second Amended Complaint, **Exh. 19** to Glabe Aff.). As detailed below, UAV has clearly indicated that it plans to sell every one of its shares at the first possible opportunity— when the Lock-Up Period expires.

### B.     The TMTG Market

12.     On March 26, 2024, New TMTG's eligible shares began trading on the public markets via the Nasdaq Stock Exchange ("Nasdaq") under the symbol DJT. On the first five days of trading, average daily trading volume was understandably high. Over the last 10 trading days, from July 30, 2024 to August 12, 2024, TMTG's daily trading volume has averaged approximately 3.65 million shares per day.

### C.     UAV's Shares

13.     Moss and Litinsky, as initial *de facto* directors of Old TMTG, were principally responsible for its day-to-day operations with the goal of establishing Old TMTG's corporate governance structure, launching the Truth Social platform, and finding a publicly traded merger partner. (*See* Glabe Aff. ¶¶ 8-9).

14.    Post-merger, UAV is recorded as the holder of 10,912,141[7] shares of TMTG's issued and outstanding stock—more than 5% of total outstanding shares as of August 7, 2024. (*See* TMTG Form S-1 at 133, dated July 3, 2024, **Exh. 20** to Glabe Aff.). It is those shares that are challenged due to UAV's utter failure to perform and its involvement with ARC and Orlando in the unlawful pre-targeting scheme.

### D.    ARC and Orlando's Shares

15.    ARC, as DWAC's sponsor, initially invested $25,000 in DWAC in exchange for 8,625,000 Class B "founder" shares of DWAC stock. (*See* SEC Compl. ¶ 27).

16.    ARC retained the majority of these "founder" shares, which converted into ordinary, Class A common shares upon closing of the merger. Post-merger, ARC is recorded as the beneficial owner at least 7,400,520 shares of TMTG's issued and outstanding stock that converted from "founder" shares[8]—approximately 4% of total outstanding shares as of August 7, 2024. (*See* Glabe Aff., Exh. 20 at 133). While ARC is the record holder of these TMTG shares, TMTG's public disclosures reflect that "Orlando is the current managing member of ARC and has sole voting and dispositive power with respect to the shares held of record by ARC. By virtue of this relationship, Mr. Orlando may be deemed to share beneficial ownership of the securities held of record by ARC." (*Id.*).

17.    ARC's ownership of TMTG shares is also the subject of several active litigations in which alleged ARC investors assert that their interests in ARC entitle them to converted shares in TMTG. These cases include:

---

[7] This figure excludes 52,859 shares included in TMTG's public filings which will remain in an indemnification escrow beyond the expiration of the Lock-Up Period.

[8] The precise number of such shares is subject to separate, pending litigation in the Delaware Court of Chancery.

a.     Michael J. Melkersen v. ARC, TMTG, and Odyssey Transfer and Trust Company ("Odyssey"): Case No. 2024-011456-CA-01 in Florida Circuit Court, Miami-Dade County ("*Melkersen*");

b.     Edwin Tucker, et al. v. ARC and DWAC: Case No. 2024-008668-CA-01 in Florida Circuit Court, Miami-Dade County ("*Tucker*");

c.     Dan Akers, et al. v. ARC: Case No. 652515/2024 in the Supreme Court of New York, New York County ("*Akers*"); and

d.     Odyssey v. ARC and Melkerson, with TMTG as nominal defendant: Case No. 24-cv-729-GBW in the United States District Court for the District of Delaware ("*Odyssey*").

(*See* Glabe Aff., ¶ 22, Exhs. 14-17). *Melkerson*, *Tucker*, and *Akers* generally concern disputes over shares that the plaintiffs claim ARC promised them. Relatedly, *Odyssey* is an interpleader action filed by TMTG's transfer agent to resolve the aforementioned shareholder dispute between Melkersen and ARC.

18.     Accordingly, it appears that ARC and Orlando have agreed to provide some percentage of these shares to downstream investors, including, but not limited to, the plaintiffs listed above as well as various foreign trusts including at least one set up for the benefit of Orlando and his family.

19.     ARC has alleged that TMTG has liability in connection with these investor disputes for its purported failure to transfer TMTG shares to these alleged investors. (*See* Glabe Aff. ¶ 23, Exh. 18). Despite repeated requests, however, ARC and Orlando have refused to provide a capitalization table and other evidence sufficient to identify the investors or evidence their investment in ARC and, thus, entitlement to TMTG shares. (Glabe Aff. ¶ 24).

20.     Orlando's failure to provide this information is calculated. The evidence suggests that Orlando engaged in illegal conduct with respect to the sale of interests in ARC and TMTG shares. For example, Orlando appeared to enter into arrangements whereby he (i) exchanged TMTG shares for sums of cash, (ii) provided TMTG shares as repayment for personal debts, and (iii) allocated TMTG shares to his children for no financial consideration. (*See* Declaration of Alexander Cano dated August 14, 2024 ¶¶ 6-9). The individuals and entities alleged to have received these shares were indeed listed as ARC shareholders in a corporate disclosure statement filed in another shareholder litigation involving ARC and Orlando. (*See* Glabe Aff., Exh. 24). Moreover, Orlando entered into agreements whereby Orlando-backed entities borrowed millions of dollars from offshore funds purportedly to use for DWAC's operating expenses and convertible into TMTG shares. But DWAC never received those proceeds. (*See* Declaration of Eric Swider dated August 14, 2024 ¶¶ 4-7, Exh. 1).

### E.     The Lock-Up Agreements

21.     At the time of DWAC's IPO, DWAC, ARC, and other investors entered into a letter agreement that contained a Lock-Up Provision. (*See* Glabe Aff., Exh. 20 at Attachment 10.1).

22.     Moreover, on March 25, 2024, TMTG filed a second amended corporate charter overwhelmingly approved by its stockholders, which, *inter alia*, changed the name of the corporation from DWAC to TMTG (the "Second Amended Charter"). (*See* Second Amended Charter, **Exh. 21** to Glabe Aff.). The Second Amended Charter too contained a Lock-Up Provision.

23.     The Lock-Up Provision in both the DWAC IPO Letter Agreement and Second Amended Charter state, in pertinent part, that lock-up holders may not transfer any lock-up shares until:

> the earliest of (i) the date that is six months after the closing date of the DWAC Transaction, (ii) the date on which the

> closing price for the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalization and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the closing date of the DWAC Transaction, and (iii) the date after the closing of the DWAC Transaction on which the Corporation consummates a liquidation, merger, share exchange or other similar transaction that results in all of the Corporation's stockholders having the right to exchange their equity holdings in the Corporation for cash, securities or other property.

(*See* Glabe Aff., Exh. 21; *see also* Glabe Aff., Exh. 20 at Attachment 10.1).

24.    Assuming TMTG does not earlier "consummate[] a liquidation, merger, share exchange or other similar transaction that results in all of [its] stockholders having the right to exchange their equity holdings . . . for cash, securities or other property," the Lock-up Period set forth above expires as early as September 19, 2024—a little more than a month from today.  (UAV has advocated for an even earlier date and sought to remove the lock-up altogether.)

### F.    UAV's Intent to Sell

25.    UAV has explicitly stated that, absent the Lock-Up Provision, it would have sold its shares in TMTG, to wit:

> UAV is suffering irreparable harm due to the restrictions on its stock because it is unable to trade or transfer its stock.  In addition, by the time the restrictions expire, UAV will face adverse market conditions that will greatly reduce the value of its stock and likely will be unable to collect money damages . . . .

(Delaware Action, Second Amended Complaint ¶ 108; *see also id.* ¶ 12 ("UAV's post-merger stock in New TMTG is unreasonably restricted and cannot currently be sold by UAV due to the lock-up provisions . . . ."). UAV has reaffirmed this intention, stating that "***[b]ut for the Charter Lockup, UAV would have traded all its shares on the first day of trading under the DJT ticker***."

(*See* Delaware Action, Opp. to Mot. to Vacate, dated April 25, 2024, **Exh. 22** to Glabe Aff.)

(emphasis added). As such, upon the expiration or removal of the Lock-Up Provisions, UAV will immediately seek to sell almost 11 million shares in TMTG—more than 5% of its issued and outstanding shares, approximately 20% of its public float, and approximately 3 times the recent average daily trading volume. That will unavoidably have a significant and negative effect on the market for TMTG stock,[9] which impact will be difficult or impossible to precisely calculate in the future. More fundamentally, UAV is not entitled to retain these shares, which TMTG is seeking to disgorge.

### III.    LEGAL STANDARD

26.    In deciding an application for a temporary injunction, the Court "considers whether the moving party has demonstrated (1) irreparable harm to the moving party unless the injunction issues, (2) unavailability of an adequate legal remedy, (3) a substantial likelihood of success on the merits, and (4) that the public interest is supported by the entry of the injunction." *Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63, 64-65 (Fla. 2d DCA 2010) (citing *Masters Freight, Inc. v. Servco, Inc.*, 915 So. 2d 666, 666 (Fla. 2d DCA 2005)).

27.    The "purpose of a temporary injunction is to maintain a status quo of the subject matter of the suit pending a final determination of the cause." *N. Dade Water Co. v. Adken Land Co.*, 114 So. 2d 347, 348 (Fla. 3d DCA 1959). "As the name would imply, a temporary injunction is not conclusive and the provisions of same may be merged in or dissolved by the final decree, dependent upon a determination of the issues made by the complaint and answer." *Id.*

---

[9] *See Initial Public Offerings: Lockup Agreements*, United States Secs. & Exch. Comm'n., *available at* https://www.investor.gov/introduction-investing/investing-basics/glossary/initial-public-offerings-lockup-agreements (last visited August 14, 2024) ("If you are considering investing in a company that has recently conducted an initial public offering, you should determine whether the company insiders have a lockup and when it expires. This is important information because a company's stock price may drop in anticipation that locked up shares will be sold into the market when the lockup ends.").

## IV.    ARGUMENT

### A.    ARC and Orlando Should Be Enjoined from Selling or Transferring Their TMTG Shares.

#### i.    ARC and Orlando's Sale of TMTG Shares Would Irreparably Harm TMTG Because There Is No Adequate Remedy at Law.

28.    A movant seeking a temporary injunction must first demonstrate irreparable harm and an inadequate remedy at law. *See Atomic Tattoos*, 45 So. 3d at 64. Courts often examine these elements as a single requirement. *See, e.g.*, *Polk Cnty. v. Mitchell*, 931 So. 2d 922, 926 (Fla. 2d DCA 2006) (requiring as an element for temporary injunction "a likelihood of irreparable harm ***and*** the unavailability of an adequate remedy at law"). That is, a movant must demonstrate "the likelihood of . . . irreparable harm ***because of*** the unavailability of an adequate remedy at law." *See De Leon v. Aerochago, S.A.*, 593 So. 2d 558, 559 (Fla. 3d DCA 1992) (emphasis added).

29.    DWAC accepted ARC's sponsor contribution with the expectation that ARC and its controlling member, Orlando, would assist in a lawful and legitimate business merger. DWAC did not receive this benefit, but ARC nonetheless benefited handsomely and illegally. Indeed, ARC has been issued over 13 million shares of TMTG stock, which more than 7 million it intends to sell upon the expiration of the Lock-Up Period. But as stated above, ARC and Orlando breached the fiduciary duties they owed to DWAC and are therefore not entitled to these shares. *See Bailey v. St. Louis*, 268 So. 3d 197, 201 (Fla. 2d DCA 2018) ("Disgorgement is a remedy designed to deter wrongdoers by making it unprofitable to engage in the wrongful behavior."); *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 698 (Fla. 3d DCA 2018) ("The equitable remedy of disgorgement is measured by the defendant's ill-gotten profits or gains rather than the plaintiff's losses."). Thus, if ARC is able to sell its shares before this matter is fully adjudicated, disgorgement of the shares will be unavailable to TMTG when it prevails. And the unavailability of this remedy is precisely why failing to preserve the status quo and hold these

shares in abeyance pending the disposition of this matter would irreparably harm TMTG. *See, e.g.,* *Gator Boring & Trenching, Inc. v. Westra Constr. Corp.*, 210 So. 3d 175, 181 (Fla. 2d DCA 2016) (holding release of a bond before trial constituted irreparable harm because the plaintiff "would be without a remedy on the bond" even after a successful plenary appeal); *see also Farrey's Wholesale Hardware Co., Inc. v. Coltin Elec. Servs., LLC*, 263 So. 3d 168, 179 (Fla. 2d DCA 2018). Indeed, ARC received TMTG's stock under false pretenses and should not be rewarded for that misconduct by reaping tens of millions in profits. *See Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 899 So. 2d 1222, 1227 (Fla. 1st DCA 2005); *King Mountain Condo. Ass'n v. Gundlach*, 425 So. 2d 569, 571 (Fla. 4th DCA 1982) (holding that disgorgement of profits as a remedy for breach of fiduciary duty is equitable in nature).

30.     Moreover, the dissipation of ARC's wrongfully held assets that will undoubtedly occur absent a temporary injunction also amounts to irreparable harm without an adequate legal remedy. In *In re Estate of Barsanti*, for example, a decedent's heir removed stock certificates from the control of the decedent's estate and claimed ownership. 773 So. 2d at 1207-08. On the estate's appeal of the denial of its application for a temporary injunction, the court held that based on the evidence, "[t]he Estate is subject to immediate and irreparable harm if [the heir and her husband were] recognized as the rightful owner[s] of the bearer certificates because this could subject the assets of the Estate to dissipation." *Id.* at 1208.

31.     Similarly, in *Vargas v. Vargas*, corporate shares were transferred to certain children of a wealthy patriarch as an early inheritance. 771 So. 2d 594, 595 (Fla. 3d DCA 2000). Some of these shares and a certain sum of money, however, were alleged to belong to the children excluded from the inheritance. *Id.* The excluded children sought a temporary injunction freezing various

safe deposit boxes containing the bearer shares, as well as $4.4 million in bank accounts. *Id.* The

court affirmed the granting of the temporary injunction, holding that:

> The sisters have shown common ownership of the bearer shares, as
> well as the $4.4 million in bank accounts, and that a lifting of the
> injunction would expose those assets to conversion or dissipation by
> a third party over which the sisters have no control. Thus, if the
> assets are not shielded from the potential conversion or dissipation,
> they might no longer be within the jurisdiction of the court. If the
> assets are taken outside the court's jurisdiction, the corpus of any
> possible constructive trust would no longer be available, thereby
> rendering such equitable relief unattainable should the sisters
> ultimately prevail on their complaint.

*Id.* at 595-96.

32.     As such, Florida courts routinely enter injunctions to freeze assets from dissipation.

*See Gyptec, S.A. v. Hakim-Daccach*, 299 So. 3d 481, 484 (Fla. 3d DCA  2020) (collecting cases

and holding that an "injunction was necessary to protect the specific identified res of the

constructive trust claim and to prevent further dissipation of the funds"); *see also Pendergraft v.

C.H.,* 225 So. 3d 420, 421 (Fla. 5th DCA 2017) (explaining "an order freezing assets for further

determination of the ownership right to those assets is in the nature of an injunction"); *TJ Mgmt.

Grp., L.L.C. v. Zidon*, 990 So. 2d 623, 625 (Fla. 3d DCA 2008) (affirming an injunction order

freezing funds held in a bank account for further determination on the ownership rights to those

funds).

33.     Accordingly, ARC's planned fire sale of TMTG stock will cause Plaintiffs

irreparable injury by foreclosing a significant legal remedy Plaintiffs seek (disgorgement of

wrongfully held TMTG shares) and by dissipating wrongfully held assets. Thus, absent prompt

action by this Court, Plaintiffs will be left irreparably harmed and without any ability to adequately

recoup their losses.

### ii.    TMTG is Substantially Likely to Succeed on the Merits.

34.    To establish a substantial likelihood of success, a movant for a temporary injunction need only establish "good reasons for anticipating" it will ultimately prevail on the merits. *City of Jacksonville v. Naegle Outdoor Advert. Co.*, 634 So. 2d 750, 753 (Fla. 1st DCA 1994); *see also Miami-Dade Cnty. v. Miami Gardens Square One, Inc.*, 314 So. 3d 389, 397 (Fla. 3d DCA 2020). After all, temporary injunctions serve to "preserve the status quo or prevent ongoing harm before a full hearing." *Hasley v. Harrell*, 971 So. 2d 149, 152 (Fla. 2d DCA 2007). A "likelihood of probable success," not certain success, is what is required. *See Southards v. Motel Mgmt. Co.*, 567 So. 2d 523, 524 (Fla. 3d DCA 1990).

35.    TMTG is substantially likely to succeed on the merits in this action. As asserted in the Proposed Second Amended Complaint—and in the SEC's recent complaint against Orlando—ARC and Orlando engaged in a pre-targeting scheme to merge DWAC and Old TMTG before DWAC's IPO. (*See* Glabe Aff. ¶¶ 12-14, 16-18). In furtherance of this scheme, Orlando made numerous false representations in public filings that DWAC did not intend to merge with, or had any substantive conversations with, any specific company. (*Id.* ¶¶ 19-21). This conduct was in direct violation of ARC and Orlando's duty of care and loyalty to DWAC, specifically its obligation (for which ARC received millions of shares in DWAC) to provide guidance and support in a *legitimate* and *lawful* merger with a private company. ARC and Orlando's numerous breaches of their fiduciary duties led to an SEC investigation and $18 million penalty, as well as incalculable loss and reputational damage stemming from the approximately two-year delay in an ultimate merger between Old TMTG and DWAC. (*Id.* ¶¶ 25-29). Plaintiffs are entitled to recoup this benefit, as permitting ARC to retain and then sell the disputed shares will unjustly enrich ARC at Plaintiffs' expense. *See Shands*, 899 So. 2d at 1227.

### iii.    Granting the Temporary Injunction Will Serve the Public Interest.

36.    The final requirement for a temporary injunction is a demonstration that the relief will serve the public interest. As stated in *Bronson v. Bd. of Pub. Instruction*, 145 So. 833, 836 (Fla. 1933),

> This court is committed to the doctrine that extraordinary relief will not be granted in cases where it plainly appears that, although the complaining party may be ordinarily entitled to it, the granting of such relief in the particular case will result in confusion and disorder, and will produce an injury to the public which outweighs the individual right of the complainant to have the relief he seeks.

37.    Granting Plaintiffs' temporary injunction will not injure the public but will instead serve the public interest by preventing ARC from wrongfully converting stock it should be forced to return after violating its fiduciary duties and engaging in an unlawful and harmful pre-targeting scheme. This, in turn, will protect TMTG's present shareholders from a fire sale of a significant percentage of the company's stock—which would undoubtedly have a diluting and depressive effect on the stock price.

38.    The public interest served by preventing ARC and Orlando from wrongfully converting shares currently held in ARC's name is particularly acute. ARC, through Orlando, has steadfastly (and by design) refused to account for the money it has raised from shareholders in connection with purportedly raising capital for DWAC or produce a comprehensive capitalization table reflecting individuals and entities to which it owes TMTG shares. (*See* Glabe Aff. ¶ 24; *see also id.* ¶¶ 22-23). If ARC is permitted to sell its wrongfully held shares, these alleged shareholders, like Plaintiffs, will be forced to litigate their disputes for an inadequate remedy. It is likely that the list of disputes outlined above will only grow, clogging the dockets of this Court and others throughout the country with causes of action and motion practice, thereby further injuring the public's access to the courts.

**B.** **UAV Should Be Enjoined from Selling or Transferring Its TMTG Shares.**

**i.** **UAV's Sale of TMTG Shares Would Irreparably Harm TMTG Because There Is No Adequate Remedy at Law.**

39.     As stated above, a movant seeking a temporary injunction must first demonstrate irreparable harm and an inadequate remedy at law. *See Atomic Tattoos*, 45 So. 3d at 64; *see also De Leon*, 593 So. 2d at 559 (a movant must demonstrate "the likelihood of . . . irreparable harm because of the unavailability of an adequate remedy at law").

40.     Plaintiffs assert several counts of breach of fiduciary duty against UAV, Litinsky, and Moss for their involvement in the pre-targeting scheme as well as their general failures to put the best interests of both DWAC and Old TMTG above their own. (*See* SAC Counts VI-IX, XI-XII). Disgorgement is a proper remedy for such a breach of fiduciary duty. *See King Mountain Condo*, 425 So. 2d at 571 ("[T]he beneficiary is entitled to obtain the benefits derived by the fiduciary through the breach." (internal quotations and citation omitted)); *see also Bailey*, 268 So. 3d at 201; *Duty Free World, Inc.*, 253 So. 3d at 698. If, however, UAV is permitted to sell or transfer its TMTG shares upon the expiration of the Lock-Up Period and before this matter is fully adjudicated, Plaintiffs will be unable to pursue the remedy of disgorgement of the shares upon successfully establishing their claims. *See, e.g., Gator Boring*, 210 So. 3d at 181; *see also Farrey's Wholesale*, 263 So. 3d at 179.  And importantly, and for reasons outlined in more detail below, *see infra* ¶¶ 47-48, any disgorgement of the monetary value of UAV's imminent fire sale of TMTG shares will be woefully insufficient to fully and adequately remedy Plaintiffs for these fiduciary breaches. Rather, it is the actual shares that must be disgorged to make Plaintiffs whole. But without the equitable path of relief presently sought, Plaintiffs are without an adequate remedy at law to resolve their irreparable harm. As such, the status quo should be maintained in this matter.

41.     As stated above, *see supra* ¶¶ 30-32, the dissipation of UAV's wrongfully held assets that will imminently occur itself amounts to irreparable harm without an adequate legal remedy. *See Barsanti*, 773 So. 2d at 1207-08; *Vargas*, 771 So. 2d at 595; *see also Gyptec*, 299 So. 3d at 484 (collecting cases).

42.     Here, UAV is obligated to restore the shares to TMTG. UAV received the shares as consideration for work it—through its principals, Moss and Litinsky—was obligated to perform in Old TMTG's early stages as a company. But UAV failed to manage Old TMTG using good faith and due care as required. Not only did UAV fail to successfully launch Truth Social, but it, *inter alia*, (i) failed to adequately establish Old TMTG's corporate governance structure and business plans; (ii) hired and contracted with inexperienced, unqualified, and expensive technical employees and companies; and (iii) when rightfully replaced as leaders at the company, created a hostile and threatening corporate culture that jeopardized Old TMTG's business operations and reputation. (Glabe Aff. ¶ 9, Exh. 4). This conduct was extremely harmful to Old TMTG and in clear violation of the fiduciary duties UAV owed to Old TMTG while managing the company.

43.     Moreover, UAV—through its principals Litinsky and Moss—engaged in an unlawful pre-targeting scheme with ARC and Orlando to merge Old TMTG and DWAC before DWAC had gone public through an initial public offering. (*See* Glabe Aff. ¶¶ 12-14, 16-18). This scheme included Orlando's numerous false statements and misrepresentations to investors and in public filings, with UAV, Moss, and Litinsky's knowledge and complicit conduct, that DWAC was considering multiple merger targets and that the Old TMTG/DWAC merger was not, in reality, preordained, in violation of securities laws. (*Id.* ¶¶ 19-21). UAV's scheme with ARC and Orlando led to an investigation by the SEC and an $18 million penalty, as well as a long delay in

the merger, which itself caused significant lost revenues and opportunities and reputational harm. (*Id.* ¶¶ 25-29).

44.    Accordingly, to prevent UAV from being unjustly enriched, UAV must surrender its shares of TMTG stock. Even after violating their fiduciary duties to TMTG through their mismanagement of Old TMTG's operations and their participation in the unlawful pre-targeting scheme, UAV, Litinsky, and Moss seek to damage Plaintiffs further by selling hundreds of millions of dollars of TMTG stock which, in turn, is subject to dissipation or transfer outside of this Court's jurisdictional reach to avoid satisfying a judgment. This would be unfair and inequitable and would effectively moot remedies Plaintiffs seek in their proposed Second Amended Complaint. Consequently, UAV should be preliminarily enjoined from engaging in any such sales.

45.    Indeed, as described above, UAV has indicated on several occasions that it intends to sell shares in TMTG as soon as the lock-up is lifted. Thus, it is a near certainty that on or after September 19, 2024, UAV will attempt to sell its shares of TMTG, which sales would—among other harms—result in a significant and potentially incalculable market impact.

46.    TMTG already has been substantially harmed by UAV's conduct and will be irreparably harmed if UAV executes its planned fire sale. TMTG is without remedy at law to cure that injury; TMTG will be unable to pursue disgorgement of shares as it is entitled for establishing a breach of fiduciary duty and unjust enrichment, and money damages will be wholly insufficient to deal with the cascade of consequences resulting from such a sell off.

47.    Indeed, as noted, UAV plans to sell a volume of stock that well exceeds TMTG's recent average daily trading volume, which will cause an immediate and irreparable depressive effect on TMTG's market capitalization and business reputation. Furthermore, TMTG will be deprived of the ability to cancel the shares wrongfully held by UAV or avoid harm to the market

capitalization and reputation of the company. For example, if a company's stock price is performing well, TMTG is likely to receive more favorable media and analyst commentary. Such information helps investors determine the long-term viability of the company and facilitates future growth through equity raises particularly where creditors favor companies with higher share prices because such share prices often correlate with better health and higher earnings.

48.    These concerns are particularly acute where TMTG is an emerging growth company that intends to expand through strategic investments and transactions, and its financial reputation is the foundation for this plan. (*See* New TMTG Form 10-Q at 21, 24-25, dated August 9, 2024, **Exh. 23** to Glabe Aff.). Accordingly, the stock price decline from UAV's planned fire sale of wrongfully held securities would irreparably harm these efforts. A company's ability to raise capital, grow, and maintain a favorable reputation is predicated on the market's perception of the company, which is reflected in its stock price. Indeed, insofar as selling its shares all at once would not maximize UAV's economic gain (as at least Mr. Moss, a FINRA-registered broker, surely knows), *UAV's threat to conduct a fire sale suggests an intent to harm TMTG even at the expense of UAV's and its principals' financial interest*.

49.    In sum, UAV's planned liquidation of a massive amount of TMTG stock in the near future will cause irreparable harm both by foreclosing a significant portion of Plaintiffs' legal remedies in this matter and by dissipating assets UAV wrongly holds and harming TMTG's business as a whole. Thus, absent prompt action by this Court, Plaintiffs will be left irreparably harmed and without any ability to recoup their losses.

**ii.    TMTG is Substantially Likely to Succeed on the Merits.**

50.    As stated above, to establish a substantial likelihood of success, a movant for a temporary injunction need only establish "good reasons for anticipating" it will ultimately prevail

on the merits. *Naegle Outdoor Advert.*, 634 So. 2d at 753 (Fla. 1st DCA 1994); *see also Southards*, 567 So. 2d at 524 (providing that a "likelihood of probable success," not a certain success, is required to establish substantial likelihood of success).

51.     TMTG is substantially likely to succeed on the merits in this action. As alleged in the Proposed Second Amended Complaint, UAV and its principals, Litinsky and Moss violated their respective fiduciary duties to TMTG and DWAC by, *inter alia*, engaging in a pre-targeting scheme to merge Old TMTG and DWAC and generally placing their own personal interests above those of TMTG and DWAC. (*See* Glabe Aff. ¶¶ 12-14, 16-18). Moreover, UAV failed to confer on Old TMTG the benefits it agreed to provide and has therefore been unjustly enriched. (*Id.* ¶¶ 9-10). As a result of these fiduciary breaches and unjust enrichment, UAV is required to restore the TMTG shares it wrongfully obtained. *See Bailey*, 268 So. 3d at 201 ("Disgorgement is a remedy designed to deter wrongdoers by making it unprofitable to engage in the wrongful behavior."); *see also Henry M. Butler, Inc. v. Trizec Properties, Inc.*, 524 So. 2d 710, 711 (Fla. 2d DCA 1988) (unjust enrichment serves to prevent the "wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity"); *id.* at 712 (explaining the essential elements as "a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof").

52.     UAV received Old TMTG's stock with the expectation and a condition that UAV would establish Old TMTG, get Truth Social operational, and position Old TMTG for a merger. UAV also received Old TMTG's stock subject to its adherence to general fiduciary duties to manage the company in good faith and with due care. But as stated above, UAV accepted and

retained the shares, even while abandoning its obligations and causing great harm to TMTG through woeful mismanagement and participation in an unlawful pre-targeting scheme. Permitting UAV to retain and then sell the disputed shares will unjustly enrich UAV at TMTG's expense. *See Shands*, 899 So. 2d at 1227.

### iii.    Granting the Temporary Injunction Will Serve the Public Interest.

53.    The final requirement for a temporary injunction is a demonstration that the relief will serve the public interest. *See Bronson*, 145 So. at 836.

54.    Granting Plaintiffs' temporary injunction will not injure the public. In fact, the requested temporary injunction would serve the public interest by preventing UAV from converting stock it is not entitled to retain into a huge amount of liquid cash, and by protecting TMTG's present shareholders from a fire sale of a significant percentage of the Company's stock—which would undoubtedly have a diluting and depressive effect on the stock price.

55.    If UAV is permitted to sell this significant portion of TMTG's shares, these shareholders will face substantial uncertainty—and potential decreased share value—all at the hands of a party wrongfully holding the stock. Accordingly, the relief requested herein would advance, not hinder, the public interest.

### C.    Plaintiffs' Motion Is Ripe and Should be Considered by the Court.

56.    Finally, although UAV and ARC's wrongful sale may not occur until September 19, 2024 at the earliest, both are already taking steps to effectuate the actions that would irreparably harm TMTG (including in UAV's case, suing TMTG's transfer agent in a bid to obtain freely trading shares).

57.    Plaintiffs believe that the Court can set a feasible albeit expeditious schedule for briefing and argument before Defendants attempt to sell their purported shares and inflict

irreparable harm on TMTG. In the alternative, the Court should maintain the status quo at least until Plaintiffs receive their day in court.

58.     Accordingly, Plaintiffs respectfully submit that their present motion is not a request for contingent relief, but rather a request for the Court to exercise its inherent discretion over its docket to allow for this motion to proactively proceed prior to the near-certain occurrence of irreparable harm.

## V.    CONCLUSION

For the reasons set forth above, immediate injunctive relief to preserve the status quo is critical to protect TMTG's interests and is in the best interests of TMTG's shareholders. Indeed, ARC and UAV are holding hundreds of millions of dollars' worth of TMTG shares that they must disgorge. Monetary damages are insufficient to ensure an equitable and just result because the harm inflicted upon TMTG is not merely the value of the ill-gotten shares effectively stolen from it, but the damage the Defendants' sales will have on TMTG's market, reputation, and business prospects. Accordingly, equity and fairness dictate that the status quo should be maintained, and Defendants should be enjoined from selling or otherwise transferring their shares, until this matter is adjudicated.

WHEREFORE, Plaintiffs very respectfully request that this Honorable Court GRANT the instant Motion for Temporary Injunction.

[REMAINDER INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

Dated: August 14, 2024

Respectfully submitted,

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN: 122080)
Tal Aburos (FBN: 1010901)
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8522
Facsimile: (305) 657-6366
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com
*Counsel for Plaintiffs*

*/s/ Samuel J. Salario, Jr.*
Samuel J. Salario, Jr., Esq. (FBN: 83460)
Jason B. Gonzalez, Esq. (FBN: 146854)
Mathew D. Gutierrez, Esq. (FBN: 94014)
Raymond F. Treadwell, Esq. (FBN: 93834)
**LAWSON HUCK GONZALEZ PLLC**
215 S. Monroe St., Suite 320
Tallahassee, Florida 32301
Telephone: (850) 825-4334
samuel@lawsonhuckgonzalez.com
jason@lawsonhuckgonzalez.com
mathew@lawsonhuckgonzalez.com
ray@lawsonhuckgonzalez.com
*Counsel for Plaintiffs*

# EXHIBIT 9



# JUAN FERNANDEZ-BARQUIN, ESQ.
## CLERK OF THE COURT AND COMPTROLLER
### MIAMI-DADE COUNTY

<u>Contact Us</u>    <u>My Account</u>    <u>My Desk</u>    

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

 **◀◀ BACK**

**Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding** <u>Access Security Matrix.</u>

---

**MICHAEL J MELKERSEN, VS ARC GLOBAL INVESTMENTS II LLC ET AL**

| | | | |
|---|---|---|---|
| **Local Case Number:** | 2024-011456-CA-01 | **Filing Date:** | 06/20/2024 |
| **State Case Number:** | 132024CA01145601GE01 | **Judicial Section:** | CA44 - Downtown Miami - Judge Walsh, Lisa S |
| **Consolidated Case No.:** | N/A | **Court Location:** | 73 West Flagler Street, Miami FL 33130 |
| **Case Status:** | OPEN | **Case Type:** | Contract & Indebtedness |

---

**☰ Related Cases**    Total Of Related Cases: 0  **+**

**👥 Parties**    Total Of Parties: 6  **+**

**🔧 Hearing Details**    Total Of Hearings: 1  **+**

**🔊 Dockets**    Total Of Dockets: 56  **—**

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 09/05/2024 | | Special Sets | Hearing | **DEFENDANT ARC GLOBAL INVESTMENTS II LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CONVERTIBLE NOTES** |
| 📄 | 52 | 08/29/2024 | | Notice of Hearing- | Event | **MONDAY, OCTOBER 14, 2024 TIME: 2:00 P.M** |
| 📄 | 51 | 08/28/2024 | | Response: | Event | |
| 📄 | 50 | 08/28/2024 | | Notice of Hearing- | Event | **SEPTEMBER 5, 2024, AT 11:30 A.M., VIA ZOOM** |
| 📄 | 49 | 08/28/2024 | | Notice: | Event | **OF DECLARATION OF MICHAEL MELKERSEN** |
| 📄 | 48 | 08/28/2024 | | Motion to Strike | Event | |
| 📄 | 47 | 08/28/2024 | | Motion to Strike | Event | |
| 📄 | 46 | 08/28/2024 | | Notice of Hearing- | Event | **10/11/2024 AT 11:00AM** |
| 📄 | 45 | 08/26/2024 | | Response to Motion | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 44 | 08/23/2024 | | Affidavit in Support | Event | |
| 📄 | 43 | 08/23/2024 | | Affidavit in Support | Event | |
| 📄 | 42 | 08/23/2024 | | Affidavit in Support | Event | |
| 📄 | 41 | 08/23/2024 | | Memorandum of Law | Event | |
| 📄 | 40 | 08/23/2024 | | Notice of Taking Deposition | Event | |
| 📄 | 39 | 08/21/2024 | | Motion for Extension of Time | Event | **AMENDED** Parties: MELKERSEN MICHAEL J |
| 📄 | 38 | 08/20/2024 | | Notice: | Event | **ODYSSEY TRANSFER AND TRUST COMPANY'S NOTICE OF NOT RESPONSE TO ITS MOTION TO DISMISS** |
| 📄 | 37 | 08/16/2024 | | Notice of Answer to Interrogatories | Event | |
| 📄 | 36 | 08/16/2024 | | Motion for Extension of Time | Event | Parties: MELKERSEN MICHAEL J |
| 📄 | 35 | 08/12/2024 | | Answer to Counter Claim | Event | |
| 📄 | 34 | 08/06/2024 | | Motion to Dismiss | Event | Parties: ODYSSEY TRANSFER AND TRUST COMPANY |
| 📄 | 33 | 08/06/2024 | | Order: | Event | **ON STIPULATION ACCEPTING SERVICE OF PROCESS AND SETTING DEADLINE FOR DEFENDANT TO ANSWER, ETC.** |
| 📄 | 32 | 07/29/2024 | | Notice of Hrg Special Appt | Event | **9/5/2024 @ 11:30 AM** |
| | 27 | 07/25/2024 | | Receipt: | Event | **RECEIPT#:3190022 AMT PAID:$395.00 NAME:HERNANDEZ, ANTONIO M., JR. HOMER BONNER JACOBS 1200 FOUR SEASON TOWER 1441 BR MIAMI FL 33131 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3103-CIRCUIT CROSS CLAI 1 $395.00 $395.00 TENDER TYPE:EFILINGS TENDER AMT:$395.00 RECEIPT DATE:07/25/2024 REGISTER#:319 CASHIER:EFILINGUSER** |
| 📄 | 31 | 07/24/2024 | | Motion for Summary Judgment | Event | |
| 📄 | 30 | 07/23/2024 | | Notice of Limited Appearance | Event | |
| 📄 | 29 | 07/23/2024 | | Stipulation | Event | **ACCEPTING SERVICE OF PROCESS, ETC.** |
| 📄 | 28 | 07/23/2024 | | Notice of Limited Appearance | Event | |
| 📄 | 26 | 07/22/2024 | | Answer and Counter Claim | Event | |
| 📄 | 25 | 07/18/2024 | | Affidavit of Service | Event | |
| 📄 | 24 | 07/18/2024 | | Affidavit of Service | Event | |
| 📄 | 23 | 07/18/2024 | | Affidavit of Service | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 22 | 07/18/2024 | | Affidavit of Service | Event | |
| 📄 | 21 | 07/16/2024 | 34319:4124 | Voluntary Dismissal | Event | |
| 📄 | 20 | 07/10/2024 | | Order Setting CM Deadline | Event | |
| 📄 | 19 | 07/10/2024 | | Order Setting CM Deadline | Event | |
| 📄 | 18 | 06/28/2024 | | Notice of Appearance | Event | Parties: Christopher King; Jacobs Kevin P; ARC GLOBAL INVESTMENTS II LLC |
| | 17 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | 16 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |
| 📄 | 15 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 7.**<br>Parties: TRUMP MEDIA & TECHNOLOGY GROUP CORP |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |
| 📄 | 14 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 6.**<br>Parties: ODYSSEY TRANSFER AND TRUST COMPANY |
| | 13 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | 12 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |
| 📄 | 11 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 8.**<br>Parties: Orlando Patrick |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |
| 📄 | 10 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 5.**<br>Parties: ARC GLOBAL INVESTMENTS II LLC |
| | 9 | 06/25/2024 | | Receipt: | Event | **RECEIPT#:3160188 AMT PAID:$40.00 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:EFILINGS TENDER AMT:$40.00 RECEIPT DATE:06/25/2024 REGISTER#:316 CASHIER:EFILINGUSER** |
| | 4 | 06/22/2024 | | Receipt: | Event | **RECEIPT#:3110241 AMT PAID:$401.00 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:06/22/2024 REGISTER#:311 CASHIER:EFILINGUSER** |
| 📄 | 8 | 06/21/2024 | | (M) 20 Day (P) Summons (Sub) Received | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 7 | 06/21/2024 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 6 | 06/21/2024 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 5 | 06/21/2024 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 2 | 06/20/2024 | | Complaint | Event | |
| 📄 | 1 | 06/20/2024 | | Civil Cover Sheet - Claim Amount | Event | |

◀◀ BACK

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

**General**

Online Case Home

Civil / Family Courts Information

Login

**Help and Support**

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



**Juan Fernandez-Barquin, Esq.
Clerk of the Court and Comptroller
Miami-Dade County**

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2024 Clerk of the Court & Comptroller. All rights reserved.

# EXHIBIT 10

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2024-011456-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**MICHAEL J MELKERSEN,**

Plaintiff(s)

vs.

**ARC GLOBAL INVESTMENTS II LLC et al**

Defendant(s)

_____/

## ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND TO PREPARE A MANDATORY CASE MANAGEMENT REPORT

**WHEREAS**, the Complex Business Litigation Procedures shall apply to all actions in the Complex Business Litigation Section and Fla. R. Civ. P. 1.201 Complex Litigation, except to the extent that, in any particular action, they are superseded by an Order.

**WHEREAS,** the Complex Business Litigation Procedures are designed to facilitate the proceedings of cases by the Eleventh Judicial Circuit Complex Business Litigation Section; to promote the transmission and access to case information by the Court, litigants, counsel, and the public; and to facilitate the efficient and effective presentation of evidence in the courtroom. These Procedures shall be construed and enforced to avoid technical delay, **encourage civility**, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

**NOTICE IS HEREBY GIVEN** that all outstanding and future motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Section Procedures, which are available at the court's website:

*http://www.jud11.flcourts.org/About-the-Court/Ourt-Courts/Civil-Court/Complex-Business-Litigation*.

**NOTICE IS HEREBY GIVEN** that on _____**October 23rd, 2024** at _____ **9:00AM** via Zoom, the undersigned shall convene a Case Management Conference ("CMC") in this cause.

**The Parties are ordered to provide courtesy copies of all motions and where required, memoranda pertaining thereto, hereinafter filed in this case, to the undersigned Judge via CourtMAP as a supporting document to the event. Courtesy copies are not needed to be e-mailed.**

**Orders, agreed and otherwise, shall be submitted via CourtMAP.**

**Plaintiff is required to provide a full set of pending motion(s) to dismiss, opposition(s) and reply to chambers a minimum of one (1) week prior to the initially scheduled CMC. MOTIONS FILED WITHOUT COURTESY COPIES UPLOADED TO THE EVENT ON COURTMAP AS SUPPORTING DOCUMENTS MAY NOT BE CONSIDERED.**

**Any previously filed motion not in compliance with procedures, e.g., memorandum of law where required, must be resubmitted in conformity with the Complex Business Litigation Procedures**.

**Counsel for Plaintiff(s) and Third Party Plaintiff(s) is/are ORDERED** to confirm all parties subsequently named or appearing herein have been served copies of this Notice and Order. If any subsequently served or named party has not been served with a copy of this notice, Plaintiff and Third Party Plaintiff shall provide the party with a copy of this Notice.

**Trial Counsel and their clients shall appear via Zoom for the CMC.**[1]  Failure of any party to attend, including the insurance carrier representative, shall subject that party to sanctions and/or fees.  Regardless of the pendency of any undecided motions, Trial Counsel shall meet no less than 30 days in advance of the CMC and address the following which will be included in the Joint Case Management Report, along with other appropriate topics, including those set forth in Fla. R. Civ. P. 1.201(b) Complex Litigation, some of which subjects and topics will be incorporated into a Case Management Order:

1. The name of lead trial counsel for each party, and the name of any unrepresented party;

2. A brief factual statement of the case;

3. Pleading issues, including service of process, venue, joinder of additional parties, theories of liability, damages claimed and applicable defenses;

4. The identity and number of any motions to dismiss or other preliminary or pre-discovery motions which have been filed and the time period in which they shall be filed, briefed and argued;

5. A discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions;

5.a.  A description of pertinent documents and a list of fact witnesses the parties believe to be relevant.

6. Anticipated areas of any expert testimony, the number of experts to be called by each party, timing for identification of experts, and exchange of expert reports;

7. An estimate of the volume of documents and computerized information likely to be the subject of discovery from parties and nonparties and whether there are technological means which may render document discovery more manageable at an acceptable cost;

8. The possibility of obtaining admissions of fact and voluntary exchange of documents and electronically stored information, stipulations regarding authenticity of documents, electronically stored information, and the need for advance rulings from the Court on admissibility of evidence.

9. The advisability of using the general magistrate for discovery purposes at no cost to the parties; and the advisability of using the general and/or a special magistrate(s) for fact finding, mediation, or discovery disputes or such other matters as the parties may agree upon;

10. The time period, after the close of discovery within which post-discovery dispositive motions shall be filed, briefed and argued, and a tentative schedule for such activities;

11. The possibility of settlement and the timing of Alternative Dispute Resolution, including the selection of a mediator or arbitrator(s);

12. Whether or not a party or parties desire to use technologically advanced methods of presentation or court-reporting and, to the extent that this is the case, a determination of the following:
    a. Fairness issues, including but not necessarily limited to use of such capabilities by some but not all of the parties and/or by parties whose resources permit or require variations in the use of such capabilities;

    b. Issues related to compatibility of court and party facilities and equipment;

    c. Issues related to the use of demonstrative exhibits and any balancing of relevance and potential prejudice which may need to occur in connection with such exhibits;

    d. Such other issues related to the use of the Court's and parties' special technological facilities as may be raised by any party or the Court or its technological advisor, given the nature of the case and the resources of the parties.

13. A good faith estimate by counsel for each party based upon consultation with all of the parties of the costs and fees each party is likely to incur in pursuing the litigation through trial court adjudication;

14. A preliminary listing of the principal legal and factual issues which counsel believe will need to be decided in the case;

15. A preliminary listing of any legal principles and facts that are not in dispute;

16. A good faith estimate by counsel for each party of the length of time to try the case;

17. Whether a demand for jury trial has been made.

Within ten (10) days of the meeting among Trial Counsel, but no less than fourteen (14) days in advance of the Case Management Conference, the Parties shall file a Joint Case Management Report addressing the matters described in paragraphs 1 - 17 above and shall provide a courtesy copy to the Court via CourtMap as supporting documents to the event.

All counsel and parties are responsible for filing a Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate

the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely notify the Court by written motion to be set and heard on motion calendar or request for a status conference.   Failure to provide the required case management report may subject the violating party(ies) to sanctions and/or fees.

Pursuant to the provisions of Fla. R. Civ. P. 1.201(b)(3), and notwithstanding rule 1.440, at the initial case management conference, the Court will set the trial date or dates no sooner than 6 months and no later than 24 months from the date of the initial case management conference unless good cause is shown for an earlier or later setting. **As provided in the rule, continuance of the trial of a complex action should rarely be granted, and then only upon good cause shown.**

## MANDATORY CASE MANAGEMENT SCHEDULE TO BE FILED

| | |
|---|---|
| ESI EXCHANGE PROPOSAL (including search terms, formats, data sources to be searched, etc) | Proposal -<br><br>Commence Exchange -<br><br>Complete Exchange - |
| MOTIONS TO AMEND/ADD PARTIES<br><br>(Includes Affirmative Defenses) | |
| FACT WITNESS DEPOSITIONS/ DISCOVERY CONCLUDES | |
| INITIAL MEDIATION DEADLINE | On or before |
| NUMBER OF EXPERTS PER PARTY/SIDE | |
| PLAINTIFF/THIRD PARTY PLAINTIFF/CROSS PLAINTIFF(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND** | |

| | |
|---|---|
| **DOCUMENTS RELIED UPON FOR OPINION** | |
| DEFENDANT/THIRD PARTY/CROSS DEFENDANT(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| REBUTTAL EXPERT DISCLOSURE REPORTS DUE<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| EXPERT DEPOSITIONS COMPLETED | |
| DISPOSITIVE MOTIONS FILED | |
| DAUBERT/FRYE MOTIONS FILED | |
| MOTIONS IN LIMINE FILED | |
| FINAL MEDIATION DEADLINE | On or before |
| FINAL PRETRIAL CONFERENCE<br><br>**THE COURT SHALL ADDRESS ALL PENDING MOTIONS, INCLUDING JURY INSTRUCTIONS, VERDICT FORM, MOTIONS IN LIMINE, DEPOSITION DESIGNATIONS, OBJECTIONS TO EXHIBITS AND FRYE MOTIONS** | |

---

[1] A representative of the insurance carrier for any insured party who is **not** such carrier's outside counsel and who has decision making authority without further consultation shall attend.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>10th day of July, 2024</u>.

<u>2024-011456-CA-01 07-10-2024 11:56 AM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Christopher J. King, cking@homerbonner.com
Christopher J. King, mosorio@homerbonner.com
Kevin P Jacobs, kjacobs@homerbonner.com
Kevin P Jacobs, jyanes@homerbonner.com
Mike Melkersen, mike@mlawpc.com
Mike Melkersen, galper21@gmail.com

**Physically Served:**