# EXHIBIT A



# JUAN FERNANDEZ-BARQUIN, ESQ.
## CLERK OF THE COURT AND COMPTROLLER
### MIAMI-DADE COUNTY

Contact Us    My Account    My Desk    

---

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◀◀ BACK

Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding Access Security Matrix.

### MICHAEL J MELKERSEN, VS ARC GLOBAL INVESTMENTS II LLC ET AL

| | | | |
|---|---|---|---|
| **Local Case Number:** | 2024-011456-CA-01 | **Filing Date:** | 06/20/2024 |
| **State Case Number:** | 132024CA01145601GE01 | **Judicial Section:** | CA44 - Downtown Miami - Judge Walsh, Lisa S |
| **Consolidated Case No.:** | N/A | **Court Location:** | 73 West Flagler Street, Miami FL 33130 |
| **Case Status:** | OPEN | **Case Type:** | Contract & Indebtedness |

☰ **Related Cases**  Total Of Related Cases: 0 ➕

👥 **Parties**  Total Of Parties: 6 ➕

🔧 **Hearing Details**  Total Of Hearings: 3 ➕

🔊 **Dockets**  Total Of Dockets: 63 ➖

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 09/19/2024 | | Motion Calendar | Hearing | **MELKERSENS MOTION TO STRIKE ARCS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 📄 | 57 | 09/09/2024 | | Response to Motion | Event | **TO STRIKE MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 📄 | 56 | 09/06/2024 | | Notice of Hearing- | Event | **SEPTEMBER 19, 2024, AT 9:30 A.M** |
| | | 09/05/2024 | | Special Sets | Hearing | **DEFENDANT ARC GLOBAL INVESTMENTS II LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CONVERTIBLE NOTES** |
| | | 09/05/2024 | | Special Sets | Hearing | **DEFENDANT ARC GLOBAL INVESTMENTS II LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CONVERTIBLE NOTES** |
| 📄 | 55 | 09/03/2024 | | Reply to Affirmative Defenses | Event | |
| 📄 | 54 | 09/03/2024 | | Amended Notice of Taking Deposition | Event | |
| 📄 | 53 | 08/30/2024 | | Response: | Event | **IN FURTHER SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |

| | Number | Date | Book/Page | Docket Entry | Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 52 | 08/29/2024 | | Notice of Hearing- | Event | **MONDAY, OCTOBER 14, 2024 TIME: 2:00 P.M** |
| 📄 | 51 | 08/28/2024 | | Reply | Event | **MELKERSEN REPLY TO ARC OPPOSITION TO AMENDED MOTION TO ENLARGE TIME** |
| 📄 | 50 | 08/28/2024 | | Notice of Hearing- | Event | **SEPTEMBER 5, 2024, AT 11:30 A.M., VIA ZOOM** |
| 📄 | 49 | 08/28/2024 | | Notice: | Event | **OF DECLARATION OF MICHAEL MELKERSEN** |
| 📄 | 48 | 08/28/2024 | | Notice of Filing: | Event | **BRIEF IN SUPPORT OF MELKERSEN'S MOTION TO STRIKE ARC'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 📄 | 47 | 08/28/2024 | | Motion to Strike | Event | Parties: MELKERSEN MICHAEL J |
| 📄 | 46 | 08/28/2024 | | Notice of Hearing- | Event | **10/11/2024 AT 11:00AM** |
| 📄 | 45 | 08/26/2024 | | Response to Motion | Event | |
| 📄 | 44 | 08/23/2024 | | Affidavit in Support | Event | |
| 📄 | 43 | 08/23/2024 | | Affidavit in Support | Event | |
| 📄 | 42 | 08/23/2024 | | Affidavit in Support | Event | |
| 📄 | 41 | 08/23/2024 | | Memorandum of Law | Event | |
| 📄 | 40 | 08/23/2024 | | Notice of Taking Deposition | Event | |
| 📄 | 39 | 08/21/2024 | | Motion for Extension of Time | Event | **AMENDED** <br> Parties: MELKERSEN MICHAEL J |
| 📄 | 38 | 08/20/2024 | | Notice: | Event | **ODYSSEY TRANSFER AND TRUST COMPANY'S NOTICE OF NOT RESPONSE TO ITS MOTION TO DISMISS** |
| 📄 | 37 | 08/16/2024 | | Notice of Answer to Interrogatories | Event | |
| 📄 | 36 | 08/16/2024 | | Motion for Extension of Time | Event | Parties: MELKERSEN MICHAEL J |
| 📄 | 35 | 08/12/2024 | | Answer to Counter Claim | Event | |
| 📄 | 34 | 08/06/2024 | | Motion to Dismiss | Event | Parties: ODYSSEY TRANSFER AND TRUST COMPANY |
| 📄 | 33 | 08/06/2024 | | Order: | Event | **ON STIPULATION ACCEPTING SERVICE OF PROCESS AND SETTING DEADLINE FOR DEFENDANT TO ANSWER, ETC.** |
| 📄 | 32 | 07/29/2024 | | Notice of Hrg Special Appt | Event | **9/5/2024 @ 11:30 AM** |
| 📄 | 27 | 07/25/2024 | | Receipt: | Event | **RECEIPT#:3190022 AMT PAID:$395.00 NAME:HERNANDEZ, ANTONIO M., JR. HOMER BONNER JACOBS 1200 FOUR SEASON TOWER 1441 BR MIAMI FL 33131 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3103-CIRCUIT CROSS CLAI 1 $395.00 $395.00 TENDER TYPE:EFILINGS TENDER AMT:$395.00 RECEIPT DATE:07/25/2024 REGISTER#:319 CASHIER:EFILINGUSER** |

| | Number | Date | Book/Page | Docket Entry | Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 31 | 07/24/2024 | | Motion for Summary Judgment | Event | |
| 📄 | 30 | 07/23/2024 | | Notice of Limited Appearance | Event | |
| 📄 | 29 | 07/23/2024 | | Stipulation | Event | **ACCEPTING SERVICE OF PROCESS, ETC.** |
| 📄 | 28 | 07/23/2024 | | Notice of Limited Appearance | Event | |
| 📄 | 26 | 07/22/2024 | | Answer and Counter Claim | Event | |
| 📄 | 25 | 07/18/2024 | | Affidavit of Service | Event | |
| 📄 | 24 | 07/18/2024 | | Affidavit of Service | Event | |
| 📄 | 23 | 07/18/2024 | | Affidavit of Service | Event | |
| 📄 | 22 | 07/18/2024 | | Affidavit of Service | Event | |
| 📄 | 21 | 07/16/2024 | 34319:4124 | Voluntary Dismissal | Event | |
| 📄 | 20 | 07/10/2024 | | Order Setting CM Deadline | Event | |
| 📄 | 19 | 07/10/2024 | | Order Setting CM Deadline | Event | |
| 📄 | 18 | 06/28/2024 | | Notice of Appearance | Event | Parties: Christopher King; Jacobs Kevin P; ARC GLOBAL INVESTMENTS II LLC |
| | 17 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | 16 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |
| 📄 | 15 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 7.** Parties: TRUMP MEDIA & TECHNOLOGY GROUP CORP |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |
| 📄 | 14 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 6.** Parties: ODYSSEY TRANSFER AND TRUST COMPANY |
| | 13 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | 12 | 06/26/2024 | | Electronic Summons Email Notification Sent | Event | **MIKE MELKERSEN** |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |

| | Number | Date | Book/Page | Docket Entry | Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 11 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 8.** Parties: Orlando Patrick |
| | | 06/26/2024 | | 20 Day Summons Issued | Service | |
| 📄 | 10 | 06/26/2024 | | ESummons 20 Day Issued | Event | **RE: INDEX # 5.** Parties: ARC GLOBAL INVESTMENTS II LLC |
| | 9 | 06/25/2024 | | Receipt: | Event | **RECEIPT#:3160188 AMT PAID:$40.00 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:EFILINGS TENDER AMT:$40.00 RECEIPT DATE:06/25/2024 REGISTER#:316 CASHIER:EFILINGUSER** |
| | 4 | 06/22/2024 | | Receipt: | Event | **RECEIPT#:3110241 AMT PAID:$401.00 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:06/22/2024 REGISTER#:311 CASHIER:EFILINGUSER** |
| 📄 | 8 | 06/21/2024 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| 📄 | 7 | 06/21/2024 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 6 | 06/21/2024 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 5 | 06/21/2024 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 2 | 06/20/2024 | | Complaint | Event | |
| 📄 | 1 | 06/20/2024 | | Civil Cover Sheet - Claim Amount | Event | |

**◀ BACK**

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

**General**

Online Case Home

Civil / Family Courts Information

Login

**Help and Support**

Clerk's Home

Privacy Statement

ADA Notice

Case 1:24-cv-00729-GBW    Document 66-1    Filed 09/11/24    Page 6 of 27 PageID #: 1494

Disclaimer

Contact Us

About Us



Juan Fernandez-Barquin, Esq.
Clerk of the Court and Comptroller
Miami-Dade County

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2024 Clerk of the Court & Comptroller. All rights reserved.

# EXHIBIT B

1

```
1                     IN THE UNITED STATES DISTRICT COURT

2                     IN AND FOR THE DISTRICT OF DELAWARE

3

4    UNITED ATLANTIC VENTURES, LLC,      )
     A Delaware limited liability        )
5    company,                            )   Case No.
                    Plaintiff,           )   1:24-cv-00838-GBW
6    v.                                  )
                                         )
7    ODYSSEY TRANSFER AND TRUST          )
     COMPANY, a Minnesota corporation.   )
8               Defendant.

9
                             -  -  -  -
10
                          Wilmington, Delaware
11                        Tuesday, August 27, 2024
                           Oral Argument
12
                             -  -  -  -
13

14
     BEFORE:  HONORABLE GREGORY B. WILLIAMS
15           UNITED STATES DISTRICT COURT JUDGE

16
                             -  -  -  -
17

18

19

20

21

22

23

24

25
                              Michele L. Rolfe, RPR, CRR
```

**2**

APPEARANCES:

BERGER MCDERMOTT LLP
BY: DAVID B. ANTHONY, ESQ.
    HARRY SHENTON, ESQ.
    For the Plaintiff

FAEGRE DRINKER BIDDLE & REATH LLP
BY: JACLYN C. MARASCO, ESQ.
    MICHAEL KAUPA, ESQ.
    Attorneys for Defendant Odyssey Transfer
    & Trust Company for the Defendant

- - - - -

P R O C E E D I N G S
(REPORTER'S NOTE:  The following hearing was held in Courtroom 6B, beginning at 10:00 a.m.)
THE COURT:  Good morning.  You may be seated.
All right.  We're here for oral argument on the cross motions for summary judgment in United Atlantic Ventures, LLC versus Odyssey Transfer & Trust Company. Civil Action No. 24-838.
Let's get started by having the parties put their Odyssey Transfer appearances on the report.
MR. ANTHONY:  Good morning, Your Honor.

**3**

THE COURT:  Good morning.

MR. ANTHONY:  May it please the Court.  David Anthony of Berger McDermott on behalf of the plaintiff, United Atlantic Ventures, LLC, who I may refer to today simply as "UAV."

With me at counsel table today is my colleague Harry Shenton.  And sitting right behind Mr. Shenton are UAV's members, my clients Wes Moss and Andrew Litinsky.

THE COURT:  Okay.

MR. ANTHONY:  And on behalf of UAV, we'd like to thank the Court for hearing us this morning and considering our petition for declaratory judgment.  Thank you.

THE COURT:  All right.  Thank you.

MS. MARASCO:  Good morning, Your Honor.  Jaclyn Marasco of Faegre Drinker Biddle & Reath on behalf of Odyssey Transfer & Trust Company.

With me today is my colleague Michael Kaupa also of Faegre Drinker Biddle & Reath.  He'll be presenting on behalf of Odyssey today.

THE COURT:  All right.  So what I'm going to do is I have read the submissions, so I'm going to give each side 15 minutes to make your presentation, and then I'll ask any questions I have.

I'll start with the plaintiff.

MR. ANTHONY:  Very well.  Thank you, Your Honor.

**4**

And, again, David Anthony of behalf of UAV.

Your Honor, it's important to note at the outset that we do not rise before you today because we seek to pick a fight with Odyssey as the transfer agent of our stock. Quite to the contrary, Your Honor, we very much want to avoid any liabilities incurring in this case, but we're here today, Your Honor, this entire action emanates from Odyssey's client Trump Media Technology Group or TMTG for short, and its controlling shareholder Donald Trump relentlessly trying to deprive us from our property.

As noted in our motion for a speedy hearing on June 18th, TMTG's registration statement became effective and listed Mr. Trump as a selling security holder after the lockup expires.  He owns the majority of TMTG's outstanding stock, and his ability to sell could lead to drastic decreases in the share price.  So even a short delay in the release of UAV's stock from the lockup in a way that favors TMTG's controlling shareholder can cause UAV substantial harm.

As we say in our reply brief, Your Honor, TMTG is actively interfering in our relationship with the transfer agent of our stock, trying to create gaps and ambiguities for TMTG to exploit at UAV's detriment, and applying pressure to Odyssey not to resolve this matter in a way that would have been satisfactory to both UAV and

**5**

Odyssey.

Unfortunately, we're currently in litigation with TMTG in multiple jurisdictions over what we think is an unlawful and retaliatory lockup contained in TMTG's second amended charter, but because of that charter lockup, Odyssey is now holding our property.  And indeed, Your Honor, there cannot be any debate that Odyssey is holding UAV's property because Odyssey has given us an account statement showing that it is holding 10,912,141,000 shares of TMTG stock that are registered in UAV's name: and that's attached to Mr. Litinsky's July 18th affidavit.

Now despite that Odyssey is without question holding UAV's property, Odyssey claims that it owes UAV no obligations whatsoever unless and until UAV makes what Odyssey considers to be a "valid presentment in good order." And that's from paragraph 6 of the supplemental declaration at D.I. 31.

Now, I'm prepared to address all the arguments in the briefing, Your Honor, but I think with the Court's indulgence we can really just cut straight to the heart of this dispute.  I'd like to call the Court's attention to page 7 of Odyssey's reply brief, which is D.I. 30.  On page 7 of its reply brief, Odyssey writes:  "When Odyssey says it will remove the restrictions from UAV's shares on the same basis as other similarly situated shareholders, it means

6

1  that Odyssey will remove the restrictions from all effective
2  shares without preference to any shareholder."
3        Now, contrast that, Your Honor, with the
4  proposed form of order we filed with our reply brief, and
5  that's at D.I. 28-1.  Paragraph 2 of our proposed order
6  says:  "When notified by TMTG of the expiration of the
7  lockup provisions, Odyssey shall remove restrictions on
8  transfer associated with the lockup provisions from all
9  shares of TMTG common stock that are so subject within a
10 reasonably expeditious time period without preference to any
11 TMTG shareholder."
12       The language that we propose would require
13 Odyssey to do literally the same thing that Odyssey says in
14 its briefing it's going to do.
15       So as we noted in our reply, Your Honor, Odyssey
16 had actually previously proposed that language, but after it
17 spoke to its principle and its client, TMTG, Odyssey would
18 no longer agree.  But if Odyssey is prepared to do what it
19 says it will do in its briefing, and if the Court enters an
20 order requiring Odyssey to do what it says it will do, then
21 Odyssey can -- has what it needs to deal with a difficult
22 client and go to TMTG and say, hey, guys, we really are
23 required to do what Delaware law requires us to do: here's a
24 court order that says so.
25       We were prepared to accept that form of order

7

1  and we filed it with our reply brief which, again, should
2  not be objectionable to Odyssey based on what it says it's
3  going to do in its reply brief.  And it would be a very
4  straightforward, way we submit, Your Honor, for the Court to
5  resolve the dispute.  But if Odyssey continues to resist the
6  Court entering an order like that one that was proposed and
7  agreed to before TMTG interfered, then we'll need to just go
8  through the analysis of all the arguments in the briefing,
9  which I'm happy to turn to now.
10       So let me start first with the case or
11 controversy issue that Odyssey relies on.  And as we stated
12 in our opening brief, Odyssey cites the wrong standard for
13 that proposition.  The Third Circuit standard for
14 establishing the existence of a case or controversy in a
15 declaration judgment action, *Step-Saver Data Systems* and the
16 *Pittsburgh Mack* case, as we cited, we have to show three
17 things:  That Odyssey interests are adverse, the declaration
18 would be conclusive and there that's a practical benefit to
19 the declaration.  We easily satisfy all three criteria here.
20       And with respect to the interest being adverse,
21 I think there's two issues highlighted in the reply briefing
22 and supplemental declarations that point to the adversity of
23 the issues.
24       The first is whether Odyssey has to listen to us
25 when we can demonstrate that the charter lockup has expired.

8

1        The second issue is whether Odyssey must release
2  restrictions on the stock without preference to any
3  stockholder.
4        Now starting, Your Honor, with when the lockup
5  ends, Odyssey says they have no obligation to make a
6  determination when the lockup ends.  And we agree.  We're
7  not asking them to make that determination at all, Your
8  Honor.  But on this point, Odyssey asserts what we think is
9  somewhat of a straw man argument.  They says a transfer
10 agent, we can't know when the lockup ends, that -- we can't
11 have any way of making that determination, so we have to
12 take our instructions from the issuer, TMTG.  And in a lot
13 of cases they would be right, but this case is not one of
14 those for one critical reason, Your Honor:  Most lockups are
15 imposed by SEC Rule 144.  And under SEC Rule 144 there's a
16 lot of subjective criteria with respect to when a lockup
17 period ends.  There can be different conditions on ending a
18 lockup period based on the quality and quantity of public
19 information about the issuing company that's been publicly
20 disclosed.
21       So in those cases, Odyssey would be right, they
22 would have to go and check, verify with the issuer that the
23 conditions for terminating the lockup have occurred.
24       This case is very, very different, Your Honor.
25 Here we have a publicly disclosed charter lockup that

9

1  expires when the trading price of TMTG's stock is equal to
2  or exceeds $12 a share for any 20 trading days within a
3  30-day trading period starting on August 22, 2024.  These
4  conditions have been publicly disclosed in TMTG's SEC
5  filings and in TMTG's second-amended charter filed with the
6  Delaware Secretary of State.
7        TMTG has also publicly said that the 20-day
8  trading period would end on September 19th, and that's at
9  our complaint at paragraph 18.
10       So the conditions for this charter lockup to end
11 are easily demonstrable and easily verifiable.  They are
12 based on historical trading prices of stock that's traded on
13 the NASDAQ.  It's not subject to reasonable dispute, it is
14 not subject to debate or interpretation.  There's no
15 subjective criteria that Odyssey has to analyze, unlike the
16 Rule 144 lockup scenario.
17       And tellingly, Your Honor, Odyssey can't point
18 to anywhere in its brief, does not cite to any case, any
19 statute, any SEC rule that says it can only take its
20 instruction from TMTG, the issuer, with respect to the
21 ending of this charter lockup.
22       To the contrary, Your Honor, Odyssey owes us a
23 duty under Delaware law, under sections 8-401 and 8-407 of
24 the UCC, as recognized by this court in the *Jing Jing* case
25 we cited in our papers.  Once the charter lockup expires

10

1  there's no doubt, no debate that all the conditions for
2  transferring UAV stock under section 8-401 will be
3  satisfied.
4  　　　　And as the Court of Chancery held nearly 40
5  years ago in the *Bender v. Memory Metals* case we cite in our
6  opening brief, the transfer agent has the duty to transfer
7  under those statutes and in those conditions.
8  　　　　Now, the -- Odyssey's supplemental declaration
9  hints, it hints that it has an obligation to listen to us,
10  but it also includes a huge hedge in TMTG's favor.
11  Specifically, in paragraph 8 of the supplemental declaration
12  notes that there's two ways Odyssey can determine whether
13  the charter lockup period has expired. The first is to be
14  instructed by TMTG. The second, the declaration states:
15  "Demonstration by UAV that the conditions proceeding for
16  removal of the restrictive legend have been satisfied based
17  on, among other things, an analysis of then prevailing
18  market conditions and the passage of time as confirmed and
19  instructed by TMTG."
20  　　　　But what would Odyssey need to confirm and get
21  instruction from TMTG about the expiration of this lockup?
22  What we're talking about is historical stock prices of a
23  stock traded on NASDAQ. There's nothing that needs to be
24  confirmed from the issuer. Odyssey can easily make this
25  confirmation based on publicly available data of TMTG's

11

1  historical stock price.
2  　　　　So Odyssey has a duty to take instruction from
3  us, and in this case, given that the conditions of the
4  charter lockup are publicly disclosed and can be easily
5  verified, Odyssey has no basis to refuse our instructions in
6  deference to TMTG.
7  　　　　And this brings me, Your Honor, to the second
8  point or the second controversy between the parties, which
9  is the release of the restrictive legends without preference
10  to any shareholder. Now on this point, Your Honor, we did
11  submit the stipulations that the parties exchanged; and
12  Odyssey objects now as they say those stipulations are
13  protected by rule 408. We are not using those stipulations
14  to try to demonstrate our claim as meritorious, that we've
15  established any element of our claim. We're required to do
16  that in our complaint and in our opening brief, and we've
17  done that. But we attached them to our reply brief because
18  the context in which these arise clearly show that there is
19  a present dispute between us and Odyssey.
20  　　　　Now, we were going to -- we were okay with that
21  form of order, even though it provided Odyssey would get its
22  instruction from TMTG, because the order specifically said
23  that the release would be without preference to any
24  shareholder and Odyssey agreed not to interfere with the
25  delivery of our stock to our broker through either the DRS

12

1  profile or DWAC transfer systems. All we did was add a
2  notice provision that Odyssey would notify us when it
3  received instruction from TMTG.
4  　　　　Odyssey then went and sought approval from TMTG
5  to enter the stipulation and came back to us with something
6  totally different. This time Odyssey wanted ambiguous
7  language that said it would release this transfer
8  restrictions on "similarly situated shareholders." Now that
9  gives to TMTG an enormous opportunity for more mischief.
10  TMTG is just simply going to say that my client isn't
11  similarly situated to Donald Trump because TMTG is suing my
12  client, and just because of the existence of this lawsuit,
13  we're not similar situated. That's what they're going to
14  say. So that language was clearly done to create an
15  ambiguity for TMTG to later exploit.
16  　　　　And then Odyssey also tried to include a
17  stipulation -- a provision in the stipulation that it did
18  not constitute -- that that stipulation did not constitute a
19  stipulation that UAV audit stock. Now, why would a transfer
20  agent want to do that? How can a transfer agent even square
21  that sort of position with the account statement saying that
22  its holding stock registered in my client's name? Similarly
23  can't get there.
24  　　　　Then Odyssey says nothing to see here, Judge, no
25  case, no controversy, there's no dispute. I mean let's be

13

1  very, very frank and real about what this dispute is. This
2  dispute is Trump Media Technology Group and its controlling
3  shareholder trying to deprive my clients of their property,
4  that's what it is. And Odyssey is being pressured and
5  forced by its client and its principle to do TMTG's dirty
6  work.
7  　　　　Now Odyssey says in its brief all of the things
8  that we are asking it to do, but it won't commit to that.
9  It won't agree to having an order be put in place to require
10  it to do that. So with respect to a practical affect and
11  benefit of a judgment, we think it couldn't even be more
12  clear in this circumstance.
13  　　　　The context in which, in which this litigation
14  has unfolded and in which TMTG has interfered plainly
15  demonstrates that without a court order specifically setting
16  forth what Odyssey's obligations owed to us are, there's
17  going to be more mischief. We don't want to have to be in
18  front of Your Honor on September 19th or September 20th on a
19  TRO.
20  　　　　This issue should be very -- between us and
21  Odyssey should be very straightforward. But for the
22  interference of one very disruptive party, we probably would
23  have an agreement with Odyssey, but Odyssey just can't get
24  past its client. And Odyssey -- you know, we have no
25  comfort that Odyssey will do this -- to do the things that

14

1    it says in its brief it will do unless there is an order
2    requiring it to do so.
3        Unless Your Honor has any questions for me, that
4    concludes my presentation.
5        THE COURT:  I understand.  All right.
6        MR. ANTHONY:  Thank you, Your Honor.
7        THE COURT:  All right.  Odyssey?
8        MR. KAUPA:  Good morning, Your Honor.  Michael
9    Kaupa for Odyssey Transfer & Trust Company.
10       THE COURT:  Mr. Kaupa, let me ask you right off
11   the bat:  If Odyssey will indeed do what it said it will do
12   in its reply brief, and that is remove the restrictions from
13   all effective shares without preference to any shareholder,
14   then why not just agree to the language that UAV proposed
15   both in the settlement agreement and in the proposed order
16   to their motion for summary judgment?
17       MR. KAUPA:  First of all, Your Honor, as you
18   know from our reply brief, we feel that the parties' private
19   settlement communicates are absolutely barred by Rule 408.
20       THE COURT:  Okay.  But what if the Court
21   disagrees and believes that there's basis to introduce that,
22   and particularly to define the case in controversy.
23       MR. KAUPA:  Sure, if you define those private
24   settlement communications -- first of all, there really is
25   no meaningful distinction between the language that they're

15

1    showing, you know, that Odyssey made on August 22nd.  Both
2    of, both versions of that provision simply state that
3    Odyssey will remove the transfer restrictions as to all TMTG
4    shareholders on an equal basis without preference to any
5    shareholder.  And you see in the declaration of Becky
6    Paulson, Odyssey's President, indeed both of her
7    declarations she's making that very, very clear.
8        So as to your question about why we wouldn't
9    just agree to it, you know, I don't have the ability to
10   really get into detail on that, part of it is privileged,
11   but also I would just that say we're an agent of TMTG and
12   TMTG may not want its agent to give special accommodations
13   to certain shareholders; and in this case, they didn't want
14   to give a special accommodation to UAV.
15       So I just want to go back to at the outset, Your
16   Honor, it's clear from their presentation that their real
17   dispute here is with TMTG.  And they couldn't get the
18   accommodations or the guarantees that they wanted from TMTG
19   and so they sued Odyssey, who is simply a new neutral
20   transfer agent, has no stake in the outcome of any dispute
21   between TMTG and UAV.
22       Their claim creates a doubt standard here.  They
23   alleged that Odyssey intends to give other TMTG shareholders
24   preferential treatment, but that's precisely what they're
25   asking here.  Their claim essentially asks this court to

16

1    award them some special accommodation that no other TMTG
2    shareholder, subject to lockup, will receive.
3        We've explained in our briefing, Your Honor,
4    that their claim fails at the outset because there's no
5    right controversy between the parties.
6        One thing is clear and that is Odyssey is not in
7    violation of any statutory duty to UAV.  Their duty --
8    Odyssey's duties to UAV don't even arise until UAV makes a
9    presentment in good order complying with the provisions of
10   8-401.  And as you know, Your Honor, one of the requirements
11   of that provision is that there's no transfer restrictions
12   on those shares.  Here's no dispute their shares are subject
13   to lockup provision, and that lockup provision remains in
14   place.  So that means UAV can't at this time make a valid
15   presentment in good order because those lockup provisions
16   don't expire yet.
17       And, indeed, they concede this on page 18 of
18   their opening brief, UAV says they're not making the claim
19   that Odyssey has violated statutory duties because their
20   lockup provisions remain in place at this time.  So without
21   a statutory basis for their claim, they make a number of
22   other arguments to try to demonstrate some ripe controversy
23   between the parties, but none of them are credible.
24       As they've already said, they believe the heart
25   of this dispute is that UAV contends that they must, Odyssey

17

1    must immediately comply with their instructions to lift the
2    transfer restrictions.  But Odyssey isn't legally obligated
3    to unilaterally determine when the lockup expires, and I
4    just heard counsel for UAV concede that.
5        So, again, determining when the restrictions
6    contained an issuer's corporate charter expire is just not
7    one of the administerial tasks an agent owner takes under
8    the UCC, and Odyssey may rely on TMTG, its agent, regarding
9    when TMTG's own restrictions expire.
10       The important thing is that Odyssey is committed
11   to lifting the lockup restrictions for all shareholders at
12   the same, without preference to the shareholder, as I have
13   already said.  So if the restriction can be removed to one,
14   it can be removed to all shareholders.
15       The only reason that Odyssey has raised a need
16   to get input from TMTG is if TMTG doesn't instruct Odyssey
17   to lift the restrictions before UAV makes its presentment,
18   and Odyssey has every reason to believe that TMTG will
19   provide instruction at the appropriate time.
20       One important thing I want to point out, Your
21   Honor, is that, you know, UAV introduces the parties'
22   private settlement discussions and you've already pointed
23   that out.  One of the things you'll notice if you look at
24   the proposed order the parties were contemplating is that
25   those, those provisions do actually allow Odyssey to act

18

1    when it receives notification from TMTG.  And if you look at
2    the provision it says:  "When notified by TMTG of the
3    expiration of the lockup provision, Odyssey shall remove
4    restrictions on transfer associated with the lockup
5    provisions from all shares of TMTG common stock that are so
6    subject."
7            So if they're willing to enter into stipulation
8    that allows Odyssey to rely on notifications from TMTG when
9    the restrictions expire, then what are we talking about
10   here?  They've already conceded that Odyssey can indeed rely
11   on TMTG's instructions as to when the lockup does indeed
12   expire.
13           So I've just explained there really is no
14   dispute about the lockup provision here, there's no dispute
15   about the fact that the UAV shares are still subject to the
16   lockup restrictions, there's no dispute about the terms of
17   those lockup restrictions.  They even concede that TMTG can
18   rely on -- that Odyssey can rely on TMTG to determine when
19   the lockup restrictions expire.
20           So without that as sort of a hook to base their
21   claim on, they make some other arguments; for instance, they
22   take issue with Odyssey's commitment to process transfer
23   requests on a first-come first-served basis.  Well, that's
24   really referring to the fact that -- particularly when you
25   have a DWAC transfer, Odyssey simply reviews and processes

19

1    DWAC transfers as they come in.  It doesn't mean that we're
2    going to prefer one shareholder over the other, we're simply
3    processing the transfer requests as they com in through the
4    DWAC system, so that doesn't make any sense either.
5            Another argument they've made is that Odyssey
6    has been uncooperative, but that's meritless.  If you look
7    at the communications of the parties that they provided in
8    their complaint, it's clear we've been communicating
9    regularly with UAV since May 31st; we've offered to provide
10   details; we've offered to provide additional information to
11   the extent that they ask for it.  All we can really do at
12   this time is cooperate and respond to their questions, and
13   we've done precisely that.
14           One final thing I wanted to discuss, Your Honor,
15   even if you find there's a ripe controversy here, you have
16   to -- this court, as you know, has wide discretion in terms
17   of entering a declaratory judgment.  And one of the things
18   that -- two things that the Courts look at in deciding
19   whether a declaratory judgment is appropriate is:  One,
20   whether the declaration would clarify and settle the legal
21   relationships between the parties; and, two, whether it
22   would afford relief from the uncertain and controversy at
23   issue.
24           As we've explained in our briefing, their
25   proposed order would do nothing to clarify or settle the

20

1    legal relations between the parties.  It only confuses
2    Odyssey's role as a transfer agent because it demands
3    assurances that Odyssey simply cannot provide.  Odyssey
4    can't guarantee that UAV will receive its freely
5    transferable shares concurrently with delivery of shares to
6    other TMTG shareholders.
7            As we've explained, whether they use the DRS or
8    DWAC to transfer shares, Odyssey doesn't control the timing
9    of when shares are delivered.  It's the shareholder's
10   broker, not Odyssey who initiates the transfer requests.  So
11   for its part Odyssey simply approves a daily DRS file or
12   DWAC requests as they come in in the normal course.  So we
13   simply can't guarantee that UAV will "receive delivery of
14   their shares at the same time as other TMTG shareholders
15   do."
16           So in sum, we ask that you deny their motion and
17   grant Odyssey's motion and dismiss this claim in its
18   entirety.  This is an untimely claim.  There's no ripe
19   dispute between the parties and there's no need for the
20   Court's intervention at that time.
21           THE COURT:  All right.  I understand.
22           MR. ANTHONY:  Your Honor, if I may briefly on
23   rebuttal?
24           THE COURT:  Yes.
25           MR. ANTHONY:  Thank you.

21

1            Your Honor, a couple of quick points.  First, my
2    friends on the other side say that there's no meaningful
3    distinction between the language, but I think I explained to
4    Your Honor why there's a pretty meaningful distinction.  We
5    heard, we heard that what really is happening here is that
6    TMTG doesn't want "special accommodation."  But look at our
7    proposed form of order that we filed with our reply brief at
8    D.I. 28.1, what special accommodation possibly could they be
9    talking about; that we get notice once TMTG gives Odyssey an
10   instruction?  I mean, everything else is that we're going
11   to -- that they're going to release the lockup restrictions
12   or the transfer restrictions without preference to anybody.
13   How is that a special accommodation?  That they're going to
14   agree not to interfere with the transfer of stock to our
15   broker via DWAC or DRS profile system, that's not a special
16   accommodation.
17           This is, this is really TMTG trying to pressure
18   its transfer agent and its transfer agent capitulating.  So
19   we heard that Odyssey is cooperating.  Well, they are now
20   because we sued them and we moved for summary judgment.
21   There was a substantive conversation, I believe the date was
22   August 8th, I believe, between Odyssey and my client's
23   broker, but that was after we moved for summary judgment.
24           And as we laid out in our --
25           THE COURT:  How do you respond to his argument

22

1 that Odyssey has no duty to determine the expiration of the
2 lockup provision?
3     MR. ANTHONY: Well, we agree, Your Honor. And
4 that's why we're -- what we're saying to Odyssey is the
5 lockup provision is -- the charter lockup is going to expire
6 based on easily verifiable demonstrable data, historical
7 stock price of a stock traded on NASDAQ. I mean, that's the
8 type of thing the Court even takes judicial notice of,
9 right. So there's -- they really can't -- either the stock
10 even traded above $12 for 20 days or it didn't; and that's
11 so easily verifiable or demonstrable. It doesn't require
12 Odyssey to make any sort of independent analysis whatsoever.
13     I mean, they certainly could, you know, in
14 30 seconds go on the Internet and verify the information
15 we're telling them about the historical stock price if they
16 needed to. They don't need to go to TMTG to get that. But
17 we're --
18     THE COURT: Even if they believe that it's not
19 their obligation and that it's the issuer who determines,
20 makes that determination and, thus, they have to wait to be
21 notified by TMTG, and even if that's the case, as long as
22 they remove the restrictions without preference to any
23 shareholder, then what's wrong with that?
24     MR. ANTHONY: Your Honor, we would agree to
25 that. And we would agree to that for really two reasons:

23

1 One is, you know, Odyssey is a transfer agent, so they
2 should be a neutral party. We don't think they have been,
3 but we agree they should be. As long as the -- as long as
4 the restrictions are lifted without preference, if TMTG will
5 not give the instruction on -- you know, if TMTG will not
6 give the instruction on the 19th or the 20th, we can deal
7 with that separately. TMTG has filed things with the SEC,
8 I've made disclosures saying this is when the lockup ends,
9 so they're going to have a real problem, you know, with
10 respect to perhaps the honesty of their SEC filings if they
11 change position. But we can deal with that.
12     The harm that we're seeking to prevent -- and,
13 again, the case law -- my friends on the other side says
14 well, we haven't even been harmed yet, the case isn't ripe:
15 that's not what the Third Circuit says about declaratory
16 judgments. But in any event, the harm that we're seeking to
17 prevent is the preferential treatment that the removal
18 restrictions are lifted disparately in favor of one, the
19 controlling shareholder to my client's expense. The
20 controlling shareholder could easily drive down the share
21 price of this stock. The company, the ticker symbol is DJT,
22 what sign is it going to show to the market if he starts
23 selling this stock to raise cash. I mean, even if he sells
24 a small portion of it, it could have substantial negative
25 impact on my client if my client's stock is locked up

24

1 unlawfully at that time. So --
2     THE COURT: All right. You got one minute.
3     MR. ANTHONY: Okay. The other point I would
4 just make, Your Honor -- and, again, we would live with that
5 as long as no preference to any single shareholder. But I
6 would say that Odyssey's assertion that they don't have to
7 take instruction from us is inconsistent with 8-401 and 8-
8 407 of the Delaware UCC. They can and are required to under
9 Delaware law take instruction from us.
10     Thank you, Your Honor.
11     THE COURT: All right. Mr. Kaupa, given that I
12 gave Mr. Anthony additional time, I'll give you two minutes
13 if you want.
14     MR. KAUPA: Thank you, Your Honor.
15     A couple of things. First of all, they are
16 indeed asking for preferential treatment here. They clearly
17 have, you know, a concern about TMTG's majority shareholder,
18 but there are other minority shareholders subject to the
19 lockup provision. So they're asking you to make an order
20 determining when they receive delivery of their shares as to
21 and compared with TMTG's majority shareholders, but there
22 are other shareholders subject to this lockup provision, so
23 they are indeed asking for special treatment here.
24     The other point that I would is they seem so
25 concerned about this lockup provision, the fact that it's

25

1 publicly available, the fact that it is publicly disclosed,
2 that's not the point. You know, lifting of the restrictions
3 is only one of the conditions that you have to satisfy for
4 Odyssey to have a statutory duty to register transfer of
5 shares. For instance, they haven't decided yet, apparently,
6 whether they're going to do a DRS or a DWAC transfer. As
7 you know from the briefing, one of the things they need to
8 provide in a DWAC transfer is a Medallion Signature
9 Guarantee authorizing them to release the shares. Well,
10 they haven't provided that yet because it's not time to do
11 that yet; they're still under the lockup restrictions.
12     So the point here is that Odyssey can't do
13 anything yet until they provide everything that's needed
14 under 8-401. And we don't even know how they are going to
15 transfer their shares, whether it is DRS, DWAC, there's
16 other documentation required if it is a DWAC transfer, so
17 this is all untimely. There's no concern about what the
18 term of lockup provision are and so there's no need for
19 Court intervention at this time.
20     THE COURT: All right. I understand.
21     All right. The Court thanks both sides for your
22 argument.
23     The Court will take the matter under advisement
24 and issue an order promptly.
25     ALL COUNSEL: Thank you, Your Honor.

1        (Whereupon, the following proceeding concluded

2   at 10:39 a.m.)

3              I hereby certify the foregoing is a true

4   and accurate transcript from my stenographic notes in the

5   proceeding.

6              /s/ Michele L. Rolfe, RPR, CRR

              U.S. District Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$12** [2] - 9:2, 22:10

## /

**/s** [1] - 26:6

## 1

**10,912,141,000** [1] - 5:9
**10:00** [1] - 2:17
**10:39** [1] - 26:2
**144** [3] - 8:15, 9:16
**15** [1] - 3:22
**18** [2] - 9:9, 16:17
**18th** [2] - 4:12, 5:11
**19th** [3] - 9:8, 13:18, 23:6
**1:24-cv-00838-GBW** [1] - 1:5

## 2

**2** [1] - 6:5
**20** [2] - 9:2, 22:10
**20-day** [1] - 9:7
**2024** [2] - 1:11, 9:3
**20th** [2] - 13:18, 23:6
**22** [1] - 9:3
**22nd** [1] - 15:1
**24-838** [1] - 2:22
**27** [1] - 1:11
**28-1** [1] - 6:5
**28.1** [1] - 21:8

## 3

**30** [2] - 5:22, 22:14
**30-day** [1] - 9:3
**31** [1] - 5:17
**31st** [1] - 19:9

## 4

**40** [1] - 10:4
**407** [1] - 24:8
**408** [2] - 11:13, 14:19

## 6

**6** [1] - 5:16
**6B** [1] - 2:17

## 7

**7** [2] - 5:22, 5:23

## 8

**8** [2] - 10:11, 24:7
**8-401** [5] - 9:23, 10:2, 16:10, 24:7, 25:14
**8-407** [1] - 9:23
**8th** [1] - 21:22

## A

**a.m** [2] - 2:17, 26:2
**ability** [2] - 4:15, 15:9
**absolutely** [1] - 14:19
**accept** [1] - 6:25
**accommodation** [6] - 15:14, 16:1, 21:6, 21:8, 21:13, 21:16
**accommodations** [2] - 15:12, 15:15
**account** [2] - 5:8, 12:21
**accurate** [1] - 26:4
**act** [1] - 17:25
**Action** [1] - 2:22
**action** [2] - 4:7, 7:15
**actively** [1] - 4:21
**add** [1] - 12:1
**additional** [2] - 19:10, 24:12
**address** [1] - 5:18
**administerial** [1] - 17:7
**adverse** [2] - 7:17, 7:20
**adversity** [1] - 7:22
**advisement** [1] - 25:23
**affect** [1] - 13:10
**affidavit** [1] - 5:11
**afford** [1] - 19:22
**agent** [15] - 4:4, 4:22, 8:10, 10:6, 12:20, 15:11, 15:12, 15:20, 17:7, 17:8, 20:2, 21:18, 23:1
**ago** [1] - 10:5
**agree** [10] - 6:18, 8:6, 13:9, 14:14, 15:9, 21:14, 22:3, 22:24, 22:25, 23:3
**agreed** [2] - 7:7, 11:24
**agreement** [2] - 13:23, 14:15
**ALL** [1] - 25:25
**alleged** [1] - 15:23
**allow** [1] - 17:25
**allows** [1] - 18:8
**ambiguities** [1] - 4:23
**ambiguity** [1] - 12:15
**ambiguous** [1] - 12:6

**amended** [2] - 5:5, 9:5
**analysis** [3] - 7:8, 10:17, 22:12
**analyze** [1] - 9:15
**AND** [2] - 1:2, 1:7
**Andrew** [1] - 3:8
**ANTHONY** [11] - 2:3, 2:25, 3:2, 3:10, 3:25, 14:6, 20:22, 20:25, 22:3, 22:24, 24:3
**Anthony** [3] - 3:3, 4:1, 24:12
**APPEARANCES** [1] - 2:1
**appearances** [1] - 2:24
**applying** [1] - 4:24
**appropriate** [2] - 17:19, 19:19
**approval** [1] - 12:4
**approves** [1] - 20:11
**argument** [5] - 2:19, 8:9, 19:5, 21:25, 25:22
**Argument** [1] - 1:11
**arguments** [4] - 5:18, 7:8, 16:22, 18:21
**arise** [2] - 11:18, 16:8
**assertion** [1] - 24:6
**asserts** [1] - 8:8
**associated** [2] - 6:8, 18:4
**assurances** [1] - 20:3
**ATLANTIC** [1] - 1:4
**Atlantic** [2] - 2:20, 3:4
**attached** [2] - 5:10, 11:17
**attention** [1] - 5:21
**Attorneys** [1] - 2:6
**audit** [1] - 12:19
**August** [4] - 1:11, 9:3, 15:1, 21:22
**authorizing** [1] - 25:9
**available** [2] - 10:25, 25:1
**avoid** [1] - 4:6
**award** [1] - 16:1

## B

**barred** [1] - 14:19
**base** [1] - 18:20
**based** [6] - 7:2, 8:18, 9:12, 10:16, 10:25, 22:6
**basis** [6] - 5:25, 11:5, 14:21, 15:4, 16:21, 18:23
**bat** [1] - 14:11
**became** [1] - 4:12

**Becky** [1] - 15:5
**BEFORE** [1] - 1:14
**beginning** [1] - 2:17
**behalf** [5] - 3:3, 3:10, 3:15, 3:19, 4:1
**behind** [1] - 3:7
**believes** [1] - 14:21
**Bender** [1] - 10:5
**benefit** [2] - 7:18, 13:11
**BERGER** [1] - 2:2
**Berger** [1] - 3:3
**between** [12] - 11:8, 11:19, 13:20, 14:25, 15:21, 16:5, 16:23, 19:21, 20:1, 20:19, 21:3, 21:22
**BIDDLE** [1] - 2:5
**Biddle** [2] - 3:15, 3:18
**brief** [17] - 4:25, 5:22, 5:23, 6:4, 7:1, 7:3, 7:12, 9:18, 10:6, 11:16, 11:17, 13:7, 14:1, 14:12, 14:18, 16:18, 21:7
**briefing** [8] - 5:19, 6:14, 6:19, 7:8, 7:21, 16:3, 19:24, 25:7
**briefly** [1] - 20:22
**brings** [1] - 11:7
**broker** [4] - 11:25, 20:10, 21:15, 21:23
**BY** [1] - 2:3

## C

**cannot** [2] - 5:7, 20:3
**capitulating** [1] - 21:18
**case** [16] - 4:6, 7:10, 7:14, 7:16, 8:13, 8:24, 9:18, 9:24, 10:5, 11:3, 12:25, 14:22, 15:13, 22:21, 23:13, 23:14
**Case** [1] - 1:5
**cases** [2] - 8:13, 8:21
**cash** [1] - 23:23
**certain** [1] - 15:13
**certainly** [1] - 22:13
**certify** [1] - 26:3
**Chancery** [1] - 10:4
**change** [1] - 23:11
**charter** [12] - 5:5, 7:25, 8:25, 9:5, 9:10, 9:21, 9:25, 10:13, 11:4, 17:6, 22:5
**check** [1] - 8:22
**Circuit** [2] - 7:13, 23:15

**circumstance** [1] - 13:12
**cite** [2] - 9:18, 10:5
**cited** [2] - 7:16, 9:25
**cites** [1] - 7:12
**civil** [1] - 2:22
**claim** [10] - 11:14, 11:15, 15:22, 15:25, 16:4, 16:18, 16:21, 18:21, 20:17, 20:18
**claims** [1] - 5:13
**clarify** [2] - 19:20, 19:25
**clear** [5] - 13:12, 15:7, 15:16, 16:6, 19:8
**clearly** [3] - 11:18, 12:14, 24:16
**client** [8] - 4:8, 6:17, 6:22, 12:10, 12:12, 13:5, 13:24, 23:25
**client's** [4] - 12:22, 21:22, 23:19, 23:25
**clients** [2] - 3:8, 13:3
**colleague** [2] - 3:6, 3:17
**com** [1] - 19:3
**comfort** [1] - 13:25
**commit** [1] - 13:8
**commitment** [1] - 18:22
**committed** [1] - 17:10
**common** [2] - 6:9, 18:5
**communicates** [1] - 14:19
**communicating** [1] - 19:8
**communications** [2] - 14:24, 19:7
**Company** [4] - 2:7, 2:21, 3:16, 14:9
**company** [2] - 1:5, 8:19, 23:21
**COMPANY** [1] - 1:7
**compared** [1] - 24:21
**complaint** [3] - 9:9, 11:16, 19:8
**comply** [1] - 17:1
**complying** [1] - 16:9
**concede** [3] - 16:17, 17:4, 18:17
**conceded** [1] - 18:10
**concern** [2] - 24:17, 25:17
**concerned** [1] - 24:25
**concluded** [1] - 26:1
**concludes** [1] - 14:4
**conclusive** [1] - 7:18
**concurrently** [1] - 20:5

**conditions** [10] - 8:17, 8:23, 9:4, 9:10, 10:1, 10:7, 10:15, 10:18, 11:3, 25:3
**confirm** [1] - 10:20
**confirmation** [1] - 10:25
**confirmed** [2] - 10:18, 10:24
**confuses** [1] - 20:1
**considering** [1] - 3:11
**considers** [1] - 5:15
**constitute** [2] - 12:18
**contained** [2] - 5:4, 17:6
**contemplating** [1] - 17:24
**contends** [1] - 16:25
**context** [2] - 11:18, 13:13
**continues** [1] - 7:5
**contrary** [2] - 4:5, 9:22
**contrast** [1] - 6:3
**control** [1] - 20:8
**controlling** [5] - 4:9, 4:18, 13:2, 23:19, 23:20
**controversy** [9] - 7:11, 7:14, 11:8, 12:25, 14:22, 16:5, 16:22, 19:15, 19:22
**conversation** [1] - 21:21
**cooperate** [1] - 19:12
**cooperating** [1] - 21:19
**corporate** [1] - 17:6
**corporation** [1] - 1:7
**counsel** [2] - 3:6, 17:4
**COUNSEL** [1] - 25:25
**couple** [2] - 21:1, 24:15
**course** [1] - 20:12
**court** [5] - 6:24, 9:24, 13:15, 15:25, 19:16
**Court** [12] - 3:2, 3:11, 6:19, 7:4, 7:6, 10:4, 14:20, 22:8, 25:19, 25:21, 25:23, 26:6
**COURT** [18] - 1:1, 1:15, 2:18, 3:1, 3:9, 3:13, 3:20, 14:5, 14:7, 14:10, 14:20, 20:21, 20:24, 21:25, 22:18, 24:2, 24:11, 25:20
**Court's** [3] - 5:19, 5:21, 20:20
**Courtroom** [1] - 2:17
**Courts** [1] - 19:18

**create** [2] - 4:22, 12:14
**creates** [1] - 15:22
**credible** [1] - 16:23
**criteria** [3] - 7:19, 8:16, 9:15
**critical** [1] - 8:14
**cross** [1] - 2:20
**CRR** [2] - 1:25, 26:6
**cut** [1] - 5:20

### D

**D.I** [4] - 5:17, 5:22, 6:5, 21:8
**daily** [1] - 20:11
**data** [2] - 10:25, 22:6
**Data** [1] - 7:15
**date** [1] - 21:21
**DAVID** [1] - 2:3
**David** [2] - 3:2, 4:1
**days** [2] - 9:2, 22:10
**deal** [3] - 6:21, 23:6, 23:11
**debate** [3] - 5:7, 9:14, 10:1
**decided** [1] - 25:5
**deciding** [1] - 19:18
**declaration** [5] - 5:16, 7:15, 7:17, 7:19, 10:8, 10:11, 10:14, 15:5, 19:20
**declarations** [2] - 7:22, 15:7
**declaratory** [4] - 3:12, 19:17, 19:19, 23:15
**decreases** [1] - 4:16
**Defendant** [3] - 1:8, 2:6, 2:7
**deference** [1] - 11:6
**define** [2] - 14:22, 14:23
**DELAWARE** [1] - 1:2
**Delaware** [7] - 1:4, 1:10, 6:23, 9:6, 9:23, 24:8, 24:9
**delay** [1] - 4:16
**delivered** [1] - 20:9
**delivery** [4] - 11:25, 20:5, 20:13, 24:20
**demands** [1] - 20:2
**demonstrable** [2] - 9:11, 22:6, 22:11
**demonstrate** [3] - 7:25, 11:14, 16:22
**demonstrates** [1] - 13:15
**demonstration** [1] - 10:15
**deny** [1] - 20:16
**deprive** [1] - 4:10,

13:3
**despite** [1] - 5:12
**detail** [1] - 15:10
**details** [1] - 19:10
**determination** [4] - 8:6, 8:7, 8:11, 22:20
**determine** [4] - 10:12, 17:3, 18:18, 22:1
**determines** [1] - 22:19
**determining** [2] - 17:5, 24:20
**detriment** [1] - 4:23
**different** [3] - 8:17, 8:24, 12:6
**difficult** [1] - 6:21
**dirty** [1] - 13:5
**disagrees** [1] - 14:21
**disclosed** [5] - 8:20, 8:25, 9:4, 11:4, 25:1
**disclosures** [1] - 23:8
**discretion** [1] - 19:16
**discuss** [1] - 19:14
**discussions** [1] - 17:22
**dismiss** [1] - 20:17
**disparately** [1] - 23:18
**dispute** [15] - 5:21, 7:5, 9:13, 11:19, 12:25, 13:1, 13:2, 15:17, 15:20, 16:12, 16:25, 18:14, 18:16, 20:19
**disruptive** [1] - 13:22
**distinction** [2] - 14:25, 21:3, 21:4
**District** [1] - 26:6
**DISTRICT** [3] - 1:1, 1:2, 1:15
**DJT** [1] - 23:21
**documentation** [1] - 25:16
**Donald** [2] - 4:9, 12:11
**done** [3] - 11:17, 12:14, 19:13
**doubt** [2] - 10:1, 15:22
**down** [1] - 23:20
**drastic** [1] - 4:15
**Drinker** [2] - 3:15, 3:18
**DRINKER** [1] - 2:5
**drive** [1] - 23:20
**DRS** [6] - 11:25, 20:7, 20:11, 21:15, 25:6, 25:15
**duties** [2] - 16:8, 16:19
**duty** [7] - 9:23, 10:6, 11:2, 16:7, 22:1, 25:4
**DWAC** [11] - 12:1,

18:25, 19:1, 19:4, 20:8, 20:12, 21:15, 25:6, 25:8, 25:15, 25:16

### E

**easily** [8] - 7:19, 9:11, 10:24, 11:4, 22:6, 22:11, 23:20
**effective** [3] - 4:12, 6:1, 14:13
**either** [3] - 11:25, 19:4, 22:9
**element** [1] - 11:15
**emanates** [1] - 4:7
**end** [2] - 9:8, 9:10
**ending** [2] - 8:17, 9:21
**ends** [5] - 8:5, 8:6, 8:10, 8:17, 23:8
**enormous** [1] - 12:9
**enter** [2] - 12:5, 18:7
**entering** [2] - 7:6, 19:17
**enters** [1] - 6:19
**entire** [1] - 4:7
**entirety** [1] - 20:18
**equal** [2] - 9:1, 15:4
**ESQ** [4] - 2:3, 2:3, 2:5, 2:6
**essentially** [1] - 15:25
**established** [1] - 11:15
**establishing** [1] - 7:14
**event** [1] - 23:16
**exceeds** [1] - 9:2
**exchanged** [1] - 11:11
**existence** [2] - 7:14, 12:12
**expeditious** [1] - 6:10
**expense** [1] - 23:19
**expiration** [4] - 6:6, 10:21, 18:3, 22:1
**expire** [7] - 16:16, 17:6, 17:9, 18:9, 18:12, 18:19, 22:5
**expired** [2] - 7:25, 10:13
**expires** [4] - 4:14, 9:1, 9:25, 17:3
**explained** [5] - 16:3, 18:13, 19:24, 20:7, 21:3
**exploit** [2] - 4:23, 12:15
**extent** [1] - 19:11

### F

**fact** [4] - 18:15, 18:24,

24:25, 25:1
**FAEGRE** [1] - 2:5
**Faegre** [2] - 3:15, 3:18
**fails** [1] - 16:4
**favor** [2] - 10:10, 23:18
**favors** [1] - 4:17
**fight** [1] - 4:4
**file** [1] - 20:11
**filed** [5] - 6:4, 7:1, 9:5, 21:7, 23:7
**filings** [2] - 9:5, 23:10
**final** [1] - 19:14
**first** [9] - 7:10, 7:24, 10:13, 14:17, 14:24, 18:23, 21:1, 24:15
**first-come** [1] - 18:23
**first-served** [1] - 18:23
**following** [2] - 2:16, 26:1
**FOR** [1] - 1:2
**forced** [1] - 13:5
**foregoing** [1] - 26:3
**form** [4] - 6:4, 6:25, 11:21, 21:7
**forth** [1] - 13:16
**frank** [1] - 13:1
**freely** [1] - 20:4
**friends** [2] - 21:2, 23:13
**front** [1] - 13:18

### G

**gaps** [1] - 4:22
**given** [3] - 5:8, 11:3, 24:11
**grant** [1] - 20:17
**GREGORY** [1] - 1:14
**Group** [2] - 4:8, 13:2
**Guarantee** [1] - 25:9
**guarantee** [2] - 20:4, 20:13
**guarantees** [1] - 15:18
**guys** [1] - 6:22

### H

**happy** [1] - 7:9
**harm** [3] - 4:19, 23:12, 23:16
**harmed** [1] - 23:14
**HARRY** [1] - 2:3
**Harry** [1] - 3:7
**heard** [4] - 17:4, 21:5, 21:19
**hearing** [3] - 2:16, 3:11, 4:11
**heart** [2] - 5:20, 16:24
**hedge** [1] - 10:10

**held** [2] - 2:16, 10:4
**hereby** [1] - 26:3
**highlighted** [1] - 7:21
**hints** [2] - 10:9
**historical** [5] - 9:12, 10:22, 11:1, 22:6, 22:15
**holder** [1] - 4:13
**holding** [5] - 5:6, 5:7, 5:9, 5:13, 12:22
**honesty** [1] - 23:10
**Honor** [39] - 2:25, 3:14, 3:25, 4:2, 4:5, 4:7, 4:20, 5:6, 5:19, 6:3, 6:15, 7:4, 8:4, 8:8, 8:14, 8:24, 9:17, 9:22, 11:7, 11:10, 13:18, 14:3, 14:6, 14:8, 14:17, 15:16, 16:3, 16:10, 17:21, 19:14, 20:22, 21:1, 21:4, 22:3, 22:24, 24:4, 24:10, 24:14, 25:25
**HONORABLE** [1] - 1:14
**hook** [1] - 18:20
**huge** [1] - 10:10

**I**

**immediately** [1] - 17:1
**impact** [1] - 23:25
**important** [3] - 4:2, 17:10, 17:20
**imposed** [1] - 8:15
**IN** [2] - 1:1, 1:2
**include** [1] - 12:16
**includes** [1] - 10:10
**inconsistent** [1] - 24:7
**incurring** [1] - 4:6
**indeed** [8] - 5:6, 14:11, 15:6, 16:17, 18:10, 18:11, 24:16, 24:23
**independent** [1] - 22:12
**indulgence** [1] - 5:20
**information** [3] - 8:19, 19:10, 22:14
**initiates** [1] - 20:10
**input** [1] - 17:16
**instance** [2] - 18:21, 25:5
**instruct** [1] - 17:16
**instructed** [2] - 10:14, 10:19
**instruction** [11] - 9:20, 10:21, 11:2, 11:22, 12:3, 17:19, 21:10,

23:5, 23:6, 24:7, 24:9
**instructions** [4] - 8:12, 11:5, 17:1, 18:11
**intends** [1] - 15:23
**interest** [1] - 7:20
**interests** [1] - 7:17
**interfere** [2] - 11:24, 21:14
**interfered** [2] - 7:7, 13:14
**interference** [1] - 13:22
**interfering** [1] - 4:21
**Internet** [1] - 22:14
**interpretation** [1] - 9:14
**intervention** [2] - 20:20, 25:19
**introduce** [1] - 14:21
**introduces** [1] - 17:21
**issue** [6] - 7:11, 8:1, 13:20, 18:22, 19:23, 25:24
**issuer** [2] - 8:12, 8:22, 9:20, 10:24, 22:19
**issuer's** [1] - 17:6
**issues** [2] - 7:21, 7:23
**issuing** [1] - 8:19

**J**

**JACLYN** [1] - 2:5
**Jaclyn** [1] - 3:14
**Jing** [2] - 9:24
**Judge** [1] - 12:24
**JUDGE** [1] - 1:15
**judgment** [9] - 2:20, 3:12, 7:15, 13:11, 14:16, 19:17, 19:19, 21:20, 21:23
**judgments** [1] - 23:16
**judicial** [1] - 22:8
**July** [1] - 5:11
**June** [1] - 4:12
**jurisdictions** [1] - 5:3

**K**

**KAUPA** [5] - 2:6, 14:8, 14:17, 14:23, 24:14
**Kaupa** [4] - 3:17, 14:9, 14:10, 24:11

**L**

**laid** [1] - 21:24
**language** [7] - 6:12, 6:16, 12:7, 12:14,

14:14, 14:25, 21:3
**law** [4] - 6:23, 9:23, 23:13, 24:9
**lawsuit** [1] - 12:12
**lead** [1] - 4:15
**legal** [2] - 19:20, 20:1
**legally** [1] - 17:2
**legend** [1] - 10:16
**legends** [1] - 11:9
**liabilities** [1] - 4:6
**liability** [1] - 1:4
**lift** [2] - 17:1, 17:17
**lifted** [2] - 23:4, 23:18
**lifting** [2] - 17:11, 25:2
**limited** [1] - 1:4
**listed** [1] - 4:13
**listen** [2] - 7:24, 10:9
**literally** [1] - 6:13
**litigation** [2] - 5:2, 13:13
**Litinsky** [1] - 3:8
**Litinsky's** [1] - 5:11
**live** [1] - 24:4
**LLC** [3] - 1:4, 2:21, 3:4
**LLP** [2] - 2:2, 2:5
**locked** [1] - 23:25
**lockup** [45] - 4:14, 4:17, 5:4, 5:5, 6:7, 6:8, 7:25, 8:4, 8:6, 8:10, 8:16, 8:18, 8:23, 8:25, 9:10, 9:16, 9:21, 9:25, 10:13, 10:21, 11:4, 16:2, 16:13, 16:15, 16:20, 17:3, 17:11, 18:3, 18:4, 18:11, 18:14, 18:16, 18:17, 18:19, 21:11, 22:2, 22:5, 23:8, 24:19, 24:22, 24:25, 25:11, 25:18
**lockups** [1] - 8:14
**look** [5] - 17:23, 18:1, 19:6, 19:18, 21:6

**M**

**Mack** [1] - 7:16
**majority** [3] - 4:14, 24:17, 24:21
**man** [1] - 8:9
**MARASCO** [2] - 2:5, 3:14
**Marasco** [1] - 3:15
**market** [2] - 10:18, 23:22
**matter** [2] - 4:24, 25:23
**McDermott** [1] - 3:3
**MCDERMOTT** [1] - 2:2

**mean** [6] - 12:25, 19:1, 21:10, 22:7, 22:13, 23:23
**meaningful** [3] - 14:25, 21:2, 21:4
**means** [2] - 5:25, 16:14
**Medallion** [1] - 25:8
**Media** [2] - 4:8, 13:2
**members** [1] - 3:8
**Memory** [1] - 10:5
**meritless** [1] - 19:6
**meritorious** [1] - 11:14
**Metals** [1] - 10:5
**MICHAEL** [1] - 2:6
**Michael** [2] - 3:17, 14:8
**Michele** [2] - 1:25, 26:6
**Minnesota** [1] - 1:7
**minority** [1] - 24:18
**minute** [1] - 24:2
**minutes** [2] - 3:22, 24:12
**mischief** [2] - 12:9, 13:17
**morning** [6] - 2:18, 2:25, 3:1, 3:11, 3:14, 14:8
**Moss** [1] - 3:8
**most** [1] - 8:14
**motion** [4] - 4:11, 14:16, 20:16, 20:17
**motions** [1] - 2:20
**moved** [2] - 21:20, 21:23
**MR** [14] - 2:25, 3:2, 3:10, 3:25, 14:6, 14:8, 14:17, 14:23, 20:22, 20:25, 22:3, 22:24, 24:3, 24:14
**MS** [1] - 3:14
**multiple** [1] - 5:3
**must** [3] - 8:1, 16:25, 17:1

**N**

**name** [2] - 5:10, 12:22
**NASDAQ** [3] - 9:13, 10:23, 22:7
**nearly** [1] - 10:4
**need** [7] - 7:7, 10:20, 17:15, 20:19, 22:16, 25:7, 25:18
**needed** [2] - 22:16, 25:13
**needs** [2] - 6:21, 10:23
**negative** [1] - 23:24

**neutral** [2] - 15:19, 23:2
**new** [1] - 15:19
**none** [1] - 16:23
**normal** [1] - 20:12
**note** [1] - 4:2
**NOTE** [1] - 2:16
**noted** [2] - 4:11, 6:15
**notes** [2] - 10:12, 26:4
**nothing** [3] - 10:23, 12:24, 19:25
**notice** [4] - 12:2, 17:23, 21:9, 22:8
**notification** [1] - 18:1
**notifications** [1] - 18:8
**notified** [3] - 6:6, 18:2, 22:21
**notify** [1] - 12:2
**number** [1] - 16:21

**O**

**objectionable** [1] - 7:2
**objects** [1] - 11:12
**obligated** [1] - 17:2
**obligation** [3] - 8:5, 10:9, 22:19
**obligations** [2] - 5:14, 13:16
**occurred** [1] - 8:23
**ODYSSEY** [1] - 1:7
**Odyssey** [96] - 2:6, 2:21, 2:24, 3:16, 3:19, 4:4, 4:24, 5:1, 5:5, 5:7, 5:8, 5:12, 5:13, 5:15, 5:23, 6:1, 6:7, 6:13, 6:15, 6:17, 6:18, 6:20, 6:21, 7:2, 7:5, 7:11, 7:12, 7:17, 7:24, 8:1, 8:5, 8:8, 8:21, 9:15, 9:17, 9:22, 10:12, 10:20, 10:24, 11:2, 11:5, 11:12, 11:19, 11:21, 11:24, 12:2, 12:4, 12:6, 12:16, 12:24, 13:4, 13:7, 13:21, 13:23, 13:24, 13:25, 14:7, 14:9, 14:11, 15:1, 15:3, 15:19, 15:23, 16:6, 16:19, 16:25, 17:2, 17:8, 17:10, 17:15, 17:16, 17:18, 17:25, 18:3, 18:8, 18:10, 18:18, 18:25, 19:5, 20:3, 20:8, 20:10, 20:11, 21:9, 21:19, 21:22, 22:1, 22:4, 22:12, 23:1, 25:4, 25:12

**Odyssey's** [10] - 4:8, 5:22, 10:8, 13:16, 15:6, 16:8, 18:22, 20:2, 20:17, 24:6
**OF** [1] - 1:2
**offered** [2] - 19:9, 19:10
**once** [2] - 9:25, 21:9
**one** [19] - 7:6, 8:13, 8:14, 13:22, 16:6, 16:10, 17:7, 17:13, 17:20, 17:23, 19:2, 19:14, 19:17, 19:19, 23:1, 23:18, 24:2, 25:3, 25:7
**opening** [4] - 7:12, 10:6, 11:16, 16:18
**opportunity** [1] - 12:9
**Oral** [1] - 1:11
**oral** [2] - 2:19
**order** [20] - 5:15, 6:4, 6:5, 6:20, 6:24, 6:25, 7:6, 11:21, 11:22, 13:9, 13:15, 14:1, 14:15, 16:9, 16:15, 17:24, 19:25, 21:7, 24:19, 25:24
**outcome** [1] - 15:20
**outset** [3] - 4:2, 15:15, 16:4
**outstanding** [1] - 4:14
**owed** [1] - 13:16
**owes** [2] - 5:13, 9:22
**own** [1] - 17:9
**owner** [1] - 17:7
**owns** [1] - 4:14

**P**

**page** [3] - 5:22, 16:17
**papers** [1] - 9:25
**paragraph** [4] - 5:16, 6:5, 9:9, 10:11
**part** [2] - 15:10, 20:11
**particularly** [2] - 14:22, 18:24
**parties** [10] - 2:23, 11:8, 11:11, 16:5, 16:23, 17:24, 19:7, 19:21, 20:1, 20:19
**parties'** [2] - 14:18, 17:21
**party** [2] - 13:22, 23:2
**passage** [1] - 10:18
**past** [1] - 13:24
**Paulson** [1] - 15:6
**perhaps** [1] - 23:10
**period** [6] - 6:10, 8:17, 8:18, 9:3, 9:8, 10:13
**petition** [1] - 3:12

**pick** [1] - 4:3
**Pittsburgh** [1] - 7:16
**place** [3] - 13:9, 16:14, 16:20
**plainly** [1] - 13:14
**plaintiff** [2] - 3:3, 3:24
**Plaintiff** [2] - 1:5, 2:4
**point** [10] - 7:22, 8:8, 9:17, 11:8, 11:10, 17:20, 24:3, 24:24, 25:2, 25:12
**pointed** [1] - 17:22
**points** [1] - 21:1
**portion** [1] - 23:24
**position** [2] - 12:21, 23:11
**possibly** [1] - 21:8
**practical** [2] - 7:18, 13:10
**precisely** [2] - 15:24, 19:13
**prefer** [1] - 19:2
**preference** [12] - 6:2, 6:10, 8:2, 11:9, 11:23, 14:13, 15:4, 17:12, 21:12, 22:22, 23:4, 24:5
**preferential** [3] - 15:24, 23:17, 24:16
**prepared** [3] - 5:18, 6:18, 6:25
**present** [1] - 11:19
**presentation** [3] - 3:22, 14:4, 15:16
**presenting** [1] - 3:18
**presentment** [4] - 5:15, 16:9, 16:15, 17:17
**President** [1] - 15:6
**pressure** [2] - 4:24, 21:17
**pressured** [1] - 13:4
**pretty** [1] - 21:4
**prevailing** [1] - 10:17
**prevent** [2] - 23:12, 23:17
**previously** [1] - 6:16
**price** [6] - 4:16, 9:1, 11:1, 22:7, 22:15, 23:21
**prices** [2] - 9:12, 10:22
**principle** [2] - 6:17, 13:5
**private** [3] - 14:18, 14:23, 17:22
**privileged** [1] - 15:10
**problem** [1] - 23:9
**proceeding** [3] - 10:15, 26:1, 26:5

**process** [1] - 18:22
**processes** [1] - 18:25
**processing** [1] - 19:3
**profile** [2] - 12:1, 21:15
**promptly** [1] - 25:24
**property** [5] - 4:10, 5:6, 5:7, 5:13, 13:3
**propose** [1] - 6:12
**proposed** [9] - 6:4, 6:5, 6:16, 7:6, 14:14, 14:15, 17:24, 19:25, 21:7
**proposition** [1] - 7:13
**protected** [1] - 11:13
**provide** [6] - 17:19, 19:9, 19:10, 20:3, 25:8, 25:13
**provided** [3] - 11:21, 19:7, 25:10
**provision** [15] - 12:2, 12:17, 15:2, 16:11, 16:13, 18:2, 18:3, 18:14, 22:2, 22:5, 24:19, 24:22, 24:25, 25:18
**provisions** [7] - 6:7, 6:8, 16:9, 16:15, 16:20, 17:25, 18:5
**public** [1] - 8:18
**publicly** [8] - 8:19, 8:25, 9:4, 9:7, 10:25, 11:4, 25:1
**put** [2] - 2:23, 13:9

**Q**

**quality** [1] - 8:18
**quantity** [1] - 8:18
**questions** [3] - 3:23, 14:3, 19:12
**quick** [1] - 21:1
**quite** [1] - 4:5

**R**

**raise** [1] - 23:23
**raised** [1] - 17:15
**read** [1] - 3:21
**real** [3] - 13:1, 15:16, 23:9
**really** [11] - 5:20, 6:22, 14:24, 15:10, 18:13, 18:24, 19:11, 21:5, 21:17, 22:9, 22:25
**reason** [3] - 8:14, 17:15, 17:18
**reasonable** [1] - 9:13
**reasonably** [1] - 6:10
**reasons** [1] - 22:25

**REATH** [1] - 2:5
**Reath** [2] - 3:15, 3:18
**rebuttal** [1] - 20:23
**receive** [4] - 16:2, 20:4, 20:13, 24:20
**received** [1] - 12:3
**receives** [1] - 18:1
**recognized** [1] - 9:24
**refer** [1] - 3:4
**referring** [1] - 18:24
**refuse** [1] - 11:5
**regarding** [1] - 17:8
**register** [1] - 25:4
**registered** [2] - 5:10, 12:22
**registration** [1] - 4:12
**regularly** [1] - 19:9
**relations** [1] - 20:1
**relationship** [1] - 4:21
**relationships** [1] - 19:21
**release** [7] - 4:17, 8:1, 11:9, 11:23, 12:7, 21:11, 25:9
**relentlessly** [1] - 4:10
**relief** [1] - 19:22
**relies** [1] - 7:11
**rely** [5] - 17:8, 18:8, 18:10, 18:18
**remain** [1] - 16:20
**remains** [1] - 16:13
**removal** [2] - 10:16, 23:17
**remove** [7] - 5:24, 6:1, 6:7, 14:12, 15:3, 18:3, 22:22
**removed** [2] - 17:13, 17:14
**reply** [12] - 4:20, 5:22, 5:23, 6:4, 6:15, 7:1, 7:3, 7:21, 11:17, 14:12, 14:18, 21:7
**report** [1] - 2:24
**REPORTER'S** [1] - 2:16
**requests** [4] - 18:23, 19:3, 20:10, 20:12
**require** [3] - 6:12, 13:9, 22:11
**required** [4] - 6:23, 11:15, 24:8, 25:16
**requirements** [1] - 16:10
**requires** [1] - 6:23
**requiring** [2] - 6:20, 14:2
**resist** [1] - 7:5
**resolve** [2] - 4:24, 7:5
**respect** [5] - 7:20, 8:16, 9:20, 13:10,

23:10
**respond** [2] - 19:12, 21:25
**restriction** [1] - 17:13
**restrictions** [25] - 5:24, 6:1, 6:7, 8:2, 12:8, 14:12, 15:3, 16:11, 17:2, 17:5, 17:9, 17:11, 17:17, 18:4, 18:9, 18:16, 18:17, 18:19, 21:11, 21:12, 22:22, 23:4, 23:18, 25:2, 25:11
**restrictive** [2] - 10:16, 11:9
**retaliatory** [1] - 5:4
**reviews** [1] - 18:25
**ripe** [4] - 16:22, 19:15, 20:18, 23:14
**rise** [1] - 4:3
**role** [1] - 20:2
**Rolfe** [2] - 1:25, 26:6
**RPR** [2] - 1:25, 26:6
**Rule** [4] - 8:15, 9:16, 14:19
**rule** [2] - 9:19, 11:13

**S**

**satisfactory** [1] - 4:25
**satisfied** [2] - 10:3, 10:16
**satisfy** [2] - 7:19, 25:3
**Saver** [1] - 7:15
**scenario** [1] - 9:16
**seated** [1] - 2:18
**SEC** [6] - 8:15, 9:4, 9:19, 23:7, 23:10
**second** [6] - 5:4, 8:1, 9:5, 10:14, 11:7, 11:8
**second-amended** [1] - 9:5
**seconds** [1] - 22:14
**Secretary** [1] - 9:6
**section** [1] - 10:2
**sections** [1] - 9:23
**security** [1] - 4:13
**see** [2] - 12:24, 15:5
**seek** [1] - 4:3
**seeking** [2] - 23:12, 23:16
**seem** [1] - 24:24
**sell** [1] - 4:15
**selling** [2] - 4:13, 23:23
**sells** [1] - 23:23
**sense** [1] - 19:4
**separately** [1] - 23:7
**September** [3] - 9:8,

Page 4 to 4 of 5

13:18
**served** [1] - 18:23
**setting** [1] - 13:15
**settle** [2] - 19:20, 19:25
**settlement** [4] - 14:15, 14:19, 14:24, 17:22
**shall** [2] - 6:7, 18:3
**share** [3] - 4:16, 9:2, 23:20
**shareholder** [17] - 4:9, 4:18, 6:2, 6:11, 11:10, 11:24, 13:3, 14:13, 15:5, 16:2, 17:12, 19:2, 22:23, 23:19, 23:20, 24:5, 24:17
**shareholder 's** [1] - 20:9
**shareholders** [12] - 5:25, 12:8, 15:4, 15:13, 15:23, 17:11, 17:14, 20:6, 20:14, 24:18, 24:21, 24:22
**shares** [18] - 5:9, 5:24, 6:2, 6:9, 14:13, 16:12, 18:5, 18:15, 20:5, 20:8, 20:9, 20:14, 24:20, 25:5, 25:9, 25:15
**Shenton** [2] - 3:7
**SHENTON** [1] - 2:3
**short** [2] - 4:9, 4:16
**show** [3] - 7:16, 11:18, 23:22
**showing** [2] - 5:8, 15:1
**side** [3] - 3:22, 21:2, 23:13
**sides** [1] - 25:21
**sign** [1] - 23:22
**Signature** [1] - 25:8
**similar** [1] - 12:13
**similarly** [4] - 5:25, 12:8, 12:11, 12:22
**simply** [9] - 3:5, 12:10, 15:2, 15:19, 18:25, 19:2, 20:3, 20:11, 20:13
**single** [1] - 24:5
**sitting** [1] - 3:7
**situated** [4] - 5:25, 12:8, 12:11, 12:13
**small** [1] - 23:24
**somewhat** [1] - 8:9
**sort** [3] - 12:21, 18:20, 22:12
**sought** [1] - 12:4
**special** [8] - 15:12, 15:14, 16:1, 21:6,

21:8, 21:13, 21:15, 24:23
**specifically** [3] - 10:11, 11:22, 13:15
**speedy** [1] - 4:11
**square** [1] - 12:20
**stake** [1] - 15:20
**standard** [3] - 7:12, 7:13, 15:22
**start** [2] - 3:24, 7:10
**started** [1] - 2:23
**starting** [2] - 8:4, 9:3
**starts** [1] - 23:22
**State** [1] - 9:6
**state** [1] - 15:2
**statement** [3] - 4:12, 5:8, 12:21
**STATES** [2] - 1:1, 1:15
**states** [1] - 10:14
**statute** [1] - 9:19
**statutes** [1] - 10:7
**statutory** [4] - 16:7, 16:19, 16:21, 25:4
**stenographic** [1] - 26:4
**Step** [1] - 7:15
**Step-Saver** [1] - 7:15
**still** [2] - 18:15, 25:11
**stipulation** [5] - 12:5, 12:17, 12:18, 12:19, 18:7
**stipulations** [3] - 11:11, 11:12, 11:13
**stock** [25] - 4:4, 4:15, 4:17, 4:22, 5:9, 6:9, 8:2, 9:1, 9:12, 10:2, 10:22, 10:23, 11:1, 11:25, 12:19, 12:22, 18:5, 21:14, 22:7, 22:9, 22:15, 23:21, 23:23, 23:25
**stockholder** [1] - 8:3
**straight** [1] - 5:20
**straightforward** [2] - 7:4, 13:21
**straw** [1] - 8:9
**subject** [9] - 6:9, 9:13, 9:14, 16:2, 16:12, 18:6, 18:15, 24:18, 24:22
**subjective** [2] - 8:16, 9:15
**submissions** [1] - 3:21
**submit** [2] - 7:4, 11:11
**substantial** [2] - 4:18, 23:24
**substantive** [1] - 21:21
**sued** [2] - 15:19, 21:20

**suing** [1] - 12:11
**sum** [1] - 20:16
**summary** [4] - 2:20, 14:16, 21:20, 21:23
**supplemental** [4] - 5:16, 7:22, 10:8, 10:11
**symbol** [1] - 23:21
**system** [2] - 19:4, 21:15
**systems** [1] - 12:1
**Systems** [1] - 7:15

## T

**table** [1] - 3:6
**tasks** [1] - 17:7
**Technology** [2] - 4:8, 13:2
**tellingly** [1] - 9:17
**term** [1] - 25:18
**terminating** [1] - 8:23
**terms** [2] - 18:16, 19:16
**THE** [18] - 1:1, 1:2, 2:18, 3:1, 3:9, 3:13, 3:20, 14:5, 14:7, 14:10, 14:20, 20:21, 20:24, 21:25, 22:18, 24:2, 24:11, 25:20
**they've** [3] - 16:24, 18:10, 19:5
**Third** [2] - 7:13, 23:15
**three** [2] - 7:16, 7:19
**ticker** [1] - 23:21
**timing** [1] - 20:8
**TMTG** [54] - 4:8, 4:20, 4:23, 5:3, 5:9, 6:6, 6:9, 6:11, 6:17, 6:22, 7:7, 8:12, 9:7, 9:20, 10:14, 10:19, 10:21, 11:6, 11:22, 12:3, 12:4, 12:9, 12:10, 12:11, 12:15, 13:14, 15:3, 15:11, 15:12, 15:17, 15:18, 15:21, 15:23, 16:1, 17:8, 17:16, 17:18, 18:1, 18:2, 18:5, 18:8, 18:17, 18:18, 20:6, 20:14, 21:6, 21:9, 21:17, 22:16, 22:21, 23:4, 23:5, 23:7
**TMTG's** [14] - 4:12, 4:14, 4:18, 5:4, 9:1, 9:4, 9:5, 10:10, 10:25, 13:5, 17:9, 18:11, 24:17, 24:21
**today** [6] - 3:4, 3:6, 3:17, 3:19, 4:3, 4:7

**totally** [1] - 12:6
**traded** [4] - 9:12, 10:23, 22:7, 22:10
**trading** [5] - 9:1, 9:2, 9:3, 9:8, 9:12
**transcript** [1] - 26:4
**transfer** [31] - 4:4, 4:22, 6:8, 8:9, 10:6, 12:1, 12:7, 12:19, 12:20, 15:3, 15:20, 16:11, 17:2, 18:4, 18:22, 18:25, 19:3, 20:2, 20:8, 20:10, 21:12, 21:14, 21:18, 23:1, 25:4, 25:6, 25:8, 25:15, 25:16
**TRANSFER** [1] - 1:7
**Transfer** [5] - 2:6, 2:21, 2:24, 3:16, 14:9
**transferable** [1] - 20:5
**transferring** [1] - 10:2
**transfers** [1] - 19:1
**treatment** [4] - 15:24, 23:17, 24:16, 24:23
**tried** [1] - 12:16
**TRO** [1] - 13:19
**true** [1] - 26:3
**Trump** [5] - 4:8, 4:9, 4:13, 12:11, 13:2
**TRUST** [1] - 1:7
**Trust** [4] - 2:7, 2:21, 3:16, 14:9
**try** [2] - 11:14, 16:22
**trying** [4] - 4:10, 4:22, 13:3, 21:17
**Tuesday** [1] - 1:11
**turn** [1] - 7:9
**two** [6] - 7:21, 10:12, 19:18, 19:21, 22:25, 24:12
**type** [1] - 22:8

## U

**U.S** [1] - 26:6
**UAV** [26] - 3:5, 3:10, 4:1, 4:18, 4:25, 5:13, 5:14, 10:2, 10:15, 12:19, 14:14, 15:14, 15:21, 16:7, 16:8, 16:14, 16:18, 16:25, 17:4, 17:17, 17:21, 18:15, 19:9, 20:4, 20:13
**UAV's** [7] - 3:8, 4:17, 4:23, 5:7, 5:10, 5:13, 5:24
**UCC** [3] - 9:24, 17:8, 24:8

**uncertain** [1] - 19:22
**uncooperative** [1] - 19:6
**under** [10] - 8:15, 9:23, 10:2, 10:7, 17:7, 24:8, 25:11, 25:14, 25:23
**unfolded** [1] - 13:14
**unfortunately** [1] - 5:2
**unilaterally** [1] - 17:3
**UNITED** [3] - 1:1, 1:4, 1:15
**United** [2] - 2:20, 3:4
**unlawful** [1] - 5:4
**unlawfully** [1] - 24:1
**unless** [3] - 5:14, 14:1, 14:3
**unlike** [1] - 9:15
**untimely** [2] - 20:18, 25:17
**up** [1] - 23:25

## V

**valid** [2] - 5:15, 16:14
**VENTURES** [1] - 1:4
**Ventures** [2] - 2:21, 3:4
**verifiable** [3] - 9:11, 22:6, 22:11
**verified** [1] - 11:5
**verify** [2] - 8:22, 22:14
**versions** [1] - 15:2
**versus** [1] - 2:21
**via** [1] - 21:15
**violated** [1] - 16:19
**violation** [1] - 16:7

## W

**wait** [1] - 22:20
**ways** [1] - 10:12
**Wes** [1] - 3:8
**whatsoever** [2] - 5:14, 22:12
**wide** [1] - 19:16
**WILLIAMS** [1] - 1:14
**willing** [1] - 18:7
**Wilmington** [1] - 1:10
**writes** [1] - 5:23

## Y

**years** [1] - 10:5

# EXHIBIT C

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED ATLANTIC VENTURES, LLC,
a Delaware limited liability company,

*Plaintiff*,

v.

ODYSSEY TRANSFER AND TRUST
COMPANY,

*Defendant*.

C.A. No. 1:24-cv-00838-GBW

## DECLARATION OF BECKY PAULSON IN OPPOSITION TO UAV'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ODYSSEY'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, Becky Paulson, declare under penalty of perjury under the laws of the United States of America, that:

1.      I am President of defendant Odyssey Transfer and Trust Company ("Odyssey"). I have been employed by Odyssey since 2022.

2.      I have more than 27 years of experience in the financial services industry, first at Wells Fargo, then Equiniti Trust Company, and now, Odyssey.  I have extensive experience in the operations and processes of stock transfer agents.

3.      I am competent to testify and have knowledge of the facts stated herein.

4.      Odyssey is the transfer agent for Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp. ("TMTG" or the "Issuer") pursuant to a written transfer agent agreement ("Agreement"). Pursuant to that Agreement,

Odyssey maintains TMTG's shareholder books and records, issues shares of TMTG upon its request, and processes requests for transfers of registered ownership of TMTG's stock when presented in good order.

5.  Upon information and belief, in accordance with a prior decision issued by the Delaware Court of Chancery, UAV is the registered holder of 10,912,141 TMTG common stock shares ("Shares")

6.  The Shares are uncertificated,[1] recorded in book entry form, and are subject to a restrictive legend ("Restrictive Legend") that restricts the Shares from transfer based upon lockup provisions embodied in TMTG's Second Amended and Restated Certificate of Incorporation ("Second Amended Charter").

7.  Transfer agents perform ministerial functions as agents for disclosed principals.  The process to transfer shares is initiated by a shareholder (or its broker) making a request and proper presentment to a transfer agent.

8.  For a transfer request to be in good order, such that a transfer agent may comply with the request, a shareholder must demonstrate that it has satisfied all of the preconditions to transfer set forth in Section 8-401 of the Uniform Commercial Code.  The onus is on the presenter, not the transfer agent, to provide documentation or other evidence that the conditions have been satisfied.  One of those conditions is

---

[1] "Uncertificated security" means a security that is not represented by a certificate. 6 *Del. C.* § 8-102(18).

that the request must comply with restrictions on transfer imposed by an issuer.  If, at the time a request is made, any of the conditions have not been satisfied, the transfer agent will reject the request as not being in good order.

9.      In the ordinary course, if UAV sought removal of the Restrictive Legend, Odyssey would require that UAV provide a written instruction that requests the removal of the Restrictive Legend, together with documentation demonstrating that such removal is in accordance with the lock-up provision in the Second Amended Charter.  If it appeared that the request was in good order, i.e., UAV showed that it had satisfied the conditions of the applicable lockup provision, Odyssey would then consult with its principal, TMTG, to confirm that removal was indeed appropriate and request authorization to remove the Restrictive Legend.

10.     Once Odyssey receives instruction from TMTG to remove the Restrictive Legend, Odyssey will lift the restrictions for all shares subject to such restrictions, treating other similarly situated shareholders equally.  Upon information and belief, Odyssey expects and anticipates that, once the relevant lockup period expires, TMTG will instruct Odyssey accordingly, after which Odyssey will simultaneously remove the Restrictive Legend (and substantively equivalent legends) from the shares of all similarly locked up shareholders.

11.     The request for removal of a restrictive legend and a request to transfer registered ownership of shares to a broker are two distinct requests, although they may be executed simultaneously.

12.     There are two primary ways in which book entry securities may be transferred to a broker: (1) via a service called Deposit/Withdrawal at Custodian ("DWAC"); and (2) via the Direct Registration System ("DRS").  It is important to note that both services, DWAC and DRS, require the shareholder's broker to initiate a request for transfer.  A transfer agent cannot initiate a transfer through these services.

13.     If a request to transfer is made via DWAC, the shareholder provides to the transfer agent: (1) a written instruction to transfer executed by an authorized signatory; (2) evidence of such authority to sign on behalf of the shareholder, if required per the transfer agent's procedures; and (3) a medallion signature guarantee of the authorized signature.  Then, the shareholder's broker submits a 'withdrawal DWAC' request electronically in the Depository Trust Company's ("DTC") Securities Processing Application ("SPA").  If the transfer agent can match the broker's DWAC request in SPA to the instructions provided to the transfer agent by the shareholder, the transfer agent approves the DWAC transaction and the shares are immediately credited to the broker's DTC participant position.  The broker then

follows its internal procedures, which are unknown to Odyssey, to credit the shares to the shareholder's account at the broker.

14.     If a request to transfer is made via DRS, the transaction is initiated by the shareholder's broker in DTC's Participant Terminal System (PTS)/Participant Browser System (PBS). A valid surety or insurance number must be submitted with the instructions from the initiating broker. DRS transaction requests submitted properly are captured in a file that is delivered from DTC to the transfer agent once per business day.   The shares requested to be transferred by the broker are automatically transferred once the file from DTC is matched against the transfer agent's recordkeeping system and the transactions are approved by the transfer agent.

15.     In either situation, whether by DWAC or DRS, there is no delivery of the book entry shares by the transfer agent; rather, the onus is on the shareholder's broker to initiate the request for transfer electronically.   The transfer agent either approves the DWAC in DTC's SPA or approves the daily DRS file from DTC.  The transfer happens electronically in both transaction types.

16.     On August 7, 2024, I and Julie Fischbach, Odyssey's Client Services Director, had a call with representatives of UAV's broker, regarding transfer logistics under hypothetical scenarios.  During that call, we reiterated that removal of the Restrictive Legend was subject to certain conditions being met, and that

Odyssey would take direction from TMTG. In response to the representatives' questions, we indicated that the Restrictive Legend will be removed for all holders at the same time, and DWAC transactions pending in the system would all be accepted/processed in the order they are received. We talked through the documentation needed to process a DWAC transfer, and the representatives of UAV's broker indicated they understood and would prepare such documentation in advance of the potential lockup expiration date.

17.     Thus, Odyssey respectfully requests that any Order of this Court consider and account for the limitations of Odyssey's role, as well as the capabilities imposed by the electronic services of DWAC and DRS.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: August 9, 2024

*Becky Paulson*

_____

Becky Paulson
President, Odyssey Transfer and Trust
Company